Arjun Vasan

arjun.vasan@gmail.com

12615 193rd Street

Cerritos, CA 90703

562-900-6541

Plaintiff in Pro Per

**NO**
**IFP**

**NO**
**CV-30**

**FEE DUE**

FILED

CLERK, U.S. DISTRICT COURT

DEC 23, 2024

CENTRAL DISTRICT OF CALIFORNIA

BY_____PD_____DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**Arjun Vasan**,

          Plaintiff,

    vs.

**Checkmate.com, Inc.**,

(dba "Checkmate"),

**Vishal Agarwal**,

**Michael Bell**,

**Amy Brown**,

          Defendants.

Case No.:   **2:24-cv-11116-UA**

**COMPLAINT FOR WRONGFUL TERMINATION, RETALIATION, BREACH OF CONTRACT, VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT, INVASION OF PRIVACY, AND RELATED CLAIMS**

**DEMAND FOR JURY TRIAL**

## JURISDICTION

1. This Court has jurisdiction pursuant to:

a. 28 U.S.C. § 1331, as Plaintiff asserts claims under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.

b. 28 U.S.C. § 1367, as Plaintiff's state law claims share a common nucleus of operative facts with his federal claims.

c. 28 U.S.C. § 1332, as Plaintiff is a citizen of California, Defendant's principal place of business is in New York, and the amount in controversy exceeds $75,000.

2. Plaintiff's Employment Offer explicitly designates California law as governing the terms of employment, Plaintiff primarily worked in California and was terminated there. Thus, California law governs Plaintiff's state law claims.

3. A separate Non-Competition Agreement [Exhibit I] references Delaware law and a New York forum, but these provisions are voidable under California Labor Code § 925. The 'sale-of-business' exception under Labor Code § 925(e) does not apply as Plaintiff received only nominal consideration and lacked separate counsel to negotiate any out-of-state clauses imposed as a condition of employment.

## VENUE

4. Venue is proper in this District under 28 U.S.C. § 1391(b), as a substantial portion of the events giving rise to the claims—including Plaintiff's employment duties and termination—took place in California, and in this District. Defendant also conducts business in this District.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PARTIES**

5. Plaintiff, ARJUN VASAN, is an individual residing in California. In August 2024, Plaintiff briefly moved to Texas for personal reasons but retained his California domicile (driver's license, voter registration) and returned to California in October 2024 when his health deteriorated. Defendant terminated Plaintiff's employment while he was in California, and undergoing medical care.

6. Defendant, CHECKMATE.COM, INC. (dba "Checkmate"), is a Delaware corporation with its principal place of business in New York City, New York. Checkmate conducts business in California, including employing Plaintiff and other California residents. Checkmate is vicariously liable for the acts and omissions of its officers and employees as described herein.

7. Defendant, VISHAL AGARWAL, is an individual who, at all relevant times, served as Chief Executive Officer of Checkmate. Plaintiff alleges that Agarwal directly participated in and authorized decisions related to Plaintiff's employment, leave status, and termination, acting with malice, bad faith, and a conscious disregard for Plaintiff's rights.

8. Defendant, MICHAEL BELL, is an individual who, at all relevant times, served as Chief of Strategy at Checkmate and was Plaintiff's direct supervisor. Plaintiff alleges that Bell had a longstanding history of hostility toward Plaintiff, which

Complaint

culminated in his active involvement in Plaintiff's termination. Bell acted with malice, bad faith, and a conscious disregard for Plaintiff's rights.

9. Defendant, AMY BROWN, is an individual who, at all relevant times, served as Head of Human Resources at Checkmate. Plaintiff alleges that Brown devised and executed strategies to misclassify Plaintiff's medical leave, deny Plaintiff's rights under the Family and Medical Leave Act (FMLA), and isolate Plaintiff from his team, acting with malice, bad faith, and a conscious disregard for Plaintiff's rights.

## **STATEMENT OF FACTS**

### A. BACKGROUND AND MERGER (¶¶ 7–8)

7. Plaintiff was employed by Defendants pursuant to a Merger Agreement [Exhibit A].between Checkmate and VoiceBite, a California company co-founded by Plaintiff. Plaintiff began employment with VoiceBite in July 2023, and upon the May 1, 2024 merger, Plaintiff's employment continued without interruption.

8. Checkmate is a successor-in-interest under the FMLA to Plaintiff's former employer, VoiceBite, having continued its operations, retained key employees (including Plaintiff), and assumed Plaintiff's terms of employment.

### B. KEY INDIVIDUALS (¶¶ 9–12)

9. As CEO, Defendant Agarwal was responsible for overseeing the company's strategic direction, including personnel decisions. Agarwal directly participated in Plaintiff's termination, including soliciting private emails from third parties and making pretextual statements to justify the termination.

10. As Chief of Strategy at Checkmate, Defendant Bell was Plaintiff's direct supervisor, and responsible for M&A and new product strategy. Despite Plaintiff's explicit request not to report to Bell due to a history of personal hostility and threats of termination, beginning during merger negotiations, Plaintiff was nonetheless assigned to report to him. Bell maintained a supervisory role over Plaintiff's work and was the primary advocate for Plaintiff's termination. Bell took advantage of Plaintiff's leave to undermine Plaintiff's position; re-organizing the team and re-assigning Plaintiff's direct reports.

11. As Head of HR, Defendant Brown was responsible for enforcing company policies, handling employee leave requests, and ensuring compliance with labor laws. Brown devised and executed a strategy to misclassify Plaintiff's medical leave as "unpaid personal leave," despite evidence of FMLA/CFRA eligibility, and contributed directly to Plaintiff's financial and emotional harm.

12. Defendants collectively acted in bad faith, engaging in coordinated efforts to marginalize and retaliate against Plaintiff, ultimately leading to Plaintiff's wrongful termination while on protected medical leave.

## C. EMPLOYMENT TERMS AND EARLY CONFLICTS (¶¶ 13–15)

13. Under Plaintiff's employment offer letter [Exhibit B], if terminated by the company with or without cause or if Plaintiff resigned for good reason, Plaintiff was entitled to 12 weeks of severance totaling $72,000 and one-quarter of a $200,000 performance bonus. Under a separate Bonus Agreement [Exhibit C], Plaintiff was entitled to a $500,000 retention bonus, earned on July 30, 2024, payable upon Defendants' bona fide $7,500,000 fundraising. On October 23, 2024, Defendants publicly announced a $10,000,000 Series B round [Exhibit D].

14. From the start of Plaintiff's employment, Defendants exhibited hostility towards Plaintiff's reasonable and lawful requests. When Plaintiff raised privacy and compliance concerns due to Checkmate's failure to provide or reimburse purchase of basic work equipment citing California law, Defendant Agarwal criticized and threatened to terminate him in front of his teammates.

15. When Plaintiff raised concerns about and eventually demanded overdue back pay promised to himself and his team, which had remained unpaid for months, Defendants Agarwal and Bell publicly berated Plaintiff in front of his co-founders, implying that insisting on lawful wage payment indicated disloyalty.

## D. BONUS DISPUTE AND INCREASED PRESSURE (¶¶ 16–23)

16. In August 2024, Defendant Agarwal internally announced a fundraise of $10,000,000. Believing their retention bonuses should have been triggered, Plaintiff and other former VoiceBite team members sought clarification.

17. Defendants claimed, without providing proof, that the raise was structured as $5,000,000 immediately and $5,000,000 in January 2025 if certain targets were met. Based on this claim, Defendants contended that no bonus was yet owed. Defendant Agarwal further stated that Tiger Global, Checkmate's main investor, suggested this structure specifically to delay the VoiceBite team's bonuses.

18. Another team meeting was arranged in August 2024, during which Defendants offered only half of the bonus, criticized Plaintiff for not looking out for the company's interests, and asked the team members to each individually request payment and sign a "partial bonus acceleration" release.

19. Plaintiff repeatedly requested Defendant Bell share clear performance bonus targets, which were originally promised within 2 weeks of the merger on May 1st. Bell continued to delay and stonewall these requests.

20. On September 25th, 2024, Defendant Bell finally shared the targets with Plaintiff and his team, stipulating that half the bonus would be earned by the voice AI product hitting an accuracy threshold higher than the state of the art in a new industry by October 1st, 2024, a mere 7 days away. Further Defendant Agarwal

stated that a major client demo in mid October was "make or break", claiming that if they failed, Checkmate would dissolve the team.

21. Plaintiff began working nights and weekends, up to 20 hours a day, determined to achieve these targets for himself and his team. In due course, Plaintiff's health began to deteriorate. Nonetheless, Plaintiff's work paid off, and he was largely responsible for success in hitting the target and the major client demo.

22. Rather than congratulate the Plaintiff, Defendant Agarwal exaggerated a minor one-on-one Slack argument requesting a team offsite and protesting once again the company's non-compliance with California labor law, and on October 14th, 2024 threatened disciplinary action up to termination.

23. On or about October 20th, 2024, fearing for his future at the company, Plaintiff signed the "partial bonus acceleration and release" document, which stipulated payment of 50% of his retention bonus within 10 days of signing.


E. DETERIORATING HEALTH AND REQUEST FOR LEAVE (¶¶ 24–26)

24. The stress caused by Defendants' repeated termination threats, failure to act in good faith in honoring obligations to Plaintiff, and imposition of unreasonable deadlines led to severe burnout, sleep deprivation, and panic attacks for Plaintiff, culminating in a mental breakdown on October 22nd, 2024.

25. Despite Plaintiff informing Defendants of his mental state multiple times over the preceding two weeks, and despite the acknowledged success of a major demo on October 22nd, Defendant Agarwal took advantage of the opportunity to demand that Plaintiff accept demotion or face termination within 24 hours.

26. Exhausted and unable to make a decision in the time allotted, Plaintiff requested medical leave under FMLA and CFRA on October 22nd, 2024. Plaintiff entered an in-patient medical facility the next day.

F. MISCLASSIFICATION OF LEAVE AND HR ISSUES (¶¶ 27–35)

27. Checkmate had a policy of unlimited paid leave [Exhibit E], as long as it was approved and all required work was completed. This policy was extended to and routinely approved for other employees at the company, including Plaintiff's teammate Chris Lam, who was approved to take a month off for his honeymoon.

28. On October 23rd, 2024, Defendant Brown requested medical certification for what she referred to as "unpaid personal leave" [Exhibit F] instead of properly characterizing it as FMLA-protected leave, as required under 29 C.F.R. § 825.300. Brown's failure to acknowledge Plaintiff's leave as protected under FMLA created ambiguity about his rights, adding unnecessary financial and emotional strain during a vulnerable period. This mischaracterization was inconsistent with both federal regulations and Defendants' own unlimited paid leave policy.

Complaint

29. When Plaintiff questioned this policy, and referenced Mr. Lam, Defendant Brown claimed that the policy did not apply to medical leave, which was not consistent with Defendants' own Employee handbook [Exhibit E] or prior practice.

30. Defendant Brown further failed to share information on the Company's enhanced short-term disability policy, repeatedly using the phrase "unpaid personal leave," except when denying the request for Paid Leave as not applicable to medical leave and updating Plaintiff's slack status to "FMLA Leave".

31. On November 4th, Defendant Brown emailed Plaintiff [Exhibit G], noting that his pay would stop in two days if he didn't return to work and that his access to slack and email would be cut off due to "security protocols." Plaintiff protested he was still advising his team, and requested an update on his overdue bonus payment.

32. When Defendants did not reply, Plaintiff asked two more times, finally getting an answer from Defendant Bell that this would be discussed only upon his return. Plaintiff contested this, saying the bonus was past due as per his signed agreement, and that he was unsure when the medical staff would clear him to return.

33. Defendants' financial and emotional pressure caused Plaintiff to fear for his place at the company, and to begin looking for alternative work; he reached out, via personal email, to companies in the same space. Concurrently, Plaintiff sought medical permission to return part-time. Facility staff strongly opposed this, but Plaintiff managed to get partial clearance.

34. On November 12th, 2024, Defendant Brown emailed Plaintiff [Exhibit H], mentioning that his reduced work request was being evaluated, and separately that due to his status on "unprotected personal leave," his health coverage would end on 11/30/24, despite his in-patient care needs. Plaintiff questioned why his leave was now "unprotected," citing FMLA protections and previously submitted medical certification. Defendant Agarwal replied, requesting a meeting to discuss.

35. Anxious to return to work, and informed by teammates that the team was being reorganized, Plaintiff agreed to meet on November 14th, 2024 at 8AM. He noted that his access to phone and computer at the facility was limited.


G. TERMINATION WHILE ON LEAVE (¶¶ 36–39)

36. The meeting commenced at 8AM, and Defendant Agarwal initially inquired about Plaintiff's health. As Plaintiff began describing improvements in various symptoms, Agarwal cut him off, stating that Plaintiff was "terminated, with immediate effect" based on two emails indicating Plaintiff had contacted a competitor, allegedly offering to bring others along.

37. Defendant Agarwal claimed this was a breach of trust and of Plaintiff's non-solicitation obligations. Plaintiff protested, but Agarwal insisted the termination was final and informed Plaintiff to settle any disputes with or without counsel.

38. After the call, Plaintiff emailed Defendants, disputing that his emails constituted solicitation and expressing willingness to settle if terms aligned with what he believed were the terms of his employment agreement.

39. Two hours later, Plaintiff, in a state of panic, sent an email [Exhibit H] "resigning for good reason," fearing Defendants would otherwise invalidate obligations owed to him. Defendant Brown emailed a "standard" separation notice but did not clarify the cause of termination or any severance details. Defendants would later cite this email to reject Plaintiff's request for severance pay.

H. POST-TERMINATION THREATS AND ACTIONS (¶¶ 40–50)

40. On December 7, 2024, Defendants, through counsel, responded to Plaintiff's demand for contractual severance and bonus payments by rejecting his purported "good reason resignation" and citing unsubstantiated claims of intellectual property misuse related to Plaintiff's prior startup [Exhibit J].

41. Defendants alleged that certain artifacts in the codebase infringed on the rights of a 3rd party company, which Plaintiff founded, owned and controlled prior to his employment with Defendants. They further claimed breaches rising to criminal fraud and threatened to pursue damages, including out-of-pocket merger costs. Defendants did not mention non-solicitation in their letter to Plaintiff.

42. While searching for the email thread leading up to his termination, Plaintiff discovered that Defendants' AI service had inadvertently emailed him a link to the video and AI summary of his termination meeting [Exhibit K].

43. In the recording, Defendant Agarwal is heard clearly terminating Plaintiff multiple times. The recording continued even after Plaintiff left the call, capturing Defendants discussing next steps and how to inform the team.

44. Defendant Agarwal can be heard expressing relief that "if there was a 0.001% chance [Plaintiff] did not send those emails, we would be totally screwed," explicitly acknowledging the problematic nature of firing someone on medical leave and in a vulnerable state without concrete evidence.

45. Defendant Brown expressed frustration over the team's continued communication with Plaintiff, indicating that management would need to speak with specific team members.

46. Defendant Bell disparaged Plaintiff's character, while declaring confidence in the other team members' loyalty and stating "they know how he is."

47. At the following team meeting, Defendants threatened employees with termination if they were found communicating with Plaintiff, accusing Plaintiff of solicitation and stating they would be speaking to each team member individually.

48. This threat extended even to the "Holder Representative," who, under the Merger Agreement, was designated to act on behalf of the other Pre-Closing Holders—including Plaintiff—regarding indemnification claims.

49. With no way to contest the allegations and demands, and unable to secure counsel promptly during the holiday period, Plaintiff responded pro se.

50. Despite a detailed response [Exhibit L] showing he had rights to the disputed code and reiterating that he had clearly been terminated, and had not resigned, Defendants did not acknowledge Plaintiff's position.

I. ONGOING HARM (¶ 51)

51. To date, Defendants have neither remitted payment nor offered a settlement, and have failed to fulfill their contractual obligations to Plaintiff. As a result, Plaintiff continues to suffer financial, professional, and emotional harm. Plaintiff has repeatedly requested executed copies of signed agreements and his complete personnel file, but Defendants have failed to produce them. Plaintiff believes that the drafts in his possession are substantially identical to the final executed versions and bases this Complaint on those drafts.

**CLAIMS**

## CLAIM I – FMLA (29 U.S.C. § 2601 et seq.)

52. Plaintiff incorporates all preceding paragraphs.

53. Defendants terminated Plaintiff while on protected FMLA leave, interfering with and retaliating against his exercise of FMLA rights. Plaintiff meets eligibility due to combined service at Defendant and VoiceBite.

54. Defendants' actions caused financial harm and emotional distress.

55. Defendant Bell conditioned Plaintiff's partial bonus payment, or even discussion of it, on his premature return to work.

56. Defendants' refused to pay the agreed bonus during Plaintiff's leave and revoked his work access under pretextual "security policies,".

57. Defendants refused to follow their own company policy regarding unlimited paid time off, routinely approved for other employees. Defendant Brown characterized Plaintiff's leave as "Unpaid Personal Leave,", despite requesting and receiving medical certification, causing Plaintiff anxiety and confusion. Brown further claimed that paid time off was not applicable to "medical leave", despite the employee handbook indicating otherwise.

58. Brown later reclassified the leave as "Unprotected Personal Leave," and asserted Plaintiff's health coverage would end unless he returned to work, despite receiving medical certification supporting Plaintiff's eligibility for FMLA leave.

Complaint

59. Defendants discouraged Plaintiff's teammates from communicating with him during his leave, isolating Plaintiff and creating a hostile environment.

60. Defendants' actions, including deliberate misrepresentations about Plaintiff's leave status, threats and termination of his health coverage, withholding of owed payments and failure to follow it's own policy regarding unlimited paid time off interfered with Plaintiff's ability to exercise his FMLA rights and created significant financial and emotional insecurity and were intended to pressure Plaintiff into returning prematurely, thereby undermining his right to take the full duration of protected leave and resulting in a wrongful termination.

## CLAIM II – CFRA (Cal. Gov. Code § 12945.2)

61. Plaintiff incorporates all preceding paragraphs.

62. Defendants interfered with and retaliated against Plaintiff's exercise of CFRA rights. Plaintiff meets eligibility requirements under CFRA due to combined service with Checkmate and VoiceBite.

63. Defendants' termination of Plaintiff during protected leave, mischaracterization of his leave status as "unprotected," and threats to terminate his health coverage violated CFRA and caused economic and emotional harm.

## CLAIM III – RETALIATION (Cal. Labor Code § 1102.5)

64. Plaintiff incorporates all preceding paragraphs.

65. Defendant Agarwal knowingly assigned Plaintiff to report directly to Defendant Bell, despite Plaintiff's written concerns about Defendant Bell's history of hostility to Plaintiff and threats of termination against him. This decision created an environment that enabled retaliatory conduct.

66. Defendant Bell acted on longstanding personal animosity to retaliate against Plaintiff by marginalizing his role, creating a hostile work environment, and ultimately pushing for Plaintiff's termination under false pretenses.

67. Plaintiff engaged in protected activity by raising concerns about overdue wages, labor law compliance, and lack of reimbursement for required equipment.

68. Defendants Agarwal and Bell retaliated against Plaintiff for engaging in protected activity by:

   a. Publicly shaming him during team meetings;

   b. Withholding owed resources and payments; and

   c. Terminating Plaintiff, which harmed his reputation, finances, and career opportunities.

   d. Refusing to approve paid leave as per the company's policy of unlimited paid leave, despite employees in similar positions being approved.

69. Defendant Agarwal cited alleged solicitation of team members as a pretext for terminating Plaintiff. However, under California law, non-solicitation agreements

that restrain an individual's ability to engage in lawful trade or employment are void and unenforceable, as reflected in Cal. Bus. & Prof. Code § 16600. Defendants' reliance on this purported violation demonstrates that the termination was retaliatory and pretextual.

70. Defendants' actions constitute unlawful retaliation under California Labor Code § 1102.5, as they were designed to punish Plaintiff for engaging in protected activity and to deter others from exercising their workplace rights.

## CLAIM IV – INVASION OF PRIVACY

71. Plaintiff incorporates all preceding paragraphs.

72. Defendants secretly recorded the termination meeting without obtaining Plaintiff's consent, in violation of California privacy laws (Cal. Penal Code § 632).

73. Defendants' uploading of the recording to an unsecured website, which risked leaking Plaintiff's private medical disclosures, further violated Plaintiff's privacy and caused significant reputational and emotional harm.

## CLAIM V – NEGLIGENCE AND GROSS NEGLIGENCE

74. Plaintiff incorporates all preceding paragraphs.

75. Defendants owed Plaintiff a duty of care, including safeguarding sensitive information and ensuring compliance with contractual obligations.

76. Defendants breached this duty by:

    a. Failing to secure sensitive recordings and disclosures;

    b. Withholding Plaintiff's partial bonus and tying its payment to his

premature return from medical leave; and

    c. Ignoring Plaintiff's communication about escalating stressors that led to

Plaintiff's mental health crisis.

77. Defendants' actions caused Plaintiff financial harm, reputational damage, and

severe emotional distress.


## CLAIM VI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)

78. Plaintiff incorporates all preceding paragraphs.

79. Defendants engaged in extreme and outrageous conduct by deliberately

creating financial and emotional distress for Plaintiff during a period of known

vulnerability caused by his serious medical condition.

80. Defendants' conduct included:

    a. Falsely characterizing Plaintiff's protected medical leave as "unpaid" and

later "unprotected," knowing this would create financial uncertainty and

emotional distress during a critical period;

b. Repeatedly emphasizing to Plaintiff that he would not be paid unless he prematurely returned to work, despite Plaintiff's medically certified leave and his severe mental and physical health condition;

c. Withholding Plaintiff's bonus payment, which was contractually owed, as a coercive tactic to force him to return to work against medical advice;

d. Threatening and terminating Plaintiff's health coverage while he was in an inpatient care facility, despite legal obligations to maintain benefits during FMLA-protected leave; and

e. Isolating Plaintiff by discouraging his teammates from communicating with him, leaving him cut off from critical emotional and professional support during his recovery.

81. Defendants acted with the intent to cause emotional distress or with reckless disregard for the high probability that its actions would result in emotional harm.

82. Defendants' actions caused Plaintiff severe emotional distress, including panic attacks, severe anxiety, depression, and sleep deprivation. These conditions further exacerbated Plaintiff's existing health issues, requiring additional medical care and significantly impairing his ability to engage in personal and professional activities.

86. Defendants' deliberate manipulation of Plaintiff's financial and emotional well-being during a time of medical crisis was particularly egregious and warrants an award of compensatory and punitive damages to deter such conduct in the future.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CLAIM VII – BREACH OF CONTRACT

83. Plaintiff incorporates all preceding paragraphs.

84. Defendants breached the employment offer letter and bonus agreement by failing to pay owed wages, severance, and bonuses, and by mischaracterizing the termination.

85. Defendants acted in bad faith and deprived Plaintiff of contractual benefits.

86. Defendants violated a mutual non-disparagement agreement by disparaging Plaintiff and threatening employees who communicated with him.

87. Defendants misrepresented the timing and structure of its fundraising to avoid triggering the retention bonus owed to Plaintiff..

88. Defendants failed to pay the partial bonus owed under the "partial bonus acceleration and release" document.

89. Defendants' refusal to pay the severance and retention bonus, owed under his offer letter and bonus agreement, caused direct financial harm to Plaintiff.

90. Checkmate further violated its obligations under the merger agreement by retaliating against the Holder Representative and other teammates who attempted to engage with Plaintiff. These actions disrupted the Representative's duty to represent Pre-Closing Holders, including Plaintiff, depriving Plaintiff of the contractual benefits and protections intended under the agreement.

91. Defendants' breach caused financial, reputational, and professional harm.

92. As a result of Defendants' breach of contract, Plaintiff seeks compensatory damages for unpaid wages, severance, and bonuses. Plaintiff further seeks damages for the reputational harm and financial instability caused by Defendants' failure to meet its contractual obligations.

### CLAIM VIII – WAGE THEFT (Cal. Labor Code §§ 201, 204, 226, 510)

93. Plaintiff incorporates all preceding paragraphs.

94. Defendants violated California wage and hour laws by:

    a. Failing to timely pay two months of back wages owed to Plaintiff's team;

    b. Failing to pay wages for Plaintiff's final day of employment; and

    c. Withholding severance and bonus payments owed under contract.

95. Plaintiff seeks unpaid wages, liquidated damages, penalties, and attorneys' fees under California law.

### CLAIM IX – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

96. Plaintiff incorporates all preceding paragraphs.

97. Plaintiff had professional relationships and opportunities with a reasonable probability of economic benefit.

98. Defendants Bell and Agarwal interfered with these relationships by:

    a. Disparaging Plaintiff to his teammates, Holder Representative, and other professional contacts; and

    b. Threatening Plaintiff's colleagues with termination if they communicated with him, thereby isolating Plaintiff from his professional network.

99. Defendants' actions caused Plaintiff to lose valuable business opportunities and professional relationships.

100. Plaintiff seeks compensatory and punitive damages for this interference.

## CLAIM X – VIOLATION OF CALIFORNIA PUBLIC POLICY ON NON-SOLICITATION AGREEMENTS

101. Plaintiff incorporates all preceding paragraphs.

102. Defendant Agarwal terminated Plaintiff, citing alleged solicitation of team members in violation of his non-solicitation obligations.

103. California public policy, as reflected in Cal. Bus. & Prof. Code § 16600, prohibits restrictions that unfairly limit an individual's ability to engage in their trade, business, or profession.

104. Defendants' reliance on a non-solicitation clause in a non-competition agreement [Exhibit I] as grounds for termination violates California public policy, which renders any such agreement unenforceable.

105. Defendants' wrongful termination of Plaintiff based on these purported violations caused economic harm, reputational damage, and emotional distress.

## **REQUEST FOR RELIEF**

Plaintiff requests judgment in his favor and against Defendants as follows:

106. A declaration that Defendants:

    a. Violated the Family and Medical Leave Act (FMLA), California Family Rights Act (CFRA), and applicable provisions of the California Labor Code.

    b. Breached Plaintiff's employment agreements, including the offer letter, bonus agreement, and severance terms.

    c. Acted in bad faith, causing financial, reputational, and emotional harm to Plaintiff.

    d. Wrongfully terminated Plaintiff while he was on protected leave.

107. Compensatory damages sufficient to make Plaintiff whole, including but not limited to:

    a. Lost wages, back pay, front pay, and severance, to address the financial harm caused by Defendants' breach of contract, bad-faith conduct, and wrongful termination.

b. The full performance bonus and retention bonus owed under the agreements, as these amounts were contractually due and necessary for Plaintiff's financial stability.

c. Emotional distress damages caused by Defendants' extreme and outrageous conduct, including financial coercion, emotional manipulation, public shaming, termination on protected leave, and unauthorized disclosure of sensitive information.

d. Damages for reputational harm and lost professional opportunities, reflecting the impact of Defendants' disparagement and interference with Plaintiff's relationships.

108. Statutory damages, including:

a. Liquidated damages under the FMLA and CFRA for Defendants' interference with and retaliation against Plaintiff's protected rights.

b. Penalties under the California Labor Code for unpaid wages, wage statement violations, and waiting time penalties.

109. Punitive damages in an amount sufficient to deter Defendants and others from engaging in similar bad-faith and retaliatory conduct.

110. Pre-judgment and post-judgment interest at the maximum rate permitted by law, to account for the delayed payment of owed amounts and damages.

111. Attorneys' fees and costs where permitted by law, including under the FMLA, CFRA, and applicable provisions of the California Labor Code.

112. An order requiring Defendants to take corrective actions, including but not limited to:

      a. Issuing a formal apology to Plaintiff for its wrongful conduct.

      b. Implementing training and policies to ensure compliance with FMLA, CFRA, and California labor laws.

113. Any other relief the Court deems just, proper, and equitable under the circumstances.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Complaint

**DATED**: December 19th, 2024

Respectfully submitted,

_____

**ARJUN VASAN**

Plaintiff in Pro Per

12615 193rd St, Cerritos, CA 90703

562-900-6541

arjun.vasan@gmail.com

Complaint

**[EXHIBIT A]**

Checkmate / VoiceBite Merger Agreement

*Specifies merger terms, including indemnification and the role of the "Holder Representative" in representing the pre-closing holders, including plaintiff.*

Please note that Defendant has not provided executed copies of signed agreements despite repeated requests. This is the latest draft in possession, and in Plaintiff's belief identical to the final executed version.

**[EXHIBIT B]**

<u>Employee Offer Letter</u>

*Details Severance Obligations*

Please note that Defendant has not provided executed copies of signed agreements despite repeated requests. This is the latest draft in possession, and in Plaintiff's belief identical to the final executed version.

Complaint

**[EXHIBIT C]**

Bonus Agreement

*Specifies Retention Bonus*


Please note that Defendant has not provided executed copies of signed agreements despite repeated requests. This is the latest draft in possession, and in Plaintiff's belief identical to the final executed version.

**[EXHIBIT D]**

Checkmate Fundraising Announcement

1. Indicates fundraise greater than the Retention Bonus trigger of $7,500,000.

Complaint

**[EXHIBIT E]**

Checkmate Employee Handbook (excerpts)

1. Specifies Unlimited Paid Time Off Policy as applicable to medical leave

2. Specifies Enhanced Short Term Disability Policy

Complaint

**[EXHIBIT F]**

Email thread with Defendant Amy Brown on October 23th, 2024.

*Indicates attempt to mischaracterize nature of Plaintiff's leave as "Unpaid*

*Personal Leave" and start of financial pressure to coerce Plaintiff back to work.*

**[EXHIBIT G]**

November 4th, 2024 Email thread with Defendants Amy Brown and Michael Bell

*Continued efforts to coerce Plaintiff into ending his leave early using financial pressure.*

1. Defendant Brown continues pressuring Plaintiff to return to work from medical leave, emphasizing that his pay would cease in two days.

2. Defendant Bell responds after repeated inquiries about Plaintiff's overdue partial bonus payment, and further pressures Plaintiff to return to discuss further.

3. Plaintiff protests it should have been paid regardless, as 10 business days had passed since he had signed a document stipulating payment in 10 business days.

Complaint

**[EXHIBIT H]**

November 12th, 2024 Email thread with Defendants Amy Brown, Michael Bell and Vishal Agarwal

*Communications leading up to termination meeting, and continuing after.*

1. Defendant Brown attempts to coerce Plaintiff back to work, emphasizing the end of his health coverage while he was still receiving in patient care, and re-characterizing Plaintiff's leave as "Unprotected Personal Leave"

2. Defendant Agarwal schedules termination meeting for 8AM, November 14th.

3. Plaintiff contests characterization of his leave as "unprotected", noting that Brown had provided an FMLA medical certification form, and accepted it.

4. Plaintiff contests allegations of solicitation of Checkmate employees about 30 minutes after the end of the 15 minute 8AM meeting.

5. Plaintiff sends "good reason resignation" two hours after meeting.

**[EXHIBIT I]**

Non-Competition Agreement

*Separate agreement signed as a condition of employment. During merger*

*negotiations, this was described as "non-negotiable".*

Please note that Defendant has not provided executed copies of signed agreements

despite repeated requests. This is the latest draft in possession, and in Plaintiff's

belief identical to the final executed version.

Complaint

**[EXHIBIT J]**

<u>December 6th, 2024 Notice of Claim sent by Defendant counsel.</u>

*Shows attempts to intimidate Plaintiff and discourage him from seeking his due severance and bonus payments.*

1. Rejects "good reason" for resignation without acknowledging that Plaintiff was terminated two hours earlier and so could not actually resign.

2. Alleges misuse of IP from Plaintiff's non-operative startup.

3. Alleges breaches of contract, insinuating fraudulent misrepresentation.

**[EXHIBIT K]**

Fathom.video Recording of Termination Meeting (Screenshots)

*Demonstrates Defendants' negligence and violation of Plaintiff's privacy by recording termination meeting without his consent, and inadvertently posting the recording to an unsecured fathom.video account.*

1. Transcript Screenshot - Defendant Agarwal terminates Plaintiff multiple times.

2. Transcript Screenshot - (after Plaintiff has left the call) Defendant Brown shows intent to prevent Plaintiff's teammates from communicating with him.

3. Transcript Screenshot - (after Plaintiff has left the call)  Defendant Bell indicates that he has disparaged Plaintiff to his teammates.

4. Transcript Screenshot - (after Plaintiff has left the call) Defendant Agarwal acknowledges medical necessity of Plaintiff's leave and expresses relief that he was able to "pull some favors" to guard against liability for the termination.

5. Copied and highlighted full transcript.

Complaint

**[EXHIBIT L]**

December 20th, 2024. Response to Notice of Claim by Plaintiff

*Plaintiff rejects Defendants' Allegations of IP Misuse via formal letter.*

1. Plaintiff argues that Defendants' Notice of Claim was procedurally defective, as it was inconsistent with the process outlined in the merger agreement.

2. Plaintiff argues that Defendants' Notice of Claim was substantively defective, as he possessed the necessary rights to any IP used for VoiceBite and subsequently brought into Checkmate.

Complaint

Confidential

AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER is made and entered into as of April ___, 2024, by and among Checkmate.com Inc., a Delaware corporation ("Purchaser"), VoiceBite Merger Sub, Inc., a Delaware corporation and a wholly-owned subsidiary of Purchaser ("Merger Sub"), VoiceBite Corporation, a Delaware corporation (the "Company"), Robert Nessler, Arjun Vasan, Christopher Lam, Isamu Aoki and Paul Justin Garcia (each a "Stockholder" and collectively the "Stockholders"), and Robert Nessler as representative of the Pre-Closing Holders (the "Holder Representative").

RECITALS

A.    Each of Purchaser, Merger Sub and the Company believe it advisable and in the best interests of each corporation and company and their respective stockholders that Purchaser and the Company enter into a business combination transaction in accordance with the Delaware General Corporation Law (the "DGCL") pursuant to which Merger Sub will merge with and into the Company with the Company surviving that merger on the terms and subject to the conditions set forth herein (the "Merger") and, in furtherance thereof, have approved this Agreement and the Merger.  The parties intend that the Merger qualifies as a "reorganization" within the meaning of Section 368(a)(2)(E) of the Internal Revenue Code.

B.    Immediately prior to the execution of this Agreement, the Company has obtained, in accordance with Section 228 of the DGCL, a written consent of its stockholders approving this Agreement, the Merger and the transactions contemplated hereby in accordance with Section 251 of the DGCL.

C.    Purchaser, Merger Sub and the Company desire to make certain representations, warranties, covenants and agreements in connection with the Merger and to prescribe various conditions to the Merger.

D.    Simultaneously with the execution and delivery of this Agreement, and as a condition and inducement to Purchaser to enter into this Agreement, certain employees of the Company have entered into employment arrangements with Purchaser or a Subsidiary thereof to become effective at the Effective Time.

Accordingly, the parties to this Agreement, intending to be legally bound, agree as follows:

SECTION 1
DEFINED TERMS; RULES OF CONSTRUCTION

Section 1.1    Definitions.  In addition to the terms defined elsewhere herein, the following terms have the meanings set forth below:

"Acquisition Transaction" means any transaction or series of related transactions involving (a) any merger, consolidation, share exchange, business combination, recapitalization, tender offer, exchange offer or similar transaction involving the Company; (b) any sale, lease, exchange, transfer, license, acquisition or disposition of a substantial portion of the business or assets of the Company; or (c) any issuance, sale or acquisitions of a substantial amount of securities or other equity interests of any of the Company.

"Affiliate" means, with respect to any Person, any other Person, directly or indirectly, controlling, controlled by or under common control with such Person.

"Agreement" means this Agreement and Plan of Merger, as amended from time to time.

"Antitrust Laws" means any applicable Law that is designed or intended to prohibit, restrict or regulate foreign investment or actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or otherwise, including the Sherman Antitrust Act, the Clayton Antitrust Act, the HSR Act and the Federal Trade Commission Act.

"Available Cash" means cash on the Company's balance sheet immediately prior to Closing.

"Business Day" means any day except Saturday, Sunday or a day on which banks are generally not open for business in New York, New York.

"Closing Shares" means the Merger Consideration.

"Code" means the Internal Revenue Code of 1986, as amended.

"Common Stock" means the common stock, par value $0.00001 per share, of the Company.

"Company Benefit Plan" means each Employee Benefit Plan sponsored or maintained or required to be sponsored or maintained at any time by the Company or to which the Company makes or has made, or has or has had an obligation to make, contributions at any time, or with respect to which the Company has any liability or obligation.

"Company Disclosure Schedule" means the disclosure schedule delivered to Purchaser on behalf of the Company on, and dated as of, the date of this Agreement.

"Company Intellectual Property" means all Intellectual Property owned by, licensed to or used by the Company.

"Company Proprietary Software" means all Software owned by the Company.

"Company Registered Intellectual Property" means all of the Registered Intellectual Property owned by or filed in the name of the Company.

"Company Related Agreement" means any certificate, agreement, document or other instrument, other than this Agreement, to be executed and delivered by the Company in connection with the transactions contemplated hereby.

"Company Transaction Expenses" means the sum of (a) all fees, costs and expenses (including legal, accounting and financial advisor fees and expenses) that are incurred by or for the benefit of the Company through the Closing Date in connection with the transactions contemplated by this Agreement (whether or not already paid), and (b) all sale, change of control, severance or similar bonuses and amounts that will or may become payable by or on behalf of the Company in connection with or as a result of the consummation of the transactions contemplated by this Agreement.

"Confidential Information" means any data or information concerning the Company (including trade secrets), without regard to form, regarding (for example and including) (a) business process models, (b) proprietary software, (c) research, development, products, services, marketing, selling, business plans, budgets, unpublished financial statements, licenses, prices, costs, Contracts, suppliers, customers, and customer lists, (d) the identity, skills and compensation of employees, contractors, and consultants, (e) specialized training or (f) discoveries, developments, trade secrets, processes, formulas, data, lists, and all

other works of authorship, mask works, ideas, concepts, know-how, designs, and techniques, whether or not any of the foregoing is or are patentable, copyrightable, or registrable under any intellectual property Laws or industrial property Laws in the United States or elsewhere.  Notwithstanding the foregoing, no data or information constitutes "Confidential Information" if such data or information is publicly known and in the public domain through means that do not involve a breach by the Company of any covenant or obligation set forth in this Agreement.

"Contract" means any written or oral agreement, contract, subcontract, lease, understanding, instrument, note, warranty, license, sublicense, insurance policy, benefit plan or legally binding commitment or undertaking of any nature, whether express or implied.

"Controlled Group Liability" means any and all liabilities (a) under Title IV of ERISA, (b) under Section 302 of ERISA, (c) under Sections 412 and 4971 of the Code or (d) resulting from a failure to comply with the continuation coverage requirements of Section 601 et. seq. of ERISA and Section 4980B of the Code.

"Dissenting Shares" means shares held by Pre-Closing Holders who object to the Merger and comply with the applicable provisions of the DGCL concerning the rights of Pre-Closing Holders to dissent from the Merger and require appraisal of their shares.

"Employee Benefit Plan" means, with respect to any Person, each plan, fund, program, agreement, arrangement or scheme, including each plan, fund, program, agreement, arrangement or scheme maintained or required to be maintained under applicable Laws, that promises or provides compensation or benefits of any kind to any current or former employee, director, manager, officer, consultant, independent contractor, contingent worker or leased employee of such Person or an Affiliate of such Person or the beneficiaries or dependents of any of them (whether written or oral), including (i) each deferred compensation, bonus, incentive compensation, pension, retirement, employee stock ownership, stock purchase, stock option, profit sharing or deferred profit sharing, stock appreciation, phantom stock plan and other equity compensation plan, "welfare" plan (within the meaning of Section 3(1) of ERISA, determined without regard to whether such plan is subject to ERISA), (ii) each "pension" plan (within the meaning of Section 3(2) of ERISA, determined without regard to whether such plan is either subject to ERISA or is tax-qualified under the Code) and (iii) each severance plan or agreement, and each other plan providing health, vacation, supplemental unemployment benefit, hospitalization insurance, medical, dental, disability, life insurance, death or survivor benefits, fringe benefits or legal benefits.

"Encumbrance" means any lien, pledge, hypothecation, charge, mortgage, security interest, encumbrance, claim, infringement, interference, option, right of first refusal, preemptive right, community property interest or restriction of any nature affecting property, real or personal, tangible or intangible, including any restriction on the voting of any security, any restriction on the transfer of any security or other asset, any restriction on the receipt of any income derived from any asset, any restriction on the use of any asset, any restriction on the possession, exercise or transfer of any other attribute of ownership of any asset, any lease in the nature thereof and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statute of any jurisdiction).

"Entity" means any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any Person that together with the Company would be deemed a "single employer" within the meaning of Section 414 of the Code.

"ERISA Affiliate Plan" means each Employee Benefit Plan sponsored or maintained or required to be sponsored or maintained at any time by any ERISA Affiliate, or to which such ERISA Affiliate makes or has made, or has or has had an obligation to make, contributions at any time, or with respect to which such ERISA Affiliate has any liability or obligation.

"Fraud" means common law fraud under the laws of the State of Delaware.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Governmental Authorization" means any approval, permit, license, certificate, franchise, permission, clearance, registration, qualification or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

"Governmental Body" means any (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature, (b) federal, state, local, municipal, foreign, supranational or other government or (c) governmental, self-regulatory or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or Entity and any court or other tribunal).

"Group Company" means the Company and each of its Subsidiaries.

"Holder Allocable Expenses" means the aggregate amount of the fees and expenses that may be incurred by the Holder Representative in its capacity as Holder Representative under this Agreement on behalf of the Pre-Closing Holders, including (i) any losses, claims, damages, liabilities, costs, expenses, judgments, fines or amounts paid in settlement incurred in connection with the acceptance or administration of the Holder Representative's duties, (ii) the fees and disbursements of outside counsel to the Holder Representative, (iii) the fees and expenses of any other agents, advisors, consultants and experts employed by the Holder Representative, and (iv) any such reserves as the Holder Representative determines in good faith to be appropriate for any fees and expenses that are not then known or determinable.

"Holder Indemnified Parties" means the Pre-Closing Holders and their respective heirs, executors, successors and assigns.

"HSR Act" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Indebtedness" means, with respect to any Person, at any particular time, all of the following liabilities or obligations, contingent or otherwise, of such Person: (a) all liabilities or obligations for borrowed money; (b) all liabilities or obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other liabilities or obligations in respect of letters of credit, bankers acceptances or other financial products; (c) all liabilities or obligations in respect of lease obligations that are required to be classified as capitalized lease obligations in accordance with GAAP; (d) all liabilities or obligations of others secured by an Encumbrance on any asset of a Person or its Subsidiaries, irrespective of whether such obligation or liability is assumed; (e) all liabilities or obligations to pay the deferred purchase price of assets or services with respect to which such Person or any Subsidiary of such Person is liable, as obligor or otherwise (including past acquisitions); (f) all liabilities or obligations under conditional sale or other title retention agreements; (g) all liabilities or obligations guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or with recourse) any obligation

of any other Person that constitutes Indebtedness under any of clauses (a) though (f) above or secured by any Encumbrance on the assets of such Person or any Subsidiary; and (h) any accrued interest, fees, expenses or penalties in respect of any of the foregoing, including repayment penalties, termination fees, reimbursements, indemnities, letters of credit and bankers' acceptances and consent fees, "breakage" costs, "break fees" or similar payments or contractual charges. For the avoidance of doubt, all interest, prepayment penalties, premiums, fees and expenses (if any) which would be payable if all Company Indebtedness were paid in full on the Closing Date shall be treated as Indebtedness. Prior to Closing the Company may use Available Cash to pay all or a portion of the Indebtedness.

"Indemnified Party" means the Persons entitled to indemnification pursuant to Section 8.1 or 8.2, as the case may be. Solely for purposes of providing notice in connection with a claim for indemnification by a Holder Indemnified Party, asserting such claim on behalf of the Holder Indemnified Parties and controlling the defense and settlement of such claim pursuant to Section 8.3, the term "Indemnified Party" refers to the Holder Representative, acting on behalf of the Holder Indemnified Parties.

"Indemnifying Party" means the Person or Persons having the obligation to indemnify another Person pursuant to Section 8.1. Solely for the purpose of receiving notice in connection with a claim for indemnification by a Purchaser Indemnified Party, disputing and resolving such claim and controlling the defense and settlement of such claim pursuant to Section 8.3, the term "Indemnifying Party" refers to the Holder Representative; provided, however, that in no event will the Holder Representative have any obligation to indemnify any Person hereunder solely in its capacity as the Holder Representative.

"Intellectual Property" means any or all of the following: (a) all patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof; (b) all inventions (whether patentable or not), invention disclosures, improvements, proprietary information, know-how, technology, technical data and customer lists, and all documentation relating to any of the foregoing; (c) all copyrights, copyright registrations and applications therefor, and all other rights corresponding thereto; (d) all industrial designs and any registrations and applications therefor; (e) all internet uniform resource locators, domain names, trade names, logos, slogans, designs, common law trademarks and service marks, trademark and service mark registrations and applications therefor; (f) all Software, databases and data collections and all rights therein; (g) all moral and economic rights of authors and inventors, however denominated; and (h) all rights arising out of or associated with the foregoing.

"Knowledge" means (a) in the case of an individual, the actual knowledge of such individual, upon reasonable inquiry, (b) in the case of the Company, the actual knowledge of Robert Nessler, Arjun Vasan and Christopher Lam, upon reasonable inquiry, and (c) in the case of Purchaser, the actual knowledge of Vishal Agarwal and Michael Bell, upon reasonable inquiry.

"Law" means any federal, state, local, municipal, foreign or international, multinational other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

"Leased Real Property" means the parcels of real property of which the Company is the lessee or sublessee (together with all fixtures and improvements thereon).

"Legal Proceeding" means any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Body or any arbitrator or arbitration panel.

"<u>Losses</u>" means any and all claims, liabilities, obligations, damages, losses, penalties, fines, judgments, costs and expenses (including amounts paid in settlement, costs of investigation and reasonable attorney's fees and expenses), whenever arising or incurred, and whether arising out of a third party claim.

"<u>Made Available</u>" shall mean that the Company has posted such materials to the virtual data room made available to Purchaser and its representatives before or during the negotiation of this Agreement.

"<u>Material Adverse Effect</u>" means any change, effect, event, occurrence, condition, circumstance, matter, state of facts or development that has, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the assets, business, properties, results of operations or condition (financial or otherwise) of the Company and its subsidiaries taken as a whole.

"<u>Merger Consideration</u>" means 321,199 Purchaser Common Shares.

"<u>Net Working Capital</u>" means the amount (which may be a positive or negative number), equal to (a) the aggregate amount of the consolidated assets of the Company that are treated as current assets as calculated in accordance with the Interim Financial Statements, minus (b) the aggregate amount of the consolidated liabilities of the Company that are treated as current liabilities as calculated in accordance with the Interim Financial Statements.

"<u>Order</u>" means any decree, injunction, writ, order, judgment or similar action.

"<u>Participating Holder</u>" means a Pre-Closing Holder who holds Common Stock.

"<u>Participating Shares</u>" means shares of Common Stock.

"<u>Permitted Encumbrance</u>" means any (a) Encumbrance for Taxes not yet due and payable (excluding Encumbrances arising under ERISA or the Code), (b) Encumbrances of carriers, warehousemen, mechanics, materialmen and repairmen incurred in the ordinary course of business consistent with past practice and not yet delinquent and (c) in the case of the Real Property, zoning, building, or other restrictions, variances, covenants, rights of way, encumbrances, easements and other minor irregularities in title, none of which, individually or in the aggregate, (i) interfere in any material respect with the present use of or occupancy of the affected parcel by the Company, (ii) have more than an immaterial effect on the value thereof or its use, or (iii) would impair the ability of such parcel to be sold for its present use.

"<u>Per Share Amount</u>" means that amount per share of Common Stock set out in the Closing Spreadsheet.

"<u>Per Share Merger Consideration</u>" means (x) the Merger Consideration divided by (y) the number of shares of Participating Shares issued and outstanding immediately prior to Closing.

"<u>Person</u>" means any individual, corporation, partnership, joint venture, limited liability company, trust, Governmental Body or other organization.

"<u>Pre-Closing Holder</u>" means each Person who holds one or more share of Common Stock immediately prior to the Effective Time, as identified in the Closing Spreadsheet.

"<u>Pro Rata Share</u>" means, with respect to any Participating Holder, the percentage obtained, by dividing the amount of the Merger Consideration payable to such Participating Holder pursuant to this Agreement by the aggregate Merger Consideration payable to all Participating Holders pursuant to this Agreement. For avoidance of doubt, all Pro Rata Shares shall sum to 100%.

"Purchaser Common Shares" means the Common Stock of Purchaser, as defined in Purchaser's Amended and Restated Certificate of Incorporation, as amended.

"Purchaser Indemnified Parties" means Purchaser and its Affiliates (including, following the Effective Time, the Company), their respective Representatives and the heirs, executors, successors and assigns of any of the foregoing.

"Purchaser Related Agreement" means any certificate, agreement, document or other instrument, other than this Agreement, to be executed and delivered by Purchaser or Merger Sub in connection with the transactions contemplated hereby.

"Purchaser Voting Agreement" means that certain Voting Agreement of Purchaser, dated as of September 26, 2018, by and among the members party thereto, as amended.

"Purchaser Share Price" shall mean $0.41, subject to adjustment for stock splits and similar events.

"Real Property" means the Leased Real Property.

"Registered Intellectual Property" means all (a) patents and patent applications (including provisional applications), (b) registered trademarks and service marks, applications to register trademarks and service marks, intent-to-use applications, or other registrations or applications related to trademarks and service marks, (c) registered copyrights and applications for copyright registration, (d) domain name registrations and (e) any other Intellectual Property that is the subject of an application, certificate, filing, registration or other document issued, filed with, or recorded with or by any Governmental Body.

"Representatives" means, with respect to a Person, the officers, directors, employees, agents, attorneys, accountants, advisors and representatives of such Person.

"Company Stockholder Approval" means the affirmative votes of the holders of a majority of the outstanding Common Stock, voting together as a single class.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Series A Preferred Stock" means the Series A Preferred Stock, $0.0005 par value, of Purchaser.

"Series A-1 Preferred Stock" means the Series A-1 Preferred Stock, $0.0005 par value, of Purchaser.

"Software" means any computer software program, together with any error corrections, updates, modifications, or enhancements thereto, in both machine-readable form and human readable form, including all comments and any procedural code.

"Subsidiary" means, with respect to any Person, any Entity in which such Person (a) owns, directly or indirectly, at least a majority of the outstanding voting securities, equity interests, profits interest or capital interest, (b) is entitled to elect at least one-half of the board of directors or similar governing body or (c) in the case of a limited partnership or limited liability company, is a general partner or managing member and has the power to direct the policies, management and affairs of such Entity.

"Tax" means any (a) tax (including income, franchise, business, corporate, capital, excise, gross receipts, ad valorem, property, sales, use, turnover, value added, stamp and transfer taxes), deduction, withholding, levy, charge, assessment, tariff, duty, impost, deficiency or other fee of any kind imposed by any Governmental Body; (b) all interest, penalties, fines, additions to tax or additional amounts imposed by any Governmental Body in connection with any item described in clause (a) or for failure to file any Tax Return; (c) any successor or transferee liability in respect of any items described in clauses (a) and (b) under Treasury Regulation 1502-6 (or any similar provision of state, local or foreign law); and (d) any amounts payable under any tax sharing agreement or other contractual arrangement (excluding amounts payable under any such agreement or arrangement not related to Taxes).

"Tax Return" means any return (including any information return), report, statement, declaration, estimate, schedule, notice, notification, form, election, certificate or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Law relating to any Tax.

"Transaction Documents" means, with respect to a party, all agreements, certificates and other instruments to be delivered by such party in connection with this Agreement.

"Treasury Regulations" means the temporary and final income Tax regulations promulgated under the Code.

"WARN" means the United States Worker Adjustment and Retraining Notification Act and similar state Laws.

Section 1.2      Other Defined Terms.  Each other capitalized term shall have the definition ascribed to it in this Agreement.

Section 1.3      Construction.

(a)      Unless the context of this Agreement otherwise requires, (i) words of any gender include the other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereunder," "hereof," "herein," "hereby," "hereto" and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits hereto; (iv) the terms "Article," "Section," "paragraph," "clause" and "Exhibit" refer to the specified Article, Section, paragraph, clause or Exhibit of this Agreement; and (v) the word "including" means "including, without limitation".

(b)      References to agreements and other documents (including this Agreement) to include (i) all subsequent amendments and other modifications thereto and (ii) all addenda, exhibits and schedules thereto.

(c)      References to statutes include all regulations promulgated thereunder and references to statutes or regulations will be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation.

(d)      Whenever this Agreement refers to a number of days, such number refers to calendar days unless Business Days are specified.

(e)      All accounting terms used herein and not expressly defined herein have the meanings given to them under GAAP.

(f)     References to "$" or "dollars" will mean United States dollars.

(g)     A reference to any Person includes such Person's successors and permitted assigns.

(h)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded, and if the last day of such period is not a Business Day, the period will end on the next succeeding Business Day.

(i)     This Agreement was negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any party will not apply to any construction or interpretation hereof.

(j)     The headings contained in this Agreement are for the convenience of reference only, will not be deemed to be a part of this Agreement and will not be referred to in connection with the construction or interpretation of this Agreement.

SECTION 2
THE MERGER

Section 2.1     Merger of Merger Sub into the Company.  Upon the terms and subject to the conditions set forth in this Agreement, at the Effective Time, Merger Sub will be merged with and into the Company, the separate existence of Merger Sub shall cease and the Company will continue as the surviving corporation of the Merger (the "Surviving Corporation").

Section 2.2     Effect of the Merger.  The Merger will have the effects set forth in this Agreement and in the applicable provisions of the DGCL.  Without limiting the foregoing and subject thereto, at the Effective Time, all of the property, rights, privileges, powers and franchises of each of the Company and Merger Sub will vest in the Surviving Corporation, and all debts, liabilities and duties of each of the Company and Merger Sub will attach to, and become the debts, liabilities and duties of, the Surviving Corporation.

Section 2.3     Closing; Effective Time.

(a)     Unless otherwise mutually agreed in writing between Purchaser and the Company, the consummation of the transactions contemplated by this Agreement (the "Closing") will take place virtually, at 10:00 A.M. (Eastern Time) on the date to be agreed by Purchaser and the Company.  The date on which the Closing actually takes place is referred to in this Agreement as the "Closing Date."  Contemporaneously with or as promptly as practicable after the Closing, a certificate of merger conforming to the requirements of the DGCL and substantially in the form of Exhibit A (the "Certificate of Merger") will be duly executed by the Company and filed with the Secretary of State of the State of Delaware.  The Merger will become effective upon the date and time of the filing of the Certificate of Merger with the Secretary of State of the State of Delaware or such other date and time as Purchaser and the Company may mutually agree and specify in the Certificate of Merger (such time being hereinafter referred to as the "Effective Time").

(b)     At or prior to the Closing (or, in those cases where a specified period of time before the Closing is indicated in this Agreement, by no later than such time), the Company will deliver, or cause to be delivered, to Purchaser the following:

(i)      a certificate in accordance with the requirements of Treasury Regulation Section 1.1445-2(c)(3), validly executed on behalf of the Company by a duly authorized officer thereof, that it is not a United States real property holding corporation;

(ii)      a resignation letter in the form of Exhibit B, effective as of the Effective Time, executed by each officer and director of, or Person performing similar functions for, any Group Company; and

(iii)      a letter of transmittal from each holder of Common Stock, in the form of Exhibit C (the "Letter of Transmittal");

(iv)      a Joinder Agreement to Purchaser Voting Agreement, in the form attached hereto as Exhibit D (the "Joinder Agreement to Purchaser Voting Agreement"), duly executed by each Participating Holder;[1]

(v)      an Investor Representation Letter, in the form attached hereto as Exhibit E, duly executed by each Participating Holder;

(vi)      Restrictive Covenant Agreements in the form of Exhibit F hereto executed by the individuals identified on Schedule 2.3(b)(vi);

(vii)      Employment Offer Letters in the form of Exhibit G hereto executed by the individuals identified on Schedule 2.3(b)(viii);

(viii)      Consulting Agreements in the form of Exhibit H hereto executed by the individuals identified on Schedule 2.3(b)(viii);

(ix)      Retention Bonus Agreements in the form of Exhibit I executed by the individuals identified on Schedule 2.3(b)(ix) (the "Bonus Agreements");

(x)      The Company Stockholder Approval;

(xi)      A certificate of a duly authorized officer of the Company, attaching (i) a certified copy of resolutions of the board of directors of the Company authorizing the execution, delivery and performance of this Agreement, (ii) a certified copy of the Stockholder Approval, (iii) true and complete copies of the Organizational Documents of the Company and its Subsidiaries, and (iv) a certificate, dated no earlier than five business days prior to the Closing Date, of the Delaware Secretary of State as to the legal existence and good standing of the Company;

(xii)      a spreadsheet, reasonably agreed upon by Purchaser, indicating the number of Closing Shares to be issued to each holder of Participating Shares (the "Closing Spreadsheet").

(c)      At Closing, the Purchaser shall update its records to reflect the issuance of the Closing Shares to the holders of Participating Shares.

Section 2.4      Certificate of Incorporation and Bylaws.

---

[1] We have deleted the Merger Agreement Joinder Agreement based on our understanding that all stockholders will sign the Merger Agreement.  If that is not the case, then we will need to add the Joinder Agreement back in.

(a)    At the Effective Time, the certificate of incorporation of the Company will be amended as a result of the Merger so as to read in its entirety as set forth in Exhibit J, and, as so amended, will be the certificate of incorporation of the Surviving Corporation from and after the Effective Time, until thereafter changed or amended as provided therein and in accordance with the DGCL.

(b)    At the Effective Time, the bylaws of the Company will be amended so as to read in their entirety as set forth in Exhibit K, and, as so amended, will be the bylaws of the Surviving Corporation from and after the Effective Time, until thereafter changed or amended as provided therein and in accordance with the DGCL.

Section 2.5    Directors and Officers.

(a)    Unless otherwise determined by Purchaser prior to the Effective Time, the directors of Merger Sub immediately prior to the Effective Time will be the initial directors of the Surviving Corporation immediately after the Effective Time, each to hold office in accordance with the provisions of the DGCL and the certificate of incorporation and bylaws of the Surviving Corporation until their successors are duly elected and qualified.

(b)    Unless otherwise determined by Purchaser prior to the Effective Time, the officers of Merger Sub immediately prior to the Effective Time will be the initial officers of the Surviving Corporation immediately after the Effective Time, each to hold office in accordance with the provisions of the DGCL and the bylaws of the Surviving Corporation until their successors are duly elected and qualified.

SECTION 3
EFFECT OF THE MERGER ON COMPANY STOCK; CONVERSION OF SHARES

Section 3.1    Conversion of Shares.  Subject to Section 3.3, at the Effective Time, by virtue of the Merger and without any further action on the part of Purchaser, Merger Sub, the Company or any stockholder of the Company:

(a)    Converted Company Stock.  Each issued and outstanding share of Common Stock shall be cancelled and extinguished and shall be converted automatically into the right to receive the Per Share Merger Consideration therefor.

(b)    Merger Sub.  Each share of the common stock of Merger Sub outstanding immediately prior to the Effective Time will be converted into one fully paid and nonassessable share of common stock of the Surviving Corporation, and each stock certificate evidencing ownership of shares of common stock of Merger Sub will thereafter evidence ownership of shares of common stock of the Surviving Corporation.

Section 3.2    Dissenters' Rights.  Notwithstanding the foregoing provisions of this Section 3, the Dissenting Shares shall not be cancelled and extinguished and the holders thereof will be entitled to, and the Dissenting Shares will only represent the right to receive, payment of the fair value of such shares in accordance with Section 262 of the DGCL; provided, however, that (i) if any such holder of Dissenting Shares fails to establish such holder's entitlement to appraisal rights as provided in Section 262 of the DGCL, (ii) if any such holder of Dissenting Shares effectively withdraws such holder's demand for appraisal of such shares or loses its right to appraisal and payment for such holder's shares under Section 262 of the DGCL, or (iii) if a court of competent jurisdiction determines that such holder is not entitled to receive payment for such holder's Dissenting Shares or such holder otherwise loses such holder's appraisal rights, such holder will forfeit the right to appraisal of such Dissenting Shares and each such Dissenting Share shall no longer constitute a Dissenting Share, and will thereupon be treated as if they had been cancelled and extinguished with no consideration as of the Effective Time pursuant to Section 3.1(a).  The

11

Company will give Purchaser and Merger Sub prompt notice of any written demands received by the Company for appraisal of such shares, and Purchaser and Merger Sub will have the right to participate in all negotiations and proceedings with respect to such demands except as required by applicable Law. The Company will not, except with the prior written consent of Purchaser, voluntarily make any payment with respect to any demands for fair value for Dissenting Shares or offer to settle or negotiate in respect of any such demands.

Section 3.3    <u>Withholding Rights</u>.    Each of Purchaser, Merger Sub and the Surviving Corporation will be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as it reasonably determines in good faith it is required to deduct and withhold with respect to the making of such payment under the Code, or any other applicable Law. To the extent that amounts are so withheld and duly remitted with the appropriate Governmental Body by Purchaser, Merger Sub or the Surviving Corporation, as the case may be, such withheld amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

SECTION 4<br>REPRESENTATIONS AND WARRANTIES OF THE STOCKHOLDERS

As an inducement to Purchaser and Merger Sub to enter into this Agreement and to consummate the Transactions contemplated hereby, each Stockholder hereby represents and warrants to Purchaser and Merger Sub as of the date hereof and as of the Closing as follows (except as set forth in the corresponding section of the Disclosure Schedule):

4.1    <u>Organization and Capacity</u>.

(a)    For a Stockholder which is an entity other than a trust, such Stockholder (i) is an entity duly organized, validly existing and in good standing under the Laws of the state of its formation and (ii) has all necessary corporate power and corporate authority to carry on its business, and to own or use the properties and assets that it purports to own or use.

(b)    For a Stockholder which holds shares as a trustee of a trust, such trust (i) is in full force and effect, (ii) has not taken, and no other Person has taken, any action to effect a termination, liquidation, or bankruptcy of such trust and (iii) has only the trustee listed on the signature page hereto, which trustee has been duly appointed.

(c)    For a Stockholder which is an individual, such Stockholder (i) is mentally competent and in all respects of sound mind, (ii) has not been deprived of his or her civil rights, (iii) is over the age of twenty-one (21), (iv) is used to managing his or her financial affairs, (v) has not had a conservator or guardian appointed for him or her pursuant to a court order, and (vi) is familiar with and fully understands the nature, purpose and effect of this Agreement and each Transaction Document and the Transactions.

4.2    <u>Authority and Enforceability</u>. Such Stockholder has all requisite power and authority or capacity (as applicable), and has taken all action necessary, to execute and deliver this Agreement and each Transaction Document and to perform its obligations hereunder and thereunder. This Agreement and each Transaction Document has been duly authorized, executed and delivered by such Stockholder, and this Agreement and each Transaction Document constitutes the legal, valid and binding obligations of such Stockholder, enforceable against such Stockholder in accordance with their terms.

4.3    <u>Title to Shares</u>. Such Stockholder is the record and beneficial owner of, and has good and valid title to, the Shares set forth in the Disclosure Schedule, free and clear of all Encumbrances. Such

Stockholder is not a party to any option, warrant, right, contract, call, put or other agreement or commitment providing for the disposition or acquisition of any of the Shares (other than this Agreement and the Rollover Agreement). Such Stockholder does not have any other debt or ownership interest in any Group Company.

(b)     Other than this Agreement, the Shares owned by such Stockholder are not subject to any voting trust agreement or other Contract restricting or otherwise relating to the voting, dividend rights or other disposition.

(c)     Neither the ownership by such Stockholder of Shares, nor the right of such Stockholder to transfer Shares free and clear of Encumbrances are subject to any community property interests or laws of any jurisdiction which could require signature of any other party or parties in order to be effective.

4.4     <u>No Conflict</u>.  The execution and delivery by such Stockholder of this Agreement and each Transaction Document, and the performance by it of any actions contemplated hereunder or thereunder, does not and will not, directly or indirectly (with or without notice or lapse of time):

(a)     conflict with or violate any provision of the Governing Documents of such Stockholder;

(b)     require notice, consent or approval under, conflict with, violate, result in a breach of, result in the acceleration of obligations, loss of a benefit or increase in Liabilities or fees under, create in any Person the right to terminate, cancel or modify, or cause a default under or give rise to any rights or penalties under (i) any provision of Law relating to such Stockholder, (ii) any provision of any Governmental Order to which such Stockholder or any of his properties are subject, (iii) any provision of any Contract to which such Stockholder or its properties are bound, or (iv) any other restriction of any kind or character to which such Stockholder or its properties are subject; or

(c)     require a registration, filing, application, notice, consent, approval, order, qualification or waiver with, to or from any Governmental Authority.

4.5     <u>Legal Proceedings</u>.  There are no Actions pending or, to such Stockholder's knowledge, threatened against or by such Stockholder or any Affiliate of such Stockholder that challenge or seek to prevent, enjoin or otherwise delay the Transactions.

4.6     <u>Acknowledgement</u>.  The Stockholder acknowledges that it, he or she has conducted its, his or her own independent review and analysis of the business, assets, condition, operations and prospects of Purchaser and the Merger Sub.  In entering into this Agreement and in deciding whether to vote in favor of the Merger and the other matters set forth in the Company Stockholder Approval executed and delivered by the Stockholder in connection with the Merger, The Stockholder has relied solely upon its, his or her own investigation and analysis and the representations and warranties of Purchaser and the Merger Sub set forth in Section 6 of this Agreement, and the Stockholder acknowledges and agrees that, except for the representations and warranties of Purchaser and the Merger Sub expressly set forth in Section 6 of this Agreement, including without limitation Section 6.7, neither Purchaser nor the Merger Sub, nor any of their respective Representatives nor any other Person acting on Purchaser's or the Merger Sub's behalf makes or has made, and the Stockholder is not relying on and has not relied on, any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to the Stockholder or any of its, his or her Representatives, or otherwise with respect to Purchaser, the Merger Sub, or any of their respective businesses or the Merger.  Notwithstanding the foregoing, the acknowledgement set forth in this <u>Section 4.6</u> shall not be deemed to limit any liability of Purchaser or its Affiliates with respect to Fraud.

4.7    <u>Tax Matters</u>.  The Stockholder has had an opportunity to review with its, his or her own tax advisors the tax consequences of the Merger and the transactions contemplated by this Agreement.  The Stockholder understands that it, he or she must rely solely on its, his or her tax advisors and not on any statements or representations regarding tax matters made by Purchaser, Merger Sub, the Company or any of their respective Representatives.  The Stockholder understands that the Stockholder (and not Purchaser, Merger Sub or the Company) shall be responsible for any Tax liability for the Stockholder that may arise as a result of any of the Merger or any of the other transactions contemplated by this Agreement.

4.8    <u>Review</u>.  The Stockholder has had an opportunity to carefully read this Agreement, and the Stockholder has had reasonable time and opportunity to discuss the requirements of such agreements with the Stockholder's financial, legal and other advisors, to the extent the Stockholder has determined necessary, prior to executing this Agreement.  The Stockholder acknowledges that it, he or she is relying solely on its, his or her own counsel and not on any statements or representations of Purchaser, Merger Sub or the Company or their respective Representatives for legal advice with respect to this Agreement and the transactions contemplated hereby and thereby.

4.9    <u>Full Disclosure</u>.  No representation or warranty by such Stockholder in this Agreement and no statement concerning such Stockholder contained in the Disclosure Schedule or any certificate furnished or to be furnished by such Stockholder to Purchaser and Merger Sub in connection with the Transactions contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

SECTION 5<br>
<u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>

The Company hereby represents and warrants to Purchaser and Merger Sub, as of the date hereof that:

Section 5.1    <u>Organization; Standing and Power; Subsidiaries</u>.

(a)    The Company is an Entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization, and has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as now being conducted.  The Company is duly qualified to do business and is in good standing as a foreign corporation or other Entity in each jurisdiction listed in Section 5.1(a) of the Company Disclosure Schedule, which jurisdictions constitute the only jurisdictions in which the character of the properties it owns, operates or leases or the nature of its activities makes such qualification necessary or advisable (except any jurisdiction in which the failure to obtain such qualification would not reasonably be expected to have a Material Adverse Effect).

(b)    Section 5.1(b) of the Company Disclosure Schedule sets forth the names of the members of the board of directors of the Company (the "<u>Company Board</u>") and the names and titles of the officers of the Company.

(c)    The Company has delivered to Purchaser true, correct and complete copies of the certificate of incorporation and bylaws (or similar organizational documents) of the Company, including all amendments thereto and as presently in effect (the "<u>Organizational Documents</u>").

Section 5.2    <u>Authority; Enforceability; Company Action</u>.

(a)    The Company has all requisite corporate power and authority to enter into and to perform its obligations under this Agreement and any Company Related Agreement to which it is a party, subject

14

only to the receipt of the Company Stockholder Approval. The execution, delivery and performance by the Company of this Agreement and any Company Related Agreement to which it is a party have been duly authorized by all necessary corporate action on the part of the Company and no further corporate or similar action is required on the part of the Company to authorize this Agreement and any Company Related Agreement to which it is a party or the performance of its obligations hereunder or thereunder (subject, in the case of consummating the Merger, to the receipt of the Company Stockholder Approval). This Agreement has been, and each Company Related Agreement will be as of the Closing Date, duly and validly executed and delivered by the Company. This Agreement constitutes, and upon the execution and delivery of each Company Related Agreement, each such Company Related Agreement will constitute, the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to (a) laws of general application relating to bankruptcy, insolvency and the relief of debtors, and (b) rules of law governing specific performance, injunctive relief and other equitable remedies (the "Bankruptcy and Equity Exception").

(b)    The board of directors of the Company, at a meeting duly called and held or by written consent in lieu thereof, has unanimously (i) determined that this Agreement and the Merger are advisable and fair to and in the best interests of the Company and its stockholders, (ii) approved and adopted the Merger, this Agreement and the other transactions contemplated hereby in accordance with the provisions of the DGCL and the Company's certificate of incorporation and bylaws, (iii) directed that this Agreement and the Merger be submitted to the stockholders of the Company for their approval and adoption and (iv) recommended that the stockholders of the Company vote in favor of the approval and adoption of this Agreement and the Merger.

(c)    The Company Stockholder Approval is the only vote of the holders of any class or series of the Company's capital stock necessary to adopt this Agreement and approve the Merger.

Section 5.3    Absence of Restrictions and Conflicts; Required Consents.

(a)    Other than any filings as may be required under the DGCL in connection with the Merger, and except as set forth in Section 5.3(a) of the Company Disclosure Schedule, no notices, reports or other filings are required to be made by the Company with, nor are any consents, registrations, approvals, permits or authorizations which, required to be obtained by the Company from, any Governmental Body in connection with the execution, delivery and performance of this Agreement by the Company and the consummation of the Merger and the other transactions contemplated hereby, or in connection with the continuing operation of the business of the Company following the Effective Time.

(b)    Except as set forth in Section 5.3(b) of the Company Disclosure Schedule, neither the execution, delivery or performance by the Company of this Agreement or any of the Company Related Agreements, nor the consummation of the Merger or any of the other transactions contemplated by this Agreement or any the Company Related Agreements, will directly or indirectly (with or without the giving of notice or the lapse of time or both): (i) conflict with or result in a violation of any provision of the certificate of incorporation or bylaws of the Company; (ii) assuming that all filings, permits, authorizations, consents and approvals referred to in the preceding Section 5.3(a) are made and obtained, conflict with or result in a violation of any Law or any Order to which the Company, or any of their respective assets, or any of the assets owned, used or controlled by the Company, is subject; (iii) conflict with or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate or modify, any Governmental Authorization that is held by the Company; (iv) contravene, conflict with or result in a violation or breach of, or result in a default under, any provision of any Material Contract to which the Company is a party, or give any Person the right to (x) declare a default or exercise any remedy under any such Material Contract or (y) modify, terminate, or accelerate any right, liability or obligation of the Company under any such Material Contract, or charge any

fee, penalty or similar payment to the Company under any such Material Contract; or  (v) result in the imposition or creation of any Encumbrance upon or with respect to any asset owned or used by the Company.

Section 5.4       Capitalization.

(a)       The authorized capital stock of the Company consists of 10,000,000 shares of Common Stock.  As of the date of this Agreement, 10,000,000 shares of Common Stock are issued and outstanding, and no shares of capital stock of the Company are held in the treasury of the Company.  All of the issued and outstanding Common Stock are duly authorized, validly issued, fully paid and non-assessable and are not subject to any Encumbrances or preemptive rights created by statute, the certificate of incorporation or bylaws of the Company or any Contract to which the Company is a party or by which it is bound, other than rights of first refusal in favor of the Company.  Section 5.4(a) of the Company Disclosure Schedule sets forth, as of the date hereof, the name of each holder of Common Stock and for each such holder, the number of shares held by such Person and the number of the applicable Certificate or Certificates representing such shares.  All of the outstanding Common Stock have been issued and granted in compliance with (i) all applicable securities and other Laws, and (ii) all requirements set forth in the Company's certificate of incorporation and bylaws and Contracts to which the Company is a party or is otherwise bound.

(b)       There are no preemptive or similar rights granted by the Company on the part of any holders of any class of securities of the Company.  The Company has no outstanding bonds, debentures, notes or other obligations which grant the holders of which the right to vote (or which are convertible into or exercisable for securities having the right to vote) with the stockholders or other equity holders of the Company on any matter.  Except as listed in Section 5.4(b) of the Company Disclosure Schedule, there are not any options, warrants, rights, convertible or exchangeable securities, "phantom" stock rights, stock appreciation rights, restricted stock units, stock-based performance units, commitments, Contracts, arrangements or undertakings of any kind to which the Company is a party or by which any of them is bound (i) obligating the Company to issue, deliver or sell or cause to be issued, delivered or sold, additional securities of, or other equity interests in, or any security convertible or exercisable for or exchangeable into any security of, or other equity interest in, the Company, (ii) obligating the Company to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking or (iii) that give any Person the right to receive any economic benefit or right similar to or derived from the economic benefits and rights accruing to holders of securities of, or other equity interests in, the Company (collectively, "Company Rights").  There are no outstanding contractual obligations of the Company to repurchase, redeem or otherwise acquire any securities of, or other equity interests in, the Company.  There are no proxies, voting trusts or other agreements or understandings to which the Company is a party or is bound with respect to the voting of the securities of, or other equity interests in, the Company.

Section 5.5       Company Financial Statements; Undisclosed Liabilities.

(a)       The Company has Made Available all information required by GAAP to be included or reflected in a balance sheet of the Company or statements of income, stockholders' equity and cash flow of the Company (the "Financial Information").  The Financial Information (i) was prepared from and in accordance with the books and records of the Company and (ii) fairly presents, in all material respects, the financial position of the Company as of such dates and the results of operations, changes in stockholders' equity and cash flows of the Company as of the Closing.

(b)       The Company does not have any liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of any type, whether current or non-current, accrued, absolute, contingent, matured, unmatured, determined, determinable or otherwise (whether or not required to be

reflected in financial statements prepared in accordance with GAAP), whether known or unknown, except such liabilities or obligations that have arisen in the ordinary course of business, consistent with past practice, since February 1, 2024 and which are not in excess of $5,000 in aggregate.

(c)    The Company does not have any assets (current or non-current) other than (a) the cash set out in Section 5.5(d) and (b) any assets set out in Sections 5.8 or 5.9 of the Disclosure Schedule.

(d)    The Company's level of cash is at least the amount of the Closing Cash. Since January 1, 2024, the Company has conducted its cash management customs and practices in the usual and ordinary course of business consistent with past custom and practice in all material respects.

Section 5.6    <u>Absence of Changes</u>.  Since August 2, 2023, (a) the Company has conducted its businesses only in the ordinary course consistent with past practice; (b) there has not been any change, event or development or prospective change, event or development that, individually or in the aggregate, has had or is reasonably likely to have a Material Adverse Effect; (c)  the Company has not suffered any loss, damage, destruction or other casualty affecting, any of its material properties or assets, whether or not covered by insurance; and (d) the Company has not taken any action set forth below:

(a)    declared, set aside, made or paid any non-Cash dividend or other distribution on or with respect to any of its capital stock or other equity or ownership interest;

(b)    authorized, or made any commitment with respect to, any single capital expenditure that is in excess of $10,000 or capital expenditures that are, in the aggregate, in excess of $50,000 for the Company or its Subsidiaries;

(c)    increased the compensation payable or to become payable or the benefits provided to its directors, managers, officers, employees, consultants or advisors except for normal merit and cost-of-living increases consistent with past practice in salaries or wages of employees of the Company, or granted any severance or termination payment to, or paid, loaned or advanced any amount to, any director, manager, officer employee, consultant or advisor of the Company, or established, adopted, entered into or amended any Plan, or made any declaration, payment or commitment or obligation of any kind for the payment (whether in cash, equity or otherwise) of a severance payment, termination payment, bonus or other additional salary or compensation to any such Person, except payments made pursuant to written agreements outstanding on the date hereof and disclosed in the Disclosure Schedules;

(d)    made any change in any method of accounting or accounting practice or policy, except as required by GAAP;

(e)    made, revoked or modified any Tax election, settled or compromised any Tax liability or filed any Tax Return other than on a basis consistent with past practice;

(f)    paid, discharged or satisfied any claim, liability or obligation (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction, in the ordinary course of business consistent with past practice, of liabilities reflected or reserved against on the Unaudited Interim Balance Sheet or subsequently incurred in the ordinary course of business consistent with past practice;

(g)    cancelled, compromised, waived or released any right or claim other than in the ordinary course of business consistent with past practice;

(h)      accelerated the collection of or discounted any accounts receivable, delayed the payment of accounts payable or deferred expenses, reduced inventories or otherwise increased cash on hand, except in the ordinary course of business consistent with past practice;

(i)      commenced or settled any Action; or

(j)      announced an intention, entered into any formal or informal agreement, or otherwise made a commitment to do any of the foregoing.

Section 5.7      <u>Title to and Sufficiency of Assets</u>.

(a)      The Company has good, valid, transferable and marketable title to, or valid leasehold interests in or license rights to, all of its properties and assets, in each case free and clear of all Encumbrances, except for Permitted Encumbrances.

(b)      The properties and assets owned by the Company or used by them under enforceable Contracts constitute all of the properties and assets (whether real, personal or mixed and whether tangible or intangible) necessary and sufficient to permit the Company to conduct its business after the Effective Time in accordance with its past practice and as presently conducted.

Section 5.8      <u>Real Property; Personal Property</u>.

(a)      The Company does not occupy or use, or have any rights or obligations with respect to, any Leased Real Property.

(b)      All material items of tangible personal property and assets of the Company (i) are free of defects and in good operating condition and in a state of good maintenance and repair, subject to ordinary wear and tear and (ii) were acquired and are usable in the regular and ordinary course of business.

Section 5.9      <u>Intellectual Property</u>.

(a)      Section 5.9(a) of the Company Disclosure Schedule contains a true, correct and complete list of all Company Registered Intellectual Property (reflecting, in each case, ownership where there is co-ownership with a Person other than the Company, filing date, date of issuance and registration or application numbers, as applicable).

(b)      With respect to the applications and registrations for Company Registered Intellectual Property set forth in Section 5.9(a) of the Company Disclosure Schedule, (i) the Company is the record owner of such applications and registrations, (ii) such applications and registrations have been duly maintained, are subsisting, valid, in full force and effect, and have not been cancelled, expired, or abandoned, (iii) there are no facts or circumstances that would render such applications and registrations invalid or unenforceable, (iv) there are no pending or, to the Knowledge of the Company, threatened interferences, re-examinations, oppositions or cancellation proceedings involving such applications and registrations and (v) such applications have been prosecuted in accordance with all applicable rules, practices and procedures of the U.S. Patent and Trademark Office or other applicable Governmental Body.

(c)      The Company owns, free and clear of any Encumbrances (other than Permitted Encumbrances), or has a valid and enforceable right to use, all Intellectual Property used or proposed to be used in connection with the operation and conduct of their businesses.

18

(d)      Section 5.9(d) of the Company Disclosure Schedule sets forth a true, correct and complete list of the Company Proprietary Software (other than documentation) currently offered or planned to be offered on a commercial basis.

(e)      The Company has entered into work made for hire agreements or obtained assignments from their respective employees, former employees, independent contractors and former independent contractors who contributed to the creation or development of any Company Intellectual Property which the Company purports to own, assigning to the Company all Intellectual Property created or developed in connection with such employment or engagement.

(f)      Neither the Company nor any of its current or proposed products or services have infringed upon, misappropriated or violated or are currently infringing upon, misappropriating or otherwise violating any Intellectual Property rights of any Person; and no third party is infringing upon, misappropriating or otherwise violating any Intellectual Property of the Company.  The Company has not received from any Person any written notice or claim that the Company is infringing upon, misappropriating or otherwise violating any Intellectual Property rights of any Person.  No proceedings are pending or, to the Knowledge of the Company, threatened, that challenge the validity, ownership or use of any Company Intellectual Property that is owned by the Company.

(g)      The Company has not licensed any Company Intellectual Property to any Person on an exclusive basis.

(h)      Except as stated in Section 5.9(h) of the Company Disclosure Schedule, no source code for any Company Proprietary Software has been delivered, licensed, or made available to any escrow agent or other Person who is not an employee of the Company.

(i)      The Company has taken commercially reasonable steps to protect their rights in the Confidential Information and to prevent the unauthorized disclosure or use of the Confidential Information.

(j)      The Company has not incorporated any open source Software in any Software owned by the Company or in any Software that was developed, licensed, distributed, used or otherwise exploited by or for the Company, in a manner that requires the contribution, licensing or disclosure to any third party by the Company, including the open source Software community, of any portion of the source code of any such Software owned by the Company or developed, licensed, distributed, used or otherwise exploited by or for the Company.

Section 5.10      Contracts.

(a)      Except as set forth in Section 5.10(a) of the Company Disclosure Schedule, the Company is not a party to or bound by:

(i)      any Contract relating to the employment of, or the performance of services by, any employee, consultant or independent contractor (A) that is not terminable at will by the Company on thirty (30) days or less notice without further liability, (B) providing severance payments or other benefits or (C) providing for the payment of any cash or other compensation in connection with the consummation of the transactions contemplated hereby (whether upon or at any time following the Closing);

(ii)      any Contract that limits, or purports to limit, the ability of any of the Company, or any officers, directors, employees, stockholders or other equity holders, agents or representatives

of any of the Company (in their capacities as such) to compete in any line of business or with any Person or in any geographic area or during any period of time;

(iii)     any Contract, including any stock option plan, stock appreciation rights plan, stock purchase plan or phantom stock plan, any of the benefits of which will be increased, or the vesting of benefits of which will be accelerated or may be accelerated, by the occurrence of any of the transactions contemplated by the Agreement or the value of any of the benefits of which will be calculated on the basis of any of the transactions contemplated by this Agreement;

(iv)     any bond, debenture, note, credit or loan agreement, security agreement, mortgage or other Contract relating to Indebtedness of the Company;

(v)     any Contract relating to the creation of any Encumbrance with respect to any asset of the Company;

(vi)     any Contract involving or incorporating any guaranty, pledge, performance or completion bond, indemnity or surety by the Company with respect to the performance of any other Person;

(vii)     any Contract creating or relating to any partnership or joint venture or any sharing of revenues, profits, losses, costs or liabilities;

(viii)     any Contract relating to the purchase or sale of any product or other asset by or to, or the performance of any services by or for, any Affiliate of the Company;

(ix)     any Contract relating to the disposition or acquisition of assets or any interest in any business enterprise outside the ordinary course of the Company's business;

(x)     any inbound or outbound license, royalty or other Contract with respect to any Company Intellectual Property (except for license agreements of non-customized, generally commercially available off the shelf software subject to "shrink wrap" or "click wrap" license agreements and except for Contracts with respect to products no longer offered by the Company);

(xi)     any Contract providing for the performance of services or delivery of goods or materials by or to the Company that involves individual payments by the Company in excess of $10,000 or total future payments by the Company in excess of $10,000;

(xii)     any outstanding power of attorney empowering any Person to act on behalf of the Company; or

(xiii)     any other Contract that involves individual payments by the Company in excess of $10,000 or total payments by the Company in excess of $10,000 per annum and is not cancellable by the Company on 30 days or less notice without liability or penalty.

(b)     The Company has delivered to Purchaser true, correct and complete copies of each Contract set forth, or required to be set forth, in Section 5.10(a) of the Company Disclosure Schedule (each, a "Material Contract").

(c)     Each Material Contract is valid and in full force and effect and is enforceable by the Company in accordance with its terms. The Company is not in breach, violation or default under, or has received written notice that it is in breach, violation or default under, any of the terms or conditions of any

Material Contract and, to the Knowledge of the Company, no other party thereto is in breach, violation or default under, any of the terms or conditions of any Material Contract.

Section 5.11    Compliance with Laws; Governmental Authorizations.

(a)    The Company is in and has been in material compliance with all applicable Laws.  The Company has not received any notice or other written communication from any Governmental Body regarding any actual or possible violation of, or failure to comply with, any Law.

(b)    Section 5.11(b) of the Company Disclosure Schedule identifies each Governmental Authorization held by the Company (indicating, in each case, the holder of such Governmental Authorization).  The Governmental Authorizations held by the Company are valid and in full force and effect, and constitute all Governmental Authorizations necessary to enable the Company to conduct its business in the manner in which its business is currently being conducted and as presently planned to be conducted.  The Company is in material compliance with the terms and requirements of the respective Governmental Authorizations held by such Entity. The Company has not received any written notice or other written communication from any Governmental Body regarding (i) any actual or possible violation of or failure to comply with any term or requirement of any Governmental Authorization, or (ii) any actual or possible revocation, withdrawal, suspension, cancellation, termination or modification of any Governmental Authorization.

Section 5.12    Legal Proceedings; Orders.  There is no Legal Proceeding pending or, to the Knowledge of the Company, threatened against the Company or any of its or their respective properties or assets.  There is no Order to which the Company, or any of its or their respective properties or assets is subject.

Section 5.13    Tax Matters.

(a)    All material Tax Returns due to have been filed by the Company through the date hereof in accordance with all applicable Laws (pursuant to an extension of time or otherwise) have been duly filed and are true, correct and complete in all material respects.  No written claim has ever been made by a Governmental Body in a jurisdiction where the Company does not file Tax Returns that it is or may be subject to taxation or to a requirement to file Tax Returns in that jurisdiction.

(b)    Except as stated in Section 5.13(b) of the Company Disclosure Schedule, all Taxes, deposits and other payments for which the Company has liability (whether or not shown on any Tax Return) have been timely paid in full or are accrued as liabilities for Taxes on the books and records of the Company, as applicable.

(c)    There are not any extensions of time currently in effect with respect to the dates on which any Tax Returns were or are due to be filed by the Company.

(d)    All Tax deficiencies asserted as a result of any examination by a Governmental Body of a Tax Return of the Company have been paid in full, accrued on the books of the Company, as applicable, or finally settled.

(e)    No written claims have been asserted and no written proposals or deficiencies for any Taxes of the Company are being asserted, proposed or, to the Knowledge of the Company, threatened, and no audit or investigation of any Tax Return of the Company is currently underway, pending or threatened.

(f)　　　The Company has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor or stockholder thereof or other third party and have timely filed all Tax Returns or other reports with respect to such payments in accordance with the Code.

(g)　　　There are no outstanding waivers or agreements between any Governmental Body and the Company for the extension of time for the assessment of any Taxes or deficiency thereof, nor are there any requests for rulings, outstanding subpoenas or requests for information, notice of proposed reassessment of any property owned or leased by the Company or any other matter pending between the Company and any Governmental Body.

(h)　　　There are no Encumbrances for Taxes (excluding Permitted Encumbrances) with respect to the Company or the assets or properties thereof, nor is there any such Encumbrance that is pending or, to the Knowledge of the Company, threatened.

(i)　　　The Company is not a party to or bound by any Tax allocation or sharing agreement or similar Contract or arrangement that obligates or may obligate it to make any payment computed by reference to Taxes, taxable income or taxable losses of any other Person (except to the extent such agreement, contract or arrangement was entered into in the ordinary course of business and not primarily related to Taxes).

(j)　　　The Company has not constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock qualifying for tax free treatment under Section 355 of the Code (i) in the two years prior to the date of this Agreement or (ii) in a distribution which could otherwise constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Code) in connection with the Merger.

(k)　　　The Company has not been a member of an "affiliated group" of corporations (within the meaning of Code § 1504) filing a consolidated federal income tax return (other than a group the common parent of which is the Company).

(l)　　　The Company has no liability for the Taxes of any Person (other than for itself) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee or successor, by contract or otherwise.

(m)　　　The Company has not been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

Section 5.14　　　Company Benefit Plans.

(a)　　　The Company does not maintain or have any Company Benefit Plan.

(b)　　　The transactions contemplated by this Agreement will not result (either alone or in combination with any other event) in (i) any payment of, or increase in, remuneration or benefits, to any employee, officer, director or consultant of the Company, (ii) any cancellation of indebtedness owed to the Company by any employee, officer, director or consultant of the Company, (iii) the acceleration of the vesting, funding or time of any payment or benefit to any employee, officer, director or consultant of the Company or (iv) any "parachute payment" within the meaning of Section 280G of the Code (whether or not such payment is considered to be reasonable compensation for services rendered).  The Company is not

a party to any Contract, nor do any of them have any liability (current or contingent), to compensate any individual for excise Taxes due under Section 4999 of the Code.

(c)    Any Company agreement that constitutes a "non-qualified deferred compensation plan" subject to Code Section 409A complies with Code Section 409A with respect to its form and operation, no amounts under any such Company Benefit Plan are or have been subject to the interest and additional Tax set forth under Code Section 409A(a)(1)(B), and there is no obligation to reimburse or otherwise "gross-up" any Person for the interest or additional Tax set forth under Code Section 409A(a)(1)(B). To the extent applicable, all Company Rights granted by the Company were granted using an exercise price or a base price, as the case may be, of not less than the fair market value of the underlying shares as of the grant date, and are not otherwise subject to the requirements of Code Section 409A.

Section 5.15    Insurance.

(a)    Section 5.15(a) of the Disclosure Schedule sets forth the following information with respect to each insurance policy (including policies providing property, casualty, liability, director & officer, and workers' compensation coverage and bond and surety arrangements) with respect to which the Company is a party, a named insured, or otherwise the beneficiary of coverage (collectively, the "Company Insurance Agreements"): (a) the name of the insurer, the name of the policyholder, and the name of each covered insured; and (b) the policy number and the period of coverage.

(b)    There is no claim by the Company or any other Person pending under any such policies and bonds as to which coverage has been questioned, denied or disputed. All premiums payable under all such policies and bonds have been paid. There are no threatened terminations of, or material premium increases with respect to, any of such policies or bonds. Section 5.15(b) of the Disclosure Schedule sets forth a list of all claims made under the Company Insurance Agreements, or under any other insurance policy, bond or agreement covering the Company or any of its Subsidiaries or their operations. The Company has maintained insurance policies with coverage and policy limits that are substantially similar to the coverage and policy limits provided by the Company Insurance Agreements.

Section 5.16    Employee and Labor Matters.

(a)    Section 5.16(a) of the Company Disclosure Schedule contains a true, correct and complete list of the employees of the Company as of the date hereof and shows with respect to each such employee the employee's name, position held, principal place of employment, annual base salary or hourly wage rate, as applicable.

(b)    Section 5.16(b) of the Company Disclosure Schedule contains a true, correct and complete list of all independent contractors used by the Company as of the date hereof.

(c)    The Company is not, and has not been, a party to any collective bargaining agreement and no union or other labor organization has been certified or voluntarily recognized by any Governmental Body as an agent of collective bargaining for any employees of the Company. No representation election petition or application for certification has been filed by employees of the Company and is pending with the National Labor Relations Board or any other Governmental Body and to the Knowledge of the Company, there have been no other union organization attempts or threatened attempts with respect to the Company. There is no union, works council, employee representative or other labor organization which, pursuant to applicable Law, must be notified, consulted or with which negotiations must be conducted in connection with the transactions contemplated by this Agreement. There has not arisen any strike, work stoppage or other material labor dispute involving the Company.

(d)    The Company has not been engaged in any unfair labor practice. The Company has at all times has complied with all applicable Laws relating to employment, employment practices, labor and terms and conditions of employment, including employment discrimination and harassment, collective bargaining, wages and salaries, withholding, hours, worker classification, occupational health and safety, workers compensation, leaves of absence, immigration, WARN and any similar Laws. There are no administrative charges or court complaints or, to the Knowledge of the Company, investigations against the Company concerning alleged employment discrimination, collective bargaining, wage and hour issues, worker classification or workplace safety, or any other employment related matters pending or, to the Knowledge of the Company, threatened before the U.S. Equal Employment Opportunity Commission or any other Governmental Body.

(e)    Except as stated in Section 5.16(e) of the Company Disclosure Schedule, the Company has maintained workers' compensation coverage as required by applicable Law through the purchase of insurance and not by self-insurance or otherwise.

(f)    None of the current or former independent contractors of the Company could be reclassified as an employee and no current or former employees classified as "exempt" from overtime requirements could be reclassified as non-exempt.

Section 5.17    Customers and Vendors.

(a)    Section 5.17(a) of the Company Disclosure Schedule sets forth a true, correct and complete list of (i) the 5 largest vendors to the Company, taken as a whole, for the period beginning on formation of the Company and ending February 28, 2024 (determined on the basis of the total dollar amount paid) (each, a "Material Vendor"). The Company does not have any customers.

(b)    Except as stated on Section 5.17(b) of the Company Disclosure Schedule, at no time has there been any termination, cancellation or material curtailment of the business relationship of the Company with any Material Vendor nor, to the Knowledge of the Company, has any Material Vendor indicated an intent to so terminate, cancel or materially curtail its business relationship with the Company, whether as a result of the consummation of the transactions contemplated hereby or otherwise.

Section 5.18    Brokers, Finders and Investment Bankers. No broker, finder, investment banker or other Person is entitled to any brokerage, finder's or other fee or commission in connection with this Agreement or any of the other transactions contemplated hereby based upon arrangements made by or on behalf of the Company.

Section 5.19    Disclosure. Neither this Agreement nor any agreement, attachment, schedule, exhibit, certificate or other statement delivered pursuant to this Agreement or in connection with the transactions contemplated hereby omits to state a material fact necessary in order to make the statements and information contained herein or therein, not misleading. The Company is not aware of any information necessary to enable a prospective purchaser of the Company Shares or the business of the Company and its Subsidiaries to make an informed decision with respect to the purchase of such Company Shares or business that has not been expressly disclosed herein. Purchaser has been provided full and complete copies of all documents referred to on the Disclosure Schedule.

SECTION 6
REPRESENTATIONS AND WARRANTIES OF PURCHASER AND MERGER SUB

Purchaser and Merger Sub represent and warrant to the Company, as of the date hereof that:

Section 6.1    Organization; Standing and Power. Each of Purchaser and Merger Sub is an entity duly formed, validly existing and in good standing under the Laws of its jurisdiction of organization, and has all corporate power required to conduct its business as now conducted. Each of Purchaser and Merger Sub is duly qualified to do business and is in good standing in each jurisdiction in which the conduct of its business or the ownership or leasing of its properties requires such qualification, except where the failure to be so qualified would not reasonably be expected to prevent, materially delay or materially impair the ability of Purchaser or Merger Sub to consummate the transactions contemplated hereby.

Section 6.2    Authority; Enforceability; Company Action. Each of Purchaser and Merger Sub has all requisite corporate power and authority to enter into and perform its obligations under this Agreement and under each Purchaser Related Agreement to which it is a party, subject only to the adoption of this Agreement by the sole stockholder of Merger Sub. The execution, delivery and performance by each of Purchaser and Merger Sub of this Agreement and each Purchaser Related Agreement to which it is a party have been duly authorized by all necessary corporate action on the part of Purchaser and Merger Sub and no further corporate or similar action is required on the part of Purchaser or Merger Sub to authorize this Agreement and any Purchaser Related Agreement to which it is a party or the performance of its obligations hereunder or thereunder (subject, in the case of consummating the Merger, to the adoption of this Agreement by the sole stockholder of Merger Sub). This Agreement has been, and each Purchaser Related Agreement to which it is a party will be as of the Closing Date, duly and validly executed and delivered by each of Purchaser and Merger Sub. This Agreement constitutes, and upon the execution and delivery of each Purchaser Related Agreement to which it is a party, each such Purchaser Related Agreement will constitute, the legal, valid and binding obligation of each of Purchaser and Merger Sub, subject to the Bankruptcy and Equity Exception.

Section 6.3    Absence of Restrictions; Required Consents.

(a)    Other than any filings as may be required under the DGCL in connection with the Merger, no notices, reports or other filings are required to be made by Purchaser or Merger Sub with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by Purchaser or Merger Sub from, any Governmental Body in connection with the execution, delivery and performance of this Agreement by Purchaser or Merger Sub and the consummation of the Merger and the other transactions contemplated hereby.

(b)    Neither the execution, delivery or performance by Purchaser or Merger Sub of this Agreement or any of the Purchaser Related Agreements, nor the consummation of the transactions contemplated by this Agreement or any of the Purchaser Related Agreements, will directly or indirectly (with or without notice or lapse of time): (i) conflict with or result in a violation of any of the provisions of the organizational documents of Purchaser or Merger Sub; (ii) assuming that all filings, permits, authorizations, consents and approvals referred to in the preceding Section 5.3(a) are made and obtained, conflict with or result in a violation of any Law or Order to which Purchaser or Merger Sub, or any of the assets owned, used or controlled by Purchaser and Merger Sub, is subject; (iii) conflict with or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate or modify, any Governmental Authorization that is held by Purchaser or Merger Sub; or (iv) contravene, conflict with or result in a violation or breach of, or result in a default under, any provision of any Contract to which Purchaser or Merger Sub is a party, or give any Person the right to (x) declare a default or exercise any remedy under any such Contract or (y) modify, terminate, or accelerate any right, liability or obligation of Purchaser or Merger Sub under any such Contract, or charge any fee, penalty or similar payment to Purchaser or Merger Sub under any such Contract.

Section 6.4    Finders' Fees. Except as disclosed on Schedule 6.4, there is no investment banker, broker, finder, or other intermediary that has been retained by or is authorized to act on behalf of the

Purchaser or any Affiliate thereof, who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement or any Company Related Agreement other than fees (if any) that will be paid by the Purchaser or its Affiliates and for which the Pre-Closing Holders will have no responsibility to pay.

Section 6.5    Capitalization.  The authorized capital stock of Purchaser consists of 12,853,931 shares of Series A Preferred Stock, 1,928,909 shares of Series A-1 Preferred Stock and 30,589,995 Purchaser Common Shares.  Each share of Series A Preferred Stock and Series A-1 Preferred Stock is convertible into one (1) Purchaser Common Share.

Section 6.6    Investment Intent.  Purchaser is acquiring the shares for its own account for investment purposes only and not with a view to any public distribution or with any intention of selling, distributing or otherwise disposing of the shares in a manner that would violate the registration requirements of the Securities Act. Purchaser is a sophisticated investor. Purchaser is able to bear the economic risk of holding the shares for an indefinite period of time (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

Section 6.7    To Purchaser's Knowledge, none of the representations and warranties in this Section 6 contain any untrue statement of a material fact or omit to state a material fact required to be stated or necessary to make the representations and warranties in this Section 6, in light of the circumstances under which they were made, not false or misleading.

SECTION 7<br>CERTAIN COVENANTS AND AGREEMENTS

Section 7.1    Employee Matters.

(a)    As of the Closing, if and as requested by Purchaser, the Company will terminate, or cause to be terminated, certain or all of the Company Benefit Plans as requested by Purchaser and will ensure that no employee or former employee of the Company has any rights under such Company Benefit Plans and that any liabilities of the Company under such Company Benefit Plans (including any such liabilities relating to services performed prior to the Closing) are fully extinguished at no cost to the Company, the Surviving Corporation, Purchaser or its Affiliates.

(b)    The Company will not make any communication to employees of the Company regarding any Employee Benefit Plan maintained by Purchaser or any of its Affiliates or any compensation or benefits to be provided by Purchaser or any of its Affiliates (including the Surviving Corporation or any Subsidiary thereof) after the Closing Date without the advance approval of Purchaser.

Section 7.2    Public Announcements.  All press releases or other public communications of any nature whatsoever relating to the transactions contemplated by this Agreement, and the method of the release for publication thereof, will be subject to the prior mutual approval of (a) Purchaser and (b) prior to the Effective Time, the Company, and following the Effective Time, the Holder Representative, which approval will not be unreasonably withheld or delayed; provided, however, that such prior approval will not be required for any press release or other public communication by Purchaser, the Company or the Holder Representative (i) as required by applicable Law or the rules of any stock exchange or the SEC, in which case the other party will be advised and the parties will use commercially reasonable efforts to cause a mutually agreeable release, announcement or other disclosure to be issued; (ii) as required in order to fulfill its obligations under this Agreement; and (iii) disclosures which only repeat information that is

26

already publicly available (it being understood and agreed that, for purposes hereof, information contained in the Certificate of Merger shall not be considered publicly available solely as a result of the filing thereof).

Section 7.3    Tax Covenant and Post-Closing Tax Actions.

(a)    Tax Returns.  Following the Effective Time, Purchaser will cause the Company to prepare and timely file or cause to be prepared and timely filed, in a manner consistent in all material respects with the past practices of the Company (except where otherwise required by applicable Law), (i) all Tax Returns of the Company for Tax periods ending on or prior to the Closing Date ("Pre-Closing Tax Periods") which are due to be filed after the Closing Date (taking into account all applicable extensions of time for filing) and (ii) all Tax Returns of the Company for Tax periods which begin before the Closing Date and end after the Closing Date ("Straddle Tax Periods").  Purchaser will cause any such Tax Return to be delivered to the Holder Representative for review and comment no later than 30 days before the due date (after giving effect to any applicable extensions) of such Tax Return, unless Purchaser confirms in writing to the Holder Representative that it will not make any claim for indemnification pursuant to Section 8 with respect to such Tax Return.  Purchaser will cause the Company to incorporate any reasonable comments provided in writing by the Holder Representative to Purchaser with respect to all such Tax Returns which the Holder Representative is entitled to review and comment on pursuant to the immediately preceding sentence.

(b)    Payment of Taxes.

(i)    The Pre-Closing Holders will be responsible for any Taxes of the Company for any Pre-Closing Tax Period and that portion of a Straddle Tax Period that ends on the Closing Date.

(ii)    Taxes for any Straddle Tax Period will be allocated: (i) in the case of Taxes based on capitalization, debt or shares of stock authorized, issued or outstanding, or ad valorem Taxes, the portion of such Taxes allocated to the period ending on the Closing Date will be deemed to be the amount of such Tax for the entire taxable period, multiplied by a fraction the numerator of which is the number of days in the taxable period ending on and including the Closing Date and the denominator of which is the number of days in the entire taxable period, and (ii) in the case of any other Tax, the portion of such Taxes allocated to the period ending on the Closing Date will be determined on the basis of an interim closing of the books as of the end of the Closing Date.

(iii)    Purchaser will pay sales, use, stamp, documentary, real estate, personal property or other transfer Taxes payable as a result of the consummation of the transactions contemplated hereby.  Purchaser will file, or cause to be filed, all necessary documentation and Tax Returns with respect to such Taxes.

(c)    Contest Provisions.  Notwithstanding anything to the contrary contained in Section 6.4(a):

(i)    Purchaser will promptly notify the Holder Representative in writing upon receipt by Purchaser, any of its Affiliates or, after the Closing Date, the Company of notice of any pending or threatened Tax audits, inquiries or assessments, or other Legal Proceedings relating to Tax liabilities of the Company for which the Purchaser Indemnified Parties may be entitled to indemnification under Section 8.1 (a "Tax Contest Claim"); provided, however, that the failure or delay by Purchaser to promptly provide notice of a Tax Contest Claim will not affect Purchaser's right to indemnification hereunder except to the extent the defense of such Tax Contest Claim is materially prejudiced thereby. Such notice will include a copy of the relevant portion of any correspondence received from the relevant Governmental Body.

(ii)    The Holder Representative will have the right to control the conduct of any Tax Contest Claim which relates to any Pre-Closing Tax Period, and to employ counsel of the Holder Representative's choice at its own cost, if the Holder Representative notifies Purchaser in writing of its intention to do so; provided, however, that the Holder Representative will keep Purchaser informed regarding the progress and substantive aspects of any Tax Contest Claim that it elects to control, Purchaser will be entitled at its expense to participate in any Tax Contest Claim that the Holder Representative elects to control and the Holder Representative will not compromise or settle any such Tax Contest Claim without obtaining Purchaser's prior written consent (which consent will not be unreasonably withheld, conditioned or delayed). If the Holder Representative does not elect to control the conduct of a Tax Contest Claim pursuant to this Section 6.4(c)(ii), then Purchaser will keep the Holder Representative informed regarding the progress and substantive aspects of such Tax Contest Claim. The Holder Representative will be entitled (at the expense of the Pre-Closing Holders) to participate in such Tax Contest Claim and Purchaser will not compromise or settle any such Tax Contest Claim without obtaining the Holder Representative's prior written consent (which consent will not be unreasonably withheld, conditioned or delayed).

(iii)    Purchaser will have the right to control the conduct of any Tax Contest Claim which relates to any Straddle Tax Period. Purchaser will keep the Holder Representative informed regarding the progress and substantive aspects of such Tax Contest Claim. The Holder Representative will be entitled (at the expense of the Pre-Closing Holders) to participate in such Tax Contest Claim and Purchaser will not compromise or settle any such Tax Contest Claim without obtaining the Holder Representative's prior written consent (which consent will not be unreasonably withheld, conditioned or delayed).

(iv)    Purchaser will have the sole right to represent the Company's interests in any Tax audit, inquiry or assessment, or other administrative or court proceeding relating solely to Tax liabilities for which a Purchaser Indemnified Party is not entitled to indemnification under this Agreement and to employ counsel of Purchaser's choice at Purchaser's expense. Purchaser will have the sole right to defend the Company with respect to any issue arising in connection with any Tax Contest Claim to the extent Purchaser shall have agreed in writing to forego any indemnification under this Agreement with respect to such issue.

(d)    <u>Assistance and Cooperation</u>.    After the Closing Date, each Stockholder, the Holder Representative and Purchaser will (and will cause their respective Affiliates to):

(i)    timely sign and deliver such certificates or forms as may be necessary or appropriate to establish an exemption from (or otherwise reduce), or file Tax Returns or other reports with respect to, Taxes described in Section 6.4(b);

(ii)    assist the other party in preparing any Tax Returns which such other party is responsible for preparing and filing in accordance with Section 6.4(a), and in connection therewith provide the other party necessary powers of attorney;

(iii)    cooperate fully in preparing for and conducting any audits of, or disputes with taxing authorities regarding, any Tax Returns of the Company and provide the other party with powers of attorney as necessary to comply with Section 6.4(c)(ii) or Section 6.4(c)(iii);

(iv)    make available to the other and to any Governmental Body as reasonably requested all information, records, and documents relating to Taxes of the Company; and

(v)    furnish the other with copies of all correspondence received from any Governmental Body in connection with any Tax audit or information request with respect to any such taxable period.

Notwithstanding the provisions of this Section 7.4(d), after the Closing Date and except as required by applicable law or an order of a Governmental Body, Purchaser will not (i) make, change or revoke any Tax election or (ii) change the Company's method of accounting without the written consent of the Holder Representative, which shall not be unreasonably withheld, conditioned or delayed, if either such action will give rise to an indemnification obligation of any Indemnifying Party.

Section 7.4    Release.

(a)    Release. Each Stockholder, on behalf of such Stockholder and each of such Stockholder's Affiliates, successors and assigns (individually, a "Stockholder Releasor" and collectively, "Stockholder Releasors"), effective as of the Closing, hereby releases and forever discharges, Purchaser, the Group Company, and each of their respective individual, joint or mutual, past and present Affiliates, successors and assigns (individually, a "Purchaser Releasee" and collectively, "Purchaser Releasees") from any and all obligations, Contracts, debts, liabilities and obligations that any Purchaser Releasee now has or has ever had in favor of any Stockholder Releasor, in each case, of any nature (whether absolute or contingent, asserted or unasserted, known or unknown, primary or secondary, direct or indirect, and whether or not accrued) arising contemporaneously with or before the Closing or on account of or arising out of any matter, cause or event occurring contemporaneously with or before the Closing, whether pursuant to their respective certificate of incorporation or by-laws (or comparable documents), any Contract or otherwise and whether or not relating to claims pending on, or asserted after, the Closing Date (collectively, the "Released Claims"), in each case, other than (i) any right of such Stockholder arising under this Agreement or any Transaction Document including claims arising hereunder or thereunder; (ii) to the extent Stockholder Releasor is an employee of any Group Company, any right of Stockholder Releasor to receive accrued but unpaid wages, salary, compensation, bonuses, accrued vacation and any other accrued but unpaid compensation and/or benefits (other than any equity-based compensation) owed to Stockholder Releasor in its capacity as a service provider to the Company, provided that any such amount has been included as a consolidated liability of the Company as set out in the definition of Net Working Capital, (iii) any right to indemnification, advancement of expenses, exculpation, or rights to benefit from applicable director and officer indemnification agreements, the Charter and Bylaws, or (iv) any claim that, as a matter of Applicable Law, cannot be released by private agreement.

(b)    Acknowledgement. Each Stockholder acknowledges that the Laws of many states (including Section 1542 of the California Civil Code) provide substantially the following: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY." Each Stockholder acknowledges that such provisions are designed to protect a party from waiving claims which it does not know exist or may exist. Nonetheless, each Stockholders agrees that, effective as of the Closing Date, such party shall be deemed to waive any such provision.

(c)    No Actions. Each Stockholder further agrees that it shall not, nor permit any Affiliate thereof to (i) institute a lawsuit or other legal proceeding based upon, arising out of, or relating to any of the Released Claims, (ii) participate, assist, or cooperate in any such proceeding, or (iii) encourage, assist and/or solicit any third party to institute any such proceeding.

(d)      Enforceability. The provisions of this <u>Section 7.44</u> are intended to be for the benefit of, and shall be enforceable by, the Purchaser Releasees and each such Person's heirs, legatees, representatives, successors and assigns, it being expressly agreed that each such Person is an express third-party beneficiary of, is intended to benefit from, and may enforce its rights under this <u>Section 7.44</u>.

Section 7.5      <u>Acknowledgement; Nondisclosure</u>.

(a)      Each Stockholder acknowledges that as a result and as a part of such Stockholder's relationship with the Company (including as a result of the Stockholder's ownership of Company's shares), such Stockholder may have been afforded access to Confidential Information that could have an adverse effect on Purchaser, the Company and their businesses if it is disclosed or used for any purpose other than that for which it was intended (the "***Purpose***"), and that as a condition and inducement to Purchaser and the Merger Sub entering into this Agreement and as a condition to the consummation of the Merger, it is reasonable and necessary for each Stockholder to promise and agree, subject to the terms and conditions herein, not to disclose or use, other than for the Purpose, such Confidential Information.  Each Stockholder further acknowledges and agrees that the benefits provided to each Stockholder under this Agreement constitute good and sufficient consideration for the agreements and covenants in this <u>Section 7.5</u>.

(b)      Each Stockholder agrees and acknowledges that from and after the Closing, such Stockholder shall, and shall cause such Stockholder's respective Affiliates to, hold all of the Confidential Information in confidence and refrain from using any of the Confidential Information, *provided*, *however*, that (a) a Stockholder may disclose such information or terms if required to do so by applicable Legal Requirement, provided that such Stockholder, to the extent legally permitted, promptly notifies Purchaser in advance of disclosing such information and takes reasonable steps to minimize the extent of any such required disclosure; (b) each Stockholder may disclose such information or terms to his, her or its professional advisers and, if such Stockholder is not a natural person, to its Affiliates and its and their partners, members, managers, members, directors, officers, employees and representatives, in each case, who: (i) need to know such information; and (ii) agree to keep it confidential; (c) each Stockholder may disclose such information or terms to any Governmental Entity, court or arbitrator or other involved party (e.g., opposing counsel, expert witnesses) in connection with any dispute resolution proceedings, but in each case (x) only to the extent necessary to enforce such Stockholder's rights (including by defending against assertions by Purchaser) under this Agreement or a Transaction Document, as applicable and (y) only in accordance with the rules, regulations and other procedures to which such proceeding is subject.

SECTION 8
INDEMNIFICATION

Section 8.1      <u>Indemnification of the Purchaser Indemnified Parties</u>.  From and after the Closing, each Pre-Closing Holder shall severally, in accordance with the allocations set forth attributable thereto on the Closing Spreadsheet, but not jointly, indemnify and hold harmless the Purchaser Indemnified Parties from and against, and will be compensated, reimbursed and paid for, any and all Losses arising out of or relating to:

(a)      any inaccuracy in or breach of any representation or warranty set forth in Section 4 or Section 5;

(b)      any breach of any covenant, agreement or undertaking made by the Company in this Agreement;

(c)      the exercise of appraisal rights pursuant to the DGCL by any Pre-Closing Holders; and

(d)    any Taxes with respect to the Company that are attributable to (i) a Pre-Closing Tax Period or (ii) that portion of a Straddle Tax Period that ends on the Closing Date.

The Losses of the Purchaser Indemnified Parties described in this Section 8.1 as to which the Purchaser Indemnified Parties are entitled to indemnification are collectively referred to as "Purchaser Losses."

Section 8.2    Indemnification by Purchaser.  From and after the Effective Time, Purchaser will indemnify and hold harmless the Holder Indemnified Parties from and against all Losses arising out of or relating to:

(a)    any inaccuracy in or breach of any representation or warranty set forth in Section 6; and

(b)    any breach of any covenant, agreement or undertaking made by Purchaser or Merger Sub in this Agreement.

The Losses of the Holder Indemnified Parties described in this Section 8.2 as to which the Holder Indemnified Parties are entitled to indemnification are collectively referred to as "Holder Losses."

Section 8.3    Indemnification Procedure.

(a)    Promptly following receipt by an Indemnified Party of notice by a third party (including any Governmental Body) of any complaint, dispute or claim or the commencement of any audit, investigation, action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "Third-Party Claim"), such Indemnified Party will provide written notice thereof to the Indemnifying Party; provided, however, that the failure to so notify the Indemnifying Party will not limit the Indemnified Party's right to indemnification under this Section 8 unless, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-Party Claim.  The Indemnifying Party will have the right, upon written notice delivered to the Indemnified Party within 30 days thereafter assuming full responsibility for any Losses resulting from such Third-Party Claim, to assume the defense of such Third-Party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel.  The Indemnifying Party shall not be entitled to assume or maintain control of the defense of any Third Party Claim, to the extent (i) the Indemnifying Party does not deliver the notice referred to in this Section 8.3 within the time period set forth herein, (ii) the Third-Party Claim seeks an injunction or other equitable relief against the Indemnified Party, (iii) the Indemnifying Party has failed or is failing to actively and diligently prosecute or defend such Third Party Claim or (iv) such Third-Party Claim involves any criminal culpability or any admission of criminal wrongdoing, or any civil claim commenced by a Governmental Authority.  In the event, however, that the Indemnifying Party declines or fails to assume the defense of such Third-Party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such 30-day period, then any Losses will include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-Party Claim for which indemnification is being sought hereunder, the Indemnified Party or the Holder Representative, whichever is not assuming the defense of such Third-Party Claim, will have the right to participate in such matter and to retain its own counsel at such Person's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) will at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter the defense of which it is maintaining and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    The Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-Party Claim or consent to the entry of any judgment with respect to

31

which indemnification is being sought hereunder unless such settlement, compromise or consent (i) includes an unconditional release of the Indemnified Party and its officers, directors, employees and Affiliates from all liability arising out of, or related to, such Third-Party Claim, (ii) does not contain any admission or statement suggesting any wrongdoing or liability on behalf of the Indemnified Party or any of the Indemnified Party's Affiliates, and (iii) does not contain any equitable order, judgment or term that in any manner affects, restrains or interferes with the business of the Indemnified Party or any of its Affiliates.

(c)     If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third Party Claim (a "Direct Claim"), such Indemnified Party will send written notice of such claim to the Indemnifying Party (a "Notice of Claim").  Such Notice of Claim will specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party will not limit the Indemnified Party's right to indemnification with respect to any Direct Claim made pursuant to this Section 8.3(c) unless, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-Party Claim.  In the event the Indemnifying Party does not notify the Indemnified Party within thirty (30) days following its receipt of such Notice of Claim that the Indemnifying Party disputes the Indemnified Party's right to indemnification under this Section 8 or the amount thereof, the Indemnified Party will be conclusively entitled to the amount set forth in such Notice of Claim.  In the event the Indemnifying Party has timely disputed the Indemnified Party's right to indemnification under this Section 8 or the amount thereof, the Indemnified Party and the Indemnifying Party will, as promptly as reasonably practicable, establish the merits and amount of such Direct Claim (by mutual agreement, litigation or otherwise).

(d)     The Purchaser Indemnified Parties shall seek recovery with respect to any claim for indemnification pro rata based on each such Pre-Closing Holder's Pro Rata Share, in the form of (1) forfeiture of any right to receive Final Payment Amounts (as defined in the Bonus Agreement); (2)  for a period of eighteen (18) months after the Closing, surrender of Closing Shares with the number of such Closing Shares to be surrendered calculated using the Purchaser Share Price at the time of surrender; (3)  after such date or to the extent that that Pre-Closing Holder no longer has that number of Closing Shares, monetary payment by that Pre-Closing Holder; or (4) other legally recognized remedies.  Any such surrendered Closing Shares will revert back to the Purchaser.

Section 8.4     Survival Period.  The representations and warranties made by the Company, Stockholders, Purchaser and Merger Sub herein will not be extinguished by the Closing, but will survive the Closing for, and all claims for indemnification in connection therewith must be asserted not later than, 18 months following the Closing Date; *provided,* that each Holder Fundamental Representation and Purchaser Fundamental Representation will survive the Closing until, and all claims for indemnification in connection therewith must be asserted not later than, the expiration of the applicable subject matter statute of limitations applicable to such claim.  Notwithstanding the foregoing, if, prior to the close of business on the last day a claim for indemnification may be asserted hereunder, the Indemnifying Party shall have been properly notified of a claim for indemnity hereunder and such claim shall not have been finally resolved or disposed of at such date, such claim will continue to survive and will remain a basis for indemnity hereunder until such claim is finally resolved or disposed of in accordance with the terms hereof.  The covenants and agreements of the parties hereunder will survive without limitation as to time, and the period during which a claim for indemnification may be asserted in connection therewith will continue indefinitely.

Section 8.5     Limitations.

(a)     Notwithstanding anything in this Section 8 to the contrary, no Purchaser Indemnified Party will be entitled to indemnification for any Purchaser Losses until the aggregate of all such indemnifiable Purchaser Losses exceeds in total $25,000, in which case the Purchaser Indemnified Parties will be entitled to indemnification pursuant to Section 8.1(a) for all Purchaser Losses, including the initial $25,000

provided, however, that the limitations set forth in this Section 8.5 will not apply to any claim arising out of or related to Fraud or a breach of any of the representations and warranties contained in Section 4.1 (Organization and Capacity), Section 4.2 (Authority and Enforceability), Section 4.3 (Title to Shares), Section 4.4 (No Conflict), Section 5.1 (Organization; Standing and Power; Subsidiaries), Section 5.2 (Authority; Enforceability; Company Action), Section 5.4 (Capitalization), Section 5.9 (Intellectual Property), Section 5.13 (Tax Matters) or Section 5.18 (Brokers, Finders and Investment Bankers) (collectively, the "Holder Fundamental Representations").  No Indemnifying Pre-Closing Holder shall be liable pursuant to Section 8.1(a) for amounts in excess of the Merger Consideration received by such Indemnifying Pre-Closing Holder (based on the Purchaser Share Value) plus the Final Payment Amounts under such Indemnifying Pre-Closing Holder's Bonus Agreement except in the event of Fraud by the Company or such Indemnifying Pre-Closing Holder.

(b)    Notwithstanding anything in this Section 8 to the contrary, no Holder Indemnified Party will be entitled to indemnification for any Holder Losses until the aggregate of all such indemnifiable Holder Losses exceeds in total $25,000, in which case the Holder Indemnified Parties will be entitled to indemnification pursuant to Section 8.2 for all Holder Losses, including the initial $25,000 provided, however, that the limitations set forth in this Section 8.5 will not apply to any claim arising out of or related to Fraud or a breach of any of the representations and warranties contained in Section 6.1 (Organization; Standing and Power), Section 6.2 (Authority; Enforceability; Company Action), and Section 6.4 (Finders' Fees) (collectively, the "Purchaser Fundamental Representations" and together with the Holder Fundamental Representations, the "Fundamental Representations").   Purchaser and Merger Sub collectively shall not be liable for amounts in aggregate in excess of the Merger Consideration (based on the Purchaser Share Value) plus the Final Payment Amounts under the Bonus Agreements except in the event of Fraud by Purchaser or Merger Sub.

Section 8.6    Investigations.  The rights of a Holder Indemnified Party or Purchaser Indemnified Party to indemnification or any other remedy under this Agreement shall not be impacted or limited by any knowledge that such party may have acquired, or could have acquired, whether before or after the closing date, nor by any investigation or diligence by or on behalf of such party. The Company and Stockholders hereby acknowledge that, regardless of any investigation made (or not made) by or on behalf of the Purchaser, and regardless of the results of any such investigation, the Purchaser has entered into this transaction in express reliance upon the representations and warranties of the Seller made in this Agreement. Purchaser and Merger Sub hereby acknowledge that, regardless of any investigation made (or not made) by or on behalf of the Company or Pre-Closing Holders, and regardless of the results of any such investigation, the Company and Pre-Closing Holders have entered into this transaction in express reliance upon the representations and warranties of the Purchaser and Merger Sub made in this Agreement.

Section 8.7    Materiality.  Notwithstanding anything contained herein to the contrary, for purposes of determining whether there has been a breach of a representation and for purposes of determining the amount of Losses that are the subject matter of a claim for indemnification or reimbursement hereunder, each representation and warranty in this Agreement and the Company Disclosure Schedule will be read without regard and without giving effect to the terms "material" or "Material Adverse Effect" or similar phrases contained in such representation or warranty.

Section 8.8    Exclusive Remedy.  The parties agree that, excluding actions grounded in Fraud, from and after the Closing Date, the indemnities provided in this Section 8 will constitute the sole and exclusive remedy of any Indemnified Party for damages arising out of, resulting from or incurred in connection with any claims related to this Agreement or arising out of the transactions contemplated hereby; provided, however, that this exclusive remedy for damages does not preclude a party from bringing an action for specific performance or other equitable remedy to require a party to perform its obligations under this Agreement or any agreement entered into in connection herewith.

Section 8.9    <u>Merger Consideration Adjustment</u>.    The parties agree that any indemnification payment made pursuant to this Agreement shall be treated as an adjustment to the Merger Consideration for Tax purposes, unless otherwise required by Law.

Section 8.10    <u>Insurance</u>.  All indemnifiable Losses shall be calculated net of the amount of any recoveries actually received by a Purchaser Indemnified Party under any insurance policies and contractual indemnification or contribution provisions (in each case, calculated net of any actual collection costs and reserves, expenses, or deductibles) in respect of any indemnifiable Losses suffered, paid, sustained or incurred by any Purchaser Indemnified Party.

Section 8.11    <u>Good Faith; Mutual Cooperation</u>.  The Indemnifying Party and the Indemnified Party shall reasonably cooperate with each other with respect to resolving any claim or liability with respect to which an Indemnifying Party is allegedly obligated to indemnify an Indemnified Party hereunder. The Indemnified Party shall use all reasonable best efforts to mitigate Losses and resolve any such claim or liability. In the event that an Indemnified Party fails to make such reasonable best efforts to mitigate or resolve any such claim or liability, then notwithstanding anything else to the contrary contained in this Agreement, the Indemnifying Party shall not be required to indemnify the Indemnified Party for any Losses that would reasonably be expected to have been avoided if the Indemnified Party had made such efforts.

SECTION 9
<u>MISCELLANEOUS PROVISIONS</u>

Section 9.1    <u>Holder Representative</u>.

(a)    The parties agree that it is desirable to designate a representative to act on behalf of the Pre-Closing Holders with respect to all matters arising under this Agreement.  The Pre-Closing Holders have designated Robert Nessler as the initial Holder Representative, and adoption of this Agreement by the Company Stockholder Approval will constitute ratification and approval of such designation.  The Holder Representative may resign at any time, and may be removed by the vote of Persons which collectively owned more than 50% of the Participating Shares immediately prior to the Effective Time; provided, however, that any such removal will not be effective unless and until a successor Holder Representative reasonably acceptable to Purchaser has been appointed and accepts such position and the terms hereof.

(b)    The Holder Representative will have such powers and authority as are necessary to carry out the functions assigned to it under this Agreement; provided, however, that the Holder Representative will have no obligation to act on behalf of the Pre-Closing Holders, except as expressly provided herein, and for purposes of clarity, there are no obligations of the Holder Representative in any ancillary agreement, schedule, exhibit or the Company Disclosure Schedule.  Without limiting the generality of the foregoing, the Holder Representative will have full power, authority and discretion to (i) act according to the terms of this Agreement in the absolute discretion of the Holder Representative, (ii) represent the Pre-Closing Holders and their respective successors and assigns with respect to all matters arising under this Agreement, including, after the Closing, to negotiate and enter into amendments to this Agreement for and on behalf of the Pre-Closing Holders and make all decisions required or allowed to be made by the Holder Representative pursuant to or deemed advisable in connection with this Agreement.  Each Pre-Closing Holder, by virtue of the adoption of this Agreement by the Company Stockholder Approval, (x) agrees that all actions taken by the Holder Representative under this Agreement will be binding upon such Pre-Closing Holder and such Pre-Closing Holder's successors and assigns as if expressly confirmed and ratified in writing by

34

such Pre-Closing Holder, (y) waives any and all defenses which may be available to contest, negate or disaffirm the action of the Holder Representative taken in good faith under this Agreement and (z) grants the Holder Representative full power and authority to interpret all the terms and provisions of this Agreement and to consent to any amendment hereof or thereof on behalf of such Pre-Closing Holder and its successors and assigns. The Holder Representative will be entitled to engage such counsel, experts and other agents and consultants as it deems necessary in connection with exercising its powers and performing its function hereunder and (in the absence of bad faith on the part of the Holder Representative) will be entitled to conclusively rely on the opinions and advice of such Persons.

(c)    The Holder Representative shall not be liable to any Pre-Closing Holder for any act done or omitted hereunder as the Holder Representative while acting in good faith (and any act done or omitted pursuant to the advice of counsel shall be conclusive evidence of such good faith) and without gross negligence or willful misconduct. The Pre-Closing Holders shall severally but not jointly indemnify the Holder Representative and hold it harmless against any Holder Allocable Expenses incurred without gross negligence, willful misconduct or bad faith on the part of the Holder Representative and arising out of, resulting from or in connection with the acceptance or administration of its duties hereunder or under the Holder Representative Engagement Agreement, including all reasonable out-of-pocket costs and expenses and legal fees and other legal costs reasonably incurred by the Holder Representative. If not paid directly to the Holder Representative by the Pre-Closing Holders, Holder Allocable Expenses may be recovered by the Holder Representative from the Pre-Closing Holders according to their respective Pro Rata Shares of such Holder Allocable Expenses. The immunities and rights to indemnification shall survive the resignation or removal of the Holder Representative and the Closing and/or any termination of this Agreement.

(d)    The Holder Representative shall be entitled to: (i) rely upon the Closing Spreadsheet, (ii) rely upon any signature believed by it to be genuine, and (iii) reasonably assume that a signatory has proper authorization to sign on behalf of the applicable Pre-Closing Holder or other party. The powers, immunities and rights granted to the Holder Representative hereunder: (i) are coupled with an interest and shall be irrevocable and survive the death, incompetence, bankruptcy or liquidation of any Pre-Closing Holder and shall be binding on any successor thereto, and (ii) shall survive the delivery of an assignment by any Pre-Closing Holder of the whole or any fraction of his, her or its interest in the Holdback Shares.

(e)    If the Holder Representative takes any action that adversely affects a Pre-closing Holder differently relative to the other Equity Holders, such differently affected Pre-closing Holder shall have the right to approve such action in writing prior to the Holder Representative's taking thereof.

Section 9.2    Further Assurances. Each party hereto will execute and cause to be delivered to each other party hereto such instruments and other documents, and will take such other actions, as such other party may reasonably request (prior to, at or after the Closing) for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement.

Section 9.3    Fees and Expenses. Except as otherwise expressly set forth herein, each party to this Agreement will bear and pay all fees, costs and expenses (including legal fees and accounting fees) that have been incurred or that are incurred by such party in connection with the transactions contemplated by this Agreement; provided, however, that the Pre-Closing Holders will be responsible for all Company Transaction Expenses. Notwithstanding the foregoing, if the Closing occurs prior to midnight PST, March 11, 2024, then at the Closing, Purchaser shall pay the reasonable fees and expenses of Foster Law Group, counsel for the Company, in an amount not to exceed, in the aggregate, $27,500.

Section 9.4    Waiver; Amendment. Any agreement by a party to any extension or waiver of any provision hereof will be valid only if set forth in an instrument in writing signed on behalf of such party. A waiver by a party of the performance of any covenant, agreement, obligation, condition, representation

or warranty will not be construed as a waiver of any other covenant, agreement, obligation, condition, representation or warranty.  A waiver by any party of the performance of any act will not constitute a waiver of the performance of any other act or an identical act required to be performed at a later time.  This Agreement may not be amended, modified or supplemented except by written agreement of the parties.

Section 9.5    Entire Agreement.  This Agreement (together with the Schedules and Exhibits hereto) constitutes the entire agreement among the parties to this Agreement and supersedes all other prior agreements and understandings, both written and oral, among or between any of the parties with respect to the subject matter hereof and thereof.

Section 9.6    Execution of Agreement; Counterparts; Electronic Signatures.

(a)    This Agreement may be executed in several counterparts, each of which will be deemed an original and all of which will constitute one and the same instrument, and will become effective when counterparts have been signed by each of the parties and delivered to the other parties, it being understood that all parties need not sign the same counterparts.

(b)    The exchange of copies of this Agreement and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether mediated by the worldwide web), by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, will constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

Section 9.7    Governing Law; Jurisdiction and Venue.

(a)    This Agreement will be construed in accordance with, and governed in all respects by, the internal laws of the State of Delaware (without giving effect to principles of conflicts of laws).

(b)    Any legal action or other Legal Proceeding relating to this Agreement or the enforcement of any provision of this Agreement will be brought or otherwise commenced exclusively in any state or federal court located in the County of New York, State of New York.  Each party to this Agreement:

(i)    expressly and irrevocably consents and submits to the jurisdiction of each state and federal court located in the County of New York, State of New York (and each appellate court located in the State of New York), in connection with any Legal Proceeding;

(ii)    agrees that service of any process, summons, notice or document by U.S. mail addressed to her, him or it at the address set forth in Section 9.11 will constitute effective service of such process, summons, notice or document for purposes of any such Legal Proceeding;

Section 9.8    WAIVER OF JURY TRIAL.  EACH OF THE PARTIES IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BETWEEN THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

Section 9.9    Assignment and Successors.  No party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other parties, except that Purchaser may assign any of its rights and delegate any of its obligations under this Agreement to any

Affiliate of Purchaser.  Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon and inure to the benefit of the successors and permitted assigns of the parties.

Section 9.10    Parties in Interest.  Except for the provisions of Section 8, none of the provisions of this Agreement is intended to provide any rights or remedies to any Person other than the parties hereto and their respective successors and assigns (if any).

Section 9.11    Notices.  All notices, consents, waivers and other communications required or permitted by this Agreement will be in writing and will be deemed given to a party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid); or (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment confirmed with a copy delivered as provided in clause (a), in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a party may designate by notice to the other parties); provided that with respect to notices deliverable to the Holder Representative, such notices shall be delivered solely via email or facsimile:

**Company (before the Closing):**

VoiceBite Corporation
1149 Hollyhead Lane
Cupertino, California  95014
Attention: Robert Nessler, Chief Executive Officer
E-mail address: robert@voicebite.ai

**Any Stockholder:**

To the address set forth on the Stockholder's signature page hereto.

**Holder Representative (on its own behalf and for the benefit of the stockholders of the Company):**

Robert Nessler
1149 Hollyhead Lane
Cupertino, California  95014
E-mail address: robert@voicebite.ai

**Purchaser and Merger Sub:**

Checkmate.com Inc.
1113 York Ave, #36E
New York, NY  10065
Attn: Vishal Agarwal
Email:  vishal@itsacheckmate.com

with a mandatory copy to (which copy will not constitute notice):

DJL Corporate Law
17349 Parkside Court
Monte Sereno, CA  95030
Attention:  Todd Murtha

Email:  todd@djlcorplaw.com

Section 9.12    <u>Enforcement of Agreement</u>.  The parties acknowledge and agree that Purchaser and Merger Sub would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that any breach of this Agreement by the Company could not be adequately compensated in all cases by monetary damages alone.  Accordingly, in addition to any other right or remedy to which Purchaser or Merger Sub may be entitled, at law or in equity, it will be entitled to enforce any provision of this Agreement by a decree of specific performance and temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement, without posting any bond or other undertaking.

Section 9.13    <u>Severability</u>.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

Section 9.14    <u>Time of Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 9.15    <u>Schedules and Exhibits</u>.  The Schedules and Exhibits (including the Company Disclosure Schedule) are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full herein.  Each disclosure set forth in the Company Disclosure Schedule is identified by reference to, or has been grouped under a heading referring to, a specific individual section or subsection of this Agreement and relates only to such section or subsection; provided, however, that notwithstanding the foregoing, any matter disclosed in a Section of the Company Disclosure Schedule will be deemed to be disclosed in any Section contained in the Company Disclosure Schedule, to the extent that it is reasonably apparent from such disclosure that such disclosure is applicable to such other Section.

*       *       *

The parties hereto have caused this Agreement to be executed and delivered as of the date first set forth above.

PURCHASER:

**CHECKMATE.COM INC.**

By: _____
Name: _____
Title: _____

MERGER SUB:

**VOICEBITE MERGER SUB, INC.**

By: _____
Name: _____
Title: _____

COMPANY:

**VOICEBITE CORPORATION**

By: _____
Name: _____
Title: _____

HOLDER REPRESENTATIVE:

_____
**ROBERT NESSLER**

SIGNATURE PAGE TO AGREEMENT AND PLAN OF MERGER

The parties hereto have caused this Agreement to be executed and delivered as of the date first set forth above.

**STOCKHOLDERS:**

_____

**ROBERT NESSLER**

Address:

Email Address:

_____

**ARJUN VASAN**

Address:

Email Address:

_____

**CHRISTOPHER LAM**

Address:

Email Address:

_____

**ISAMU AOKI**

Address:

Email Address:

_____

**PAUL JUSTIN GARCIA**

Address:

Email Address:

SIGNATURE PAGE TO AGREEMENT AND PLAN OF MERGER

**Schedule 2.3(b)(vi)**

**Restrictive Covenant Agreement Parties**

**Robert Nessler**

**Arjun Vasan**

**Christopher Lam**

<u>**Schedule 2.3(b)(viii)**</u>

**Employment Offer Letter Parties**

**Robert Nessler**

**Arjun Vasan**

**Schedule 2.3(b)(viii)**

**Consulting Agreement Parties**

**Christopher Lam**

## Schedule 2.3(b)(ix)

**Retention Bonus Agreement Parties**

**Robert Nessler**

**Arjun Vasan**

**Christopher Lam**

**Isamu Aoki**

**Paul Justin Garcia**



Checkmate.com Inc.

April __, 2024

Dear Arjun Vasan,

<u>Offer and Position</u>

We are pleased to extend an offer of employment to you for the position of **VP AI  Technology** at Checkmate.com Inc., a Delaware corporation (the "***Company***"). This offer of employment is conditioned on your satisfactory completion of certain requirements, as more fully explained in this letter. Your employment is subject to the terms and conditions set forth in this letter.

<u>Duties</u>

In your capacity as VP AI Technology,  you will perform duties and responsibilities that are  commensurate with your position and such other duties as may be assigned to you from  time to time. You will report to Mike Bell.  You agree to devote your full  business time, attention, and best efforts to the performance of your duties and to the  furtherance of the Company's interests.

<u>Location</u>

You will work remotely for the Company, subject to business travel as needed to  properly fulfill your employment duties and responsibilities.

<u>Start Date</u>

Subject to satisfaction of all of the conditions described in this letter, this offer is  based on a mutually acceptable start date of May 1, 2024.

<u>Compensation</u>

Your starting base salary will be $280,000 per year, payable in two (2) week increments, and you will be eligible to receive a target bonus of up to $200,000 based on performance for 2024 and a target bonus of up to 50% of your annual salary based on performance for 2025 going forward, payable in accordance with the Company's standard practices, provided that you will not be eligible for a bonus payments unless you are continuously employed with the Company through the time of payment.  Your compensation is subject to review from time to time, and all payments will be made in accordance with the standard payroll practices of the Company and subject to standard withholdings and deductions.

<u>Stock Options</u>

Subject to approval by the Company's Board of Directors (the "***Board***"), the Company anticipates granting you an option to purchase 100,000 shares of the Company's common stock at the fair market value as

determined by the Board as of the date of grant (the "**Option**").  The anticipated Option will be governed by the terms and conditions of the Company's 2018 Stock Plan (the "**Plan**") and your grant agreement, and will include the following vesting schedule: 1/8th of the total shares will vest on the date that is 6 months after the vesting commencement date, and 1/48th of the total shares will vest at the end of each month thereafter on the same day of the month as the vesting commencement date (or if there is no corresponding day, on the last day of the month), until either the Option is fully vested or your continuous service (as defined in the Plan) terminates, whichever occurs first.

Benefits and Perquisites

You will be eligible to participate in the employee benefit plans and programs available  to the Company's employees, subject to the terms and conditions of such plans and  programs. You will be entitled to paid vacation in accordance with the Company's policies in effect from time to time. You will also be entitled to the fringe benefits and  perquisites that are made available to other similarly situated employees of the Company, each in accordance with and subject to the eligibility and other provisions of  such plans and programs. The Company reserves the right to amend, modify or  terminate any of its benefit plans or programs at any time and for any reason.

Withholding

All forms of compensation paid to you as an employee of the Company shall be less all applicable withholdings.

Stock Ownership Requirements

Except as may be expressly provided otherwise in this offer letter, as an employee of the Company, you will be required to comply with the Company's  Stock Ownership Requirements applicable to employees and to be adopted in  the future.

At-will Employment

Your employment with the Company will be for no specific period. Rather, your  employment will be at will, meaning that you or the Company may terminate the  employment relationship at any time, with or without cause, and with or without  notice and for any reason or no particular reason. Although your compensation and  benefits may change from time to time, the at-will nature of your employment may only be changed by an express written agreement signed by an authorized officer of the Company.

Contingent Post-Termination Compensation

Notwithstanding any other provision of this offer letter, if the Company terminates your employment or your terminate your employment for Good Reason, in any such case before August 1, 2025  (the "**Applicable Date**"), you will receive as post-termination compensation:

1.  A lump sum payment equal to three (3) months base salary, paid on the Company's first regular payroll paydate following the termination, provided that if such paydate is within five (5) days of the termination date, then such amount will be paid on the Company's second regular payroll paydate following the termination (the "**Payment Date**");

2.  A lump sum payment equal to twenty-five percent (25%) of the performance bonus for the then current year, paid on the Payment Date;

3.  any Accrued Compensation (as defined below).

If your employment is terminated by you other than for Good Reason, you will be paid only (i) any earned but unpaid base salary, (ii) other unpaid vested amounts or benefits under the compensation, incentive and benefit plans of the Company in which you participate, and (iii) reimbursement for all reasonable and necessary expenses incurred by you in connection with the performance of your duties on behalf of the Company in accordance with applicable Company policies and guidelines, in each case as of the effective date of such separation from service (the "***Accrued Compensation***").

"***Good Reason***" means: (i) a material reduction in your job responsibilities, job title or duties, taken in the aggregate, provided that Good Reason to terminate employment shall not exist after any acquisition of the Company (by merger or otherwise) because you will be employed by a subsidiary of the parent company or because of reasonable changes in responsibilities, job title or duties resulting from any such acquisition; (ii) without your prior written consent, the Company requires you to relocate to a facility or location more than thirty (30) miles away from the location at which you were working immediately prior to the required relocation; or (iii) a reduction of more than ten percent (10%) in your then-current base salary (other than as part of an across-the-board, proportional salary reduction applicable to all executive officers), provided that none of the foregoing events or conditions will constitute Good Reason unless you provide the Company with written objection to the event or condition within 30 days following the initial occurrence thereof, the Company does not reverse or otherwise cure the event or condition within 30 days of receiving that written objection, and you resign your employment within 30 days following the expiration of that cure period.

Dispute Resolution

Any controversy, dispute or claim regarding whether a termination is for Good Reason shall first be settled through good faith negotiation. If the dispute cannot be settled through negotiation, the parties agree to attempt in good faith to settle the dispute by mediation administered by JAMS. At the conclusion of the mediation, the mediator shall, if requested by either party, provide a non-binding reasoned opinion on the issue of whether a termination was for "Good Reason" as defined in this Agreement (the "Mediator Opinion"). The Mediator Opinion shall be confidential and may not be used in any subsequent litigation, arbitration or other proceeding. The mediation shall not involve mandatory discovery and neither the mediator nor any party shall have the ability to require or compel disclosure of any information or materials. All offers, promises, conduct and statements, whether oral or written, made in the course of the negotiation or mediation by any of the parties, their agents, employees, experts and attorneys are confidential, privileged and inadmissible for any purpose, including impeachment, in arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the negotiation.

Section 409A

This offer letter is intended to comply with Section 409A of the Internal Revenue Code ("***Section 409A***") or an exemption thereunder and shall be construed and administered in accordance with Section 409A. Notwithstanding any other provision of this offer letter, payments provided under this offer letter may only be made upon an event and in a manner that complies with Section 409A or an applicable exemption. Any payments under this offer letter that may be excluded from Section 409A either as separation pay due to

an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this offer letter shall be treated as a separate payment. Any payments to be made under this offer letter upon the termination of employment shall only be made upon a "separation from service" under Section 409A. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this offer letter comply with Section 409A, and in no event shall the Company be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by you on account of non-compliance with Section 409A.

Notwithstanding any other provision of this offer letter, if any payment or benefit provided to you in connection with the termination of employment is determined to constitute "nonqualified deferred compensation" within the meaning of Section 409A and you are determined to be a "specified employee" as defined in Section 409A(a)(2)(b)(i), then such payment or benefit shall not be paid until the first payroll date to occur following the six-month anniversary of your termination date (the "***Specified Employee Payment Date***") or, if earlier, on the date of your death. The aggregate of any payments that would otherwise have been paid before the Specified Employee Payment Date and interest on such amounts calculated based on the applicable federal rate published by the Internal Revenue Service for the month in which your separation from service occurs shall be paid to you in a lump sum on the Specified Employee Payment Date and thereafter, any remaining payments shall be paid without delay in accordance with their original schedule.

<u>Governing Law</u>

This offer letter shall be governed by the laws of the State of California, without regard to conflict of law principles.

<u>Contingent Offer</u>

This offer is contingent upon:

(a) Verification of your right to work in the United States, as demonstrated by your completion of an I-9 form upon hire and your submission of acceptable documentation (as noted on the I-9 form) verifying your identity and work authorization within three days of your Start Date.

(b) Satisfactory completion of reference checks.

(c) Your execution of the Company's Confidentiality and Intellectual Rights Assignment Agreement.

This offer will be withdrawn if any of the above conditions are not satisfied.

<u>Representations and Obligations</u>

By accepting this offer, you represent that you are able to accept this job and carry out the work that it would involve without breaching any legal restrictions on your activities, such as non-competition, non-solicitation or other work-related restrictions imposed by a current or former employer. You also represent that you will inform the Company about any such restrictions and provide the Company with as much information about them as possible, including any agreements between you and your current or former

employer describing such restrictions on your activities. You further confirm that you will not remove or take any documents or proprietary data or materials of any kind, electronic or otherwise, with you from your current or former employer to the Company without written authorization from your current or former employer, nor will you use or disclose any such confidential information during the course and scope of your employment with the Company. If you have any questions about the ownership of particular documents or other information, you should discuss such questions with your former employer before removing or copying the documents or information.

As a Company employee, you will be expected to abide by Company rules and policies. Normal business hours are from 8:00 a.m. to 5:00 p.m., Monday through Friday. As a full-time exempt salaried employee, you will be expected to work the Company's normal business hours as well as additional hours as required by the nature of your work assignments, and you will not be eligible for overtime compensation.

We are excited at the prospect of you joining our team. If you have any questions about the above details, please call me immediately. If you wish to accept this position, please sign below, and return this letter to me.

I look forward to hearing from you.

Yours sincerely,

Amy Brown – Head of Human Resources | US

On behalf of Checkmate.com Inc.

<u>Acceptance of Offer</u>

I have read, understood, and accept all the terms of the offer of employment as set forth in the foregoing letter. I have not relied on any agreements or representations, express or implied, that are not set forth expressly in the foregoing letter, and this letter supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to the subject matter of this letter.

Signed _____

Date _____

Checkmate.com Inc.
April \_\_\_\_, 2024

**BY E-MAIL**

Arjun Vasan

Dear Arjun:

This letter (the "Bonus Agreement") is being delivered to you in connection with the commencement of your employment with Checkmate.com Inc. ("Checkmate") and in conjunction with your execution of an offer letter and Confidential Information and Inventions Agreement with Checkmate.

In consideration of you remaining employed with Checkmate, and to further motivate you to devote the exceptional service and performance necessary to maximize Checkmate's performance and value, Checkmate wishes to provide you with the below bonus opportunity.

1.  Bonus.  On July \_\_, 2024 (the "Bonus Date"), you will become entitled to receive a cash bonus (less applicable withholdings and deductions) payable as set out below (the "Retention Bonus").

    a.  An amount equal to the Initial Payment Amount (as defined below), subject to reduction or adjustment as set out in this Agreement, shall be paid as set out in Section 3 of this Agreement.

    b.  A maximum of Fifty Thousand Dollars ($50,000) of the Retention Bonus (the "Final Payment Amount"), reduced as provided below, shall be paid as set forth below (the "Final Payment").  The Final Payment Amount may be reduced as set forth below:

        i.  Checkmate may seek recovery of up to your Pro Rata Share of any Purchaser Loss that is recoverable by any Purchaser Indemnified Party pursuant to Article 8 of the Merger Agreement by recovering and offsetting against (and reducing the amount of) the Final Payment Amount (it being understood that such reimbursement shall not reduce such Checkmate Indemnified Party's right to seek recovery as set out in the Merger Agreement of any Purchaser Losses that are not recovered pursuant to this Section 1(b)).  Any recovery of any Purchaser Loss against the Final Payment Amount shall reduce, on a dollar-for-dollar basis, the amount of the Final Payment paid to you hereunder.

        ii. Checkmate may seek recovery of any Reduction Amount that was not deducted from the Initial Payment Amount by recovering and offsetting against (and reducing the amount of) the Final Payment Amount.  Any recovery of any Reduction Amount against the Final Payment Amount shall reduce, on a dollar-for-dollar basis, the amount of the Final Payment paid to you hereunder.

        iii. No later than five (5) business days following the Final Payment Date, Checkmate shall pay an amount in cash to you in the amount of Final Payment Amount reduced as set out in Section 1(b)(i) or (ii) *minus* an amount equal to your Pro Rata Share of any Purchaser Loss for which any Purchaser Indemnified Party may be entitled to indemnification under Section 8 of the Merger Agreement and clause (i) above as result of any pending, but unresolved, claims

for indemnification for which Checkmate has provided notice to the Holder Representative prior to the Final Payment Date in accordance with the Merger Agreement (a "Dispute") (the amount contemplated by clause (C), the "Disputed Cash Amount").

iv.  On the later of the Final Payment Date or five (5) business days following the final resolution of any Dispute, Checkmate shall pay to you an amount in cash equal to (i) any remaining Disputed Cash Amount *minus* (ii) your Pro Rata Share of any Purchaser Indemnified Losses for which any Purchaser Indemnified Party may be entitled to indemnification under Article 8 of the Merger Agreement as result of any unresolved Dispute.

v.  For the avoidance of doubt, in no event shall you be entitled to an amount greater than Fifty Thousand Dollars ($50,000) pursuant to this Section 1(b).

2.  Definitions.

a.  "Expense Reconciliation Agreement" shall mean that certain Expense Reconciliation Agreement dated as of April __, 2024 by and among Checkmate, VoiceBite Corporation, a Delaware corporation (the "Company"), Robert Nessler, Arjun Vasan, Christopher Lam, Isamu Aoki and Paul Justin Garcia.

b.  "Final Payment Date" shall mean the date that is the later of (a) twelve (12) months after the Closing or (b) the Initial Payment Date.

c.  "Initial Payment Amount" shall mean Four Hundred Fifty Thousand Dollars ($450,000) minus (a) your Pro Rata Share of the amount of Company Transaction Expenses and Indebtedness that are unpaid as of the Closing and minus (b) your pro rata share of Non-Reimbursed Expenses as defined in the Expense Reconciliation Agreement (the amounts in (a) and (b) collectively the "Reduction Amount").

d.  The "Initial Payment Date" shall mean the earlier of (a) the date that is ten (10) business days after completion by Checkmate of a preferred stock financing in which Checkmate sells preferred stock for an aggregate purchase price of not less than $7,500,000 not including conversion of any outstanding notes or SAFEs (a "Qualified Financing") or (b) the date that is ten (10) business days after the one year anniversary of the date of this Bonus Agreement.

e.  "Merger Agreement" shall mean that certain Agreement and Plan of Merger (the "Merger Agreement"), dated April ___, 2024, by and among Checkmate, VoiceBite Merger Sub, Inc., a Delaware corporation and a wholly-owned subsidiary of Checkmate, the Company, Robert Nessler, Arjun Vasan, Christopher Lam, Isamu Aoki and Paul Justin Garcia, and Robert Nessler as the Holder Representative.

3.  Form of Payment.  If Checkmate closes a Qualified Financing (the date of such closing, the "Closing Date") within one year after the date of this Bonus Agreement (the "Anniversary Date"), then any earned Retention Bonus will be payable in cash no later than ten (10) business days after the later of the Bonus Date or the Closing Date. If Checkmate does not close a Qualified Financing by the Anniversary Date, then any earned Retention Bonus will be payable, at your discretion, (a) by conversion of any earned Retention Bonus, without interest, into Checkmate Common Stock at a price per share of $4.67, or (b) in cash, without interest, in fifteen

monthly installments beginning no later than ten (10) business days after your election of payment method is received by Checkmate.  If you have not notified Checkmate in writing within 30 days after the Anniversary Date of your choice to have the Retention Bonus convert into Checkmate Common Stock or pay out in fifteen monthly installments, then Checkmate may select the payment method and notify you.  As a condition to any earned Retention Bonus converting into Checkmate Common Stock, you and Checkmate will enter into a standard stock purchase agreement. Any payment of Retention Bonus in cash to employees of Checkmate or any of its subsidiaries will be made through Checkmate's or such subsidiary's payroll system on the next regular payroll date after the Payment Date unless such payroll date is within ten (10) business days of the Payment Date, in which case the payment may be made on the second regular payroll date after the Payment Date.

4.    <u>Termination of Employment</u>.  Notwithstanding any other provision of this Bonus Agreement, if you terminate your employment for Good Reason or if the Company terminates your employment for any reason, before the Bonus Date, you will be entitled to receive payment equal to the Initial Payment Amount and Final Payment Amount, each as adjusted or reduced as set out in this Agreement, each paid on the appropriate date set out in Section 1.

If you terminate your employment before the Bonus Date other than for Good Reason, you will not be eligible to receive any Initial Payment Amount or Final Payment.

"<u>Good Reason</u>" means: (i) a material reduction in your job responsibilities, job title or duties, taken in the aggregate, provided that Good Reason to terminate employment shall not exist after any acquisition of the Company (by merger or otherwise) because you will be employed by a subsidiary of the parent company or because of reasonable changes in responsibilities, job title or duties resulting from any such acquisition; (ii) without your prior written consent, the Company requires you to relocate to a facility or location more than thirty (30) miles away from the location at which you were working immediately prior to the required relocation; or (iii) a reduction of more than ten percent (10%) in your then-current base salary (other than as part of an across-the-board, proportional salary reduction applicable to all executive officers), provided that none of the foregoing events or conditions will constitute Good Reason unless you provide the Company with written objection to the event or condition within 30 days following the initial occurrence thereof, the Company does not reverse or otherwise cure the event or condition within 30 days of receiving that written objection, and you resign your employment within 30 days following the expiration of that cure period.

5.    <u>Dispute Resolution</u>.  Any controversy, dispute or claim regarding whether a termination is for Good Reason shall first be settled through good faith negotiation. If the dispute cannot be settled through negotiation, the parties agree to attempt in good faith to settle the dispute by mediation administered by JAMS.  At the conclusion of the mediation, the mediator shall, if requested by either party, provide a non-binding reasoned opinion on the issue of whether a termination was for "Good Reason" as defined in this Agreement (the "<u>Mediator Opinion</u>").  The Mediator Opinion shall be confidential and may not be used in any subsequent litigation, arbitration or other proceeding.  The mediation shall not involve mandatory discovery and neither the mediator nor any party shall have the ability to require or compel disclosure of any information or materials. All offers, promises, conduct and statements, whether oral or written, made in the course of the negotiation or mediation by any of the parties, their agents, employees, experts and attorneys are confidential, privileged and inadmissible for any purpose, including impeachment, in arbitration or other proceeding involving the parties, provided that evidence that is otherwise

-3-

admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the negotiation.

6.  <u>Employment Terms</u>.  You and Checkmate acknowledge that neither this Bonus Agreement nor any other oral or written agreement between Checkmate (or any affiliate thereof) and you have established any contract of employment preventing either party from terminating the relationship for any reason.  Nothing in this Bonus Agreement may be construed to create any agreement for any indefinite or specific term of employment and you will at all times be an "at will" employee of Checkmate or an affiliate thereof.

7.  <u>Miscellaneous</u>.  This Bonus Agreement may be modified only by a contract in writing executed by the party to this Bonus Agreement against whom enforcement of the modification is sought.  This Bonus Agreement: (i) contains the entire and final agreement of the parties to this Bonus Agreement with respect to the subject matter of this Bonus Agreement, and (ii) supersedes all negotiations, stipulations, understandings, letters, offers, agreements, representations and warranties, if any, with respect to such subject matter, which precede or accompany the execution of this Bonus Agreement.  If any provision of this Bonus Agreement (including its attachments) is held to be illegal, unenforceable, or invalid by any court of competent jurisdiction, such provision shall be deemed modified to the fullest extent permitted by such court in order to be legal, enforceable, or valid, unless such modification shall be deemed to be inconsistent with the intent of the parties hereto in which case such provision shall be deemed severed from this Bonus Agreement and the remaining provisions and this Bonus Agreement (without the affected provision) shall remain in full force and effect, if and to the extent practicable and equitable.  The failure or delay of either party to enforce at any time any provision of this Bonus Agreement shall not constitute a waiver of such party's right thereafter to enforce each provision of this Bonus Agreement.  You may not voluntarily or by operation of law assign, pledge, delegate or otherwise transfer or encumber all or any part of your rights, duties or other interests in this Bonus Agreement.  Subject to the foregoing, this Bonus Agreement is binding on and inures to the benefit of the successors-in-interest and assigns of each party to this Bonus Agreement (whether by merger, consolidation, or bulk transfer of Checkmate's assets, or otherwise).  Nothing in this Bonus Agreement may be construed to create, or contemplate the creation of, any trust arrangement or security interest.  This Bonus Agreement may be executed simultaneously in two (2) or more counterparts (and by facsimile copy), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Bonus Agreement shall be governed in accordance with the laws of Delaware.

8.  <u>Section 409A</u>.  The provisions of this Bonus Agreement have been prepared with the intention to comply in all respects with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), and Treasury Regulations and other official guidance promulgated thereunder, and such provisions shall be construed and interpreted consistent with that intention.  A termination of employment shall not be deemed to have occurred for purposes of any provision of this Bonus Agreement providing for the payment of any amounts or benefits considered "nonqualified deferred compensation" under Section 409A of the Code upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Section 409A of the Code and, for purposes of any such provision of this Bonus Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." For purposes of Section 409A of the Code, your right to receive any installment payments pursuant to this Bonus Agreement shall be treated as a right to receive a series of separate and distinct payments.  Whenever a payment under this Bonus Agreement specifies a payment period with reference to a number of days (e.g., "payment shall

be made within thirty (30) days following the date of termination"), the actual date of payment within the specified period shall be within the sole discretion of Checkmate.

9.    <u>Termination</u>.  This This Agreement shall automatically terminate, and be of no further force and effect, upon the termination of the Merger Agreement in accordance with its terms.

***********

Thank you for your cooperation in this transition.  The offer set forth in this Bonus Agreement may be revoked by Checkmate at any time prior to acceptance by you upon written notice to you and, if so revoked, cannot be accepted after such revocation.  Please contact the undersigned with any questions you may have.

Very truly yours,

Checkmate.com Inc.

_____

By: Vishal Agarwal

Its: Chief Executive Officer

ACCEPTED:

_____

Arjun Vasan

Date: _____



**TECHNOLOGY (/TECHNOLOGY)**

# Tech provider Checkmate raises $10M to grow AI ordering

The company got into the AI voice business via an acquisition earlier this year and now wants to bring the technology to more restaurants.

By *Joe Guszkowski (/profile/joe-guszkowski)* on Oct. 23, 2024



Checkmate acquired AI supplier VoiceBite earlier this year. | Photo courtesy of Checkmate

Checkmate, a digital ordering provider for restaurants, has raised $10 million in a Series B funding round led by Tiger Global.

The New York-based company plans to use the money to help grow one of its newest products: AI-powered phone and drive-thru ordering. Checkmate got into the AI ordering business with **the acquisition of VoiceBite back in May (https://www.restaurantbusinessonline.com/technology/itsacheckmate-rebrands-acquires-ai-voice-provider-voicebite)**.

That business is profitable, and Checkmate wants to bring it to more medium and large restaurant chains.

"With this investment, we're doubling down on our development of the technologies that are helping restaurants scale their operations, grow digital revenue and improve efficiency," said Vishal Agarwal, founder and CEO of Checkmate, in a statement.

At the time of the acquisition, VoiceBite used AI to allow restaurants to take orders over the phone. It was planning to launch a drive-thru version in the fourth quarter. It said its AI could handle 95% of calls without human intervention.

AI-powered voice ordering is growing quickly among fast-food chains as they look to automate labor-intensive roles and lower costs.

Checkmate, formerly known as ItsaCheckmate, began as a digital order integration system. It has since expanded to offer a variety of digital order products, including online and app ordering, catering and kiosks.

*Members help make our journalism possible. Become a Restaurant Business member today and unlock exclusive benefits, including unlimited access to all of our content. **Sign up here (/membership/? utm_source=website&utm_medium=RBO-content&utm_campaign=membership)**.*

NEWS (/ARTICLE/RESTAURANT-BUSINESS)     TECHNOLOGY (/ARTICLE/TECHNOLOGY)

FINANCE (/ARTICLE/FINANCE)



(/profile/joe-guszkowski)
**Joe Guszkowski is a senior editor with Restaurant Business covering technology and casual-dining chains.**

VIEW ALL ARTICLES BY THIS AUTHOR (/PROFILE/JOE-GUSZKOWSKI)

## MULTIMEDIA

### L.A. dine-around, Taco Bell nuggets and oak-fired steak

(/food/la-dine-around-taco-bell-nuggets-oak-fired-steak)

**Informa's holiday party, Yelpers' favorite restaurant and a brasserie at Grand Central**

(/food/informas-holiday-party-yelpers-favorite-restaurant-brasserie-grand-central)

**Momo crawl, Black Friday in Chinatown and dinner at Baar Baar**

(/food/momo-crawl-black-friday-chinatown-dinner-baar-baar)

**Virgil's 30th anniversary, happy hour at Mermaid Inn and Christmas decorations at Pete's Tavern**

(/food/virgils-30th-anniversary-happy-hour-mermaid-inn-christmas-decorations-petes-tavern)

## THE LATEST

**FOOD (/FOOD)**
**Trouble ahead for dessert on restaurant menus**

(/food/trouble-ahead-dessert-restaurant-menus)

**EMERGING BRANDS (/EMERGING-BRANDS)**
**London-born PizzaExpress plots first entry into the U.S.**

(/emerging-brands/london-born-pizzaexpress-plots-first-entry-us)

**PREMIUM** (/exclusive-content)
**FINANCING (/FINANCING)**
**Why Peter Cancro decided to sell Jersey Mike's**

(/financing/why-peter-cancro-decided-sell-jersey-mikes)

### Listen to your daily news: RB Podcasts
**New episodes weekdays**

| (https://www.restaura | (https://www.restaura dive) | (https://www.restaura talk) | (https://www.restaura rewind) | (https://www.restaura lunch) |
|---|---|---|---|---|
| | | | | |

## MORE ON THIS TOPIC

PREMIUM   (/exclusive-content)

**TECHNOLOGY (/TECHNOLOGY)**

**When third-party delivery math doesn't add up**

(/technology/when-third-party-delivery-math-doesnt-add)

(/technology/v
third-party-
delivery-
math-doesnt-
add)

---

**TECHNOLOGY (/TECHNOLOGY)**

**DoorDash and Wing launch drone delivery at Dallas-area malls**

(/technology/doordash-wing-launch-drone-delivery-dallas-area-malls)

(/technology/c
wing-launch-
drone-
delivery-
dallas-area-

---

PREMIUM   (/exclusive-content)

**TECHNOLOGY (/TECHNOLOGY)**

**With Grubhub settlement, the FTC puts delivery apps on notice**

(/technology/grubhub-settlement-ftc-puts-delivery-apps-notice)

(/technology/g
settlement-
ftc-puts-
delivery-
apps-notice)

---

**TECHNOLOGY (/TECHNOLOGY)**

**Grubhub to pay $25M to settle FTC lawsuit over hidden fees**

(/technology/grubhub-pay-25m-settle-ftc-lawsuit-over-hidden-fees)

(/technology/g
pay-25m-
settle-ftc-
lawsuit-over-
hidden-fees)

---

**TECHNOLOGY (/TECHNOLOGY)**

**DoorDash is cracking down on fake driver accounts**

(/technology/doordash-cracking-down-fake-driver-accounts)

(/technology/c
cracking-
down-fake-
driver-
accounts)

---

**TECHNOLOGY (/TECHNOLOGY)**

**Cyberattack hits Krispy Kreme's online ordering system**

(/technology/cyberattack-hits-krispy-kremes-online-ordering-system)

(/technology/c
hits-krispy-
kremes-
online-
ordering-

---

# EXCLUSIVE CONTENT

(/financing/why-peter-cancro-decided-sell-jersey-mikes)

PREMIUM   (/exclusive-content)
**FINANCING (/FINANCING)**

# Why Peter Cancro decided to sell Jersey Mike's

(/financing/why-peter-cancro-decided-sell-jersey-mikes)
Exclusive: In his first interview since selling the sandwich chain to private-equity firm Blackstone for $8 billion, the owner and longtime CEO said now was the time to make a move. But he remains invested in the company he first bought as a high schooler.

(/technology/when-third-party-delivery-math-doesnt-add)

PREMIUM   (/exclusive-content)
**TECHNOLOGY (/TECHNOLOGY)**

# When third-party delivery math doesn't add up

(/technology/when-third-party-delivery-math-doesnt-add)
Tech Check: Delivery margins are notoriously thin, and it doesn't take much to lose money on them. Here's what operators should watch out for.

(/food/theres-little-rhyme-or-reason-best-restaurants-year-lists)

PREMIUM   (/exclusive-content)
**FOOD (/FOOD)**

# There's little rhyme or reason to 'Best Restaurants of the Year' lists

(/food/theres-little-rhyme-or-reason-best-restaurants-year-lists)
The 2024 rankings vary widely depending on who is compiling them, but there are some common threads, says Senior Menu Editor Patricia Cobe.

PREMIUM   (/exclusive-content)

**OPINION   TECHNOLOGY (/TECHNOLOGY)**

# When third-party delivery math doesn't add up

Tech Check: Delivery margins are notoriously thin, and it doesn't take much to lose money on them. Here's what operators should watch out for.

*By **Joe Guszkowski (/profile/joe-guszkowski)** on Dec. 20, 2024*

## This Premium Content is only available to RB+ Subscribers

Continue reading with one of the options below

LOGIN (/LOGIN?T=/TECHNOLOGY/WHEN-THIRD-PARTY-DELIV

— or —

SUBSCRIBE ❯ (/MEMBERSHIP/?T=/TECHNOLOGY/WHEN-THII

# RESTAURANT BUSINESS EXCLUSIVE CONTENT

(/financing/why-peter-cancro-decided-sell-jersey-mikes)

**PREMIUM**   (/exclusive-content)

**FINANCING (/FINANCING)**

# Why Peter Cancro decided to sell Jersey Mike's

(/financing/why-peter-cancro-decided-sell-jersey-mikes)

Exclusive: In his first interview since selling the sandwich chain to private-equity firm Blackstone for $8 billion, the owner and longtime CEO said now was the time to make a move. But he remains invested in the company he first bought as a high schooler.

(/food/theres-little-rhyme-or-reason-best-restaurants-year-lists)

**PREMIUM**   (/exclusive-content)

**FOOD (/FOOD)**

# There's little rhyme or reason to 'Best Restaurants of the Year' lists

(/food/theres-little-rhyme-or-reason-best-restaurants-year-lists)

The 2024 rankings vary widely depending on who is compiling them, but there are some common threads, says Senior Menu Editor Patricia Cobe.

(/workforce/union-struggle-spills-starbucks-headquarters)

**PREMIUM**   (/exclusive-content)

**WORKFORCE (/WORKFORCE)**

# Union struggle spills into Starbucks headquarters

(/workforce/union-struggle-spills-starbucks-headquarters)

Reality Check: Starbucks Workers United has organized the home office's store. And now it looks as if an actual strike may be coming.

## TRENDING

(/food/trouble-ahead-dessert-restaurant-menus)

**FOOD (/FOOD)**

## Trouble ahead for dessert on restaurant menus

(/food/trouble-ahead-dessert-restaurant-menus)

(/emerging-brands/london-born-pizzaexpress-plots-first-entry-us)

**EMERGING BRANDS (/EMERGING-BRANDS)**

## London-born PizzaExpress plots first entry into the U.S.

(/emerging-brands/london-born-pizzaexpress-plots-first-entry-us)

(/financing/why-peter-cancro-decided-sell-jersey-mikes)

PREMIUM   (/exclusive-content)

**FINANCING (/FINANCING)**

## Why Peter Cancro decided to sell Jersey Mike's

(/financing/why-peter-cancro-decided-sell-jersey-mikes)

## MORE FROM OUR PARTNERS

(/leadership/italy-sigep-2025-interview-flavia-morelli-group-

**Italy, SIGEP 2025: interview with Flavia Morelli, Group Exhibition Manager (Food&Beverage Division), Italian Exhibition...**

(/leadership/italy-sigep-2025-interview-flavia-morelli-group-exhibition-manager-foodbeverage)

(/food/introducing-
our-new-
brand-identity-
ifma-food-
**Introducing Our New Brand Identity: IFMA The Food Away from Home Association**

(/food/introducing-our-new-brand-identity-ifma-food-away-from-home-association)

(/operations/how-
apparel-
services-help-
restaurant-
**How Apparel Services Help Restaurant Operators Address Industry Challenges**

(/operations/how-apparel-services-help-restaurant-operators-address-industry-challenges)

(/beverage/tapping-
2025-beverage-
trends-global-
beverage-
**Tapping into 2025 beverage trends with Global Beverage Innovator**

(/beverage/tapping-2025-beverage-trends-global-beverage-innovator)

(/leadership/sigep-
world-2025-
goes-berlin-
name-
**SIGEP WORLD 2025 goes to Berlin in the name of internationality and new entries**

(/leadership/sigep-world-2025-goes-berlin-name-internationality-new-entries)

# Checkmate.com, Inc. Employee Handbook



10/04/2023



AR| CA| CO| FL| IL| KS| ME| MD| MI| MN| MO| NV| NJ| NY| NC| OR| PA| TN| TX| VA| WI

# ABOUT THIS HANDBOOK/DISCLAIMER

We prepared this handbook to help employees find the answers to many questions that they may have regarding their employment with Checkmate.com, Inc. Please take the necessary time to read it.

We do not expect this handbook to answer all questions. Supervisors and Human Resources also serve as a major source of information.

Neither this handbook nor any other verbal or written communication by a management representative is, nor should it be considered to be, an agreement, contract of employment, express or implied, or a promise of treatment in any particular manner in any given situation, nor does it confer any contractual rights whatsoever. Checkmate.com, Inc. adheres to the policy of employment at will, which permits the Company or the employee to end the employment relationship at any time, for any reason, with or without cause or notice.

No Company representative other than the CEO may modify at-will status and/or provide any special arrangement concerning terms or conditions of employment in an individual case or generally and any such modification must be signed and in writing.

Many matters covered by this handbook, such as benefit plan descriptions, are also described in separate Company documents. These Company documents are always controlling over any statement made in this handbook or by any member of management.

This handbook states only general Company guidelines. The Company may, at any time, in its sole discretion, modify or vary from anything stated in this handbook, with or without notice, except for the rights of the parties to end employment at will, which may only be modified by an express written agreement signed by the employee and the CEO.

This handbook supersedes all prior handbooks.

## Table of Contents

**Section 1 - Governing Principles of Employment** 11

    **1-1. Introduction** 11

    **1-2. Equal Employment Opportunity** 11

    **1-3. Diversity, Equality & Inclusion Policy** 11

    **1-4. Reasonable Accommodations & Interactive Dialogue** 13

    **1-5. Non-Harassment** 14

    **1-6. Drug-Free and Alcohol-Free Workplace** 16

    **1-7. Workplace Violence** 17

**Section 2 - Operational Policies** 18

    **2-1. Remote Work/Telecommuting** 18

    **2-2. Bring Your Own Device (BYOD) Policy** 20

    **2-3. Personal and Company-Provided Portable Communication Devices** 21

    **2-4. Employee Classifications** 23

    **2-5. Hiring Policy** 23

    **2-6. Hiring Relatives/Employee Relationships** 24

    **2-7. References** 24

    **2-8. Job Postings** 24

    **2-9. Internal Job Posting Policy (US)** 25

    **2-10. Employee Referral Policy** 28

    **2-11. Background Check Policy** 29

    **2-12. Probation Period** 30

    **2-13. Performance Review** 30

    **2-14. Progressive Discipline Policy** 30

    **2-15. Open Door Policy** 32

    **2-16. Working Hours and Schedule** 32

    **2-17. Timekeeping Procedures** 33

    **2-18. Overtime** 33

    **2-19. Your Paycheck** 33

    **2-20. Direct Deposit** 34

    **2-21. Salary Advances** 34

    **2-22. Your Employment Records** 34

    **2-23. Record Retention** 34

    **2-24. Data Retention and Archiving** 34

    **2-25. Safe Harbor Policy for Exempt Employees** 39

## Table of Contents

2-26. Training and Development Policy ......... 40

**Section 3 - Benefits** ......... 43

3-1. Benefits Overview ......... 43

3-2. Paid Holidays ......... 43

3-3. Flex Time Off ......... 44

3-4. Lactation Accommodations ......... 44

3-5. Workers' Compensation ......... 45

3-6. Jury Duty ......... 45

3-7. Bereavement Leave ......... 45

3-8. Voting Leave ......... 46

3-9. Insurance Programs ......... 46

3-10. Long-Term Disability Benefits ......... 46

3-11. Salary Continuation ......... 46

3-12. Employee Assistance Program ......... 46

3-13. Retirement Plan ......... 47

3-14. Service/Work Anniversary Awards ......... 47

**Section 4 - Leaves of Absence** ......... 48

4-1. Personal Leave ......... 48

4-2. Military Leave ......... 48

4-3. Leave for Pregnancy Related Medical Conditions ......... 49

4-4. Medical Leave and Family Care (MLFC) ......... 49

4-5. Parental Leave ......... 52

**Section 5 - General Standards of Conduct** ......... 54

5-1. Workplace Conduct ......... 54

5-2. Confidential Company Information ......... 55

5-3. Acceptable Use Policy ......... 55

5-4. Conflict of Interest and Business Ethics ......... 56

5-5. Ethics Hotline Policy ......... 57

5-6. Employee Dress and Personal Appearance ......... 59

5-7. Publicity/Statements to the Media ......... 59

5-8. Solicitation and Distribution ......... 60

5-9. Artificial Intelligence ......... 60

5-10. Punctuality and Attendance ......... 60

5-11. Use of Communications and Computer Systems ......... 61

## Table of Contents

**5-12. Use of Social Media** — 62

**5-13. Use of Facilities, Equipment and Property, Including Intellectual Property** — 62

**5-14. Health and Safety** — 63

**5-15. Gift Policy** — 63

**5-16. Travel Policy** — 65

**5-17. Employee Travel** — 68

**5-18. Business Expense Reimbursement** — 69

**5-19. Operation of Vehicles** — 70

**5-20. Inspections** — 70

**5-21. Smoking** — 71

**5-22. Personal Visits and Telephone Calls** — 71

**5-23. Bulletin Boards** — 71

**5-24. Separation of Employment Policy** — 71

**5-25. Exit Interviews** — 73

**5-26. A Few Closing Words** — 73

**Section 6 - Arkansas Addendum** — 74

**6-1. Time Off for Crime Victims** — 74

**Section 7 - California Addendum** — 75

**7-1. Equal Employment Opportunity** — 75

**7-2. Discrimination, Harassment, and Retaliation Prevention** — 75

**7-3. Working Hours and Schedule** — 78

**7-4. Overtime** — 79

**7-5. Safe Harbor Policy for Exempt Employees** — 80

**7-6. Paid Time Off** — 81

**7-7. Sick and Safe Time** — 82

**7-8. Los Angeles Sick and Safe Time (including the California Healthy Workplaces, Healthy Families Act)** — 83

**7-9. Lactation Breaks** — 85

**7-10. Workers' Compensation** — 86

**7-11. Witness Leave** — 86

**7-12. Voting Leave** — 86

**7-13. Statutory Short-Term Disability Benefits** — 86

**7-14. Paid Family Leave Benefits** — 87

**7-15. Personal Leave** — 87

**7-16. Time Off for Military Spouses** — 88

## Table of Contents

**7-17. Bone Marrow Donation Leave** 89

**7-18. Organ Donation Leave** 89

**7-19. Family Rights Leave** 89

**7-20. Leave for Victims of Crime or Abuse (including Domestic Violence, Sexual Assault or Stalking)** 95

**7-21. Time Off for Crime Victims** 96

**7-22. Pregnancy Disability Leave** 96

**7-23. Bereavement Leave** 98

**7-24. Business Expense Reimbursement** 99

**7-25. Acknowledgment and Receipt of California: Discrimination, Harassment and Retaliation Prevention Policy** 99

**Section 8 - Colorado Addendum** 103

**8-1. Pregnancy Accommodations** 103

**8-2. Overtime** 103

**8-3. Voting Leave** 107

**8-4. Sick and Safe Time** 107

**8-5. Breaks** 110

**8-6. Volunteer Emergency Responders Leave** 112

**8-7. Time Off for Crime Victims** 112

**8-8. Paid Family and Medical Leave** 113

**8-9. COMPS Order Acknowledgment Form** 115

**Section 9 - Illinois Addendum** 116

**9-1. Pregnancy Accommodations** 116

**9-2. Discrimination and Non-Harassment (Including Sexual Harassment)** 117

**9-3. Lactation Accommodations** 119

**9-4. Jury Duty Leave** 120

**9-5. Witness Leave** 120

**9-6. Voting Leave** 120

**9-7. Voluntary Emergency Workers Leave** 120

**9-8. Paid Leave** 121

**9-9. Leave for Domestic, Sexual and Gender Violence or Other Crimes of Violence** 122

**9-10. Business Expense Reimbursement** 124

**9-11. Receipt of Non-Harassment Policy** 125

**Section 10 - Kansas Addendum** 128

**10-1. Kansas- Voting Leave** 128

## Table of Contents

**10-2. Volunteer Emergency Responders Leave**   128

**10-3. Victims of Domestic Abuse, Sexual Assault, and Related Crimes Leave**   128

**Section 11 - Maine Addendum**   130

**11-1. Pregnancy Accommodations**   130

**11-2. Non-Harassment**   130

**11-3. Volunteer Emergency Responders Leave**   132

**11-4. Victims of Domestic Abuse, Sexual Assault, and Related Crimes Leave**   133

**11-5. Family Military Leave**   133

**11-6. Receipt of Non-Harassment Policy**   134

**Section 12 - Maryland Addendum**   137

**12-1. Pregnancy Accommodations**   137

**12-2. Paid Time Off**   137

**12-3. Paid Vacations**   138

**12-4. Earned Sick and Safe Leave**   139

**12-5. Witness Leave**   141

**12-6. Voting Leave**   141

**12-7. Family Military Leave**   141

**12-8. Volunteer Emergency Responders Leave**   141

**12-9. Time Off for Crime Victims**   142

**12-10. Personal and Company-Provided Portable Communication Devices**   142

**12-11. Operation of Vehicles**   143

**Section 13 - Michigan Addendum**   145

**13-1. Social Security Number Privacy Act**   145

**13-2. Victims of Crime Leave**   146

**13-3. Time Off for Crime Victims**   146

**Section 14 - Minnesota Addendum**   147

**14-1. Equal Employment Opportunity**   147

**14-2. Right to Review Personnel Records**   147

**14-3. Wage Disclosure Protections**   148

**14-4. Crime Victims Leave**   149

**14-5. Voting Leave**   149

**14-6. Nursing Mothers, Lactating Employees, and Pregnancy Accommodations**   149

**14-7. Sick and Safe Time**   150

**14-8. Family Military Leave**   152

Table of Contents

**14-9. Domestic Abuse or Harassment Leave** — 152

**14-10. School Conference and Activities Leave** — 152

**14-11. Family and Medical Leave for Employers Not Covered by the FMLA** — 153

**Section 15 - Missouri Addendum** — 154

**15-1. Missouri Voting Leave** — 154

**15-2. Volunteer Emergency Responders Leave** — 154

**15-3. Time Off for Crime Victims** — 154

**Section 16 - Nevada Addendum** — 156

**16-1. Pregnancy Accommodations** — 156

**16-2. Overtime** — 156

**16-3. Voting Leave** — 157

**16-4. Time Off for School Related Activities** — 157

**16-5. Volunteer Emergency Responders Leave** — 158

**16-6. Victims of Domestic Abuse, Sexual Assault, and Related Crimes Leave and Accommodations** — 158

**Section 17 - New Jersey Addendum** — 160

**17-1. Equal Employment Opportunity** — 160

**17-2. Pregnancy Accommodations** — 160

**17-3. Earned Sick and Safe Leave** — 161

**17-4. Statutory Short-Term Disability Benefits** — 163

**17-5. Pre-Tax Transportation Fringe Benefit** — 164

**17-6. Family Leave Insurance Benefits** — 164

**17-7. Family and Medical Leave** — 165

**17-8. Volunteer Emergency Responders Leave** — 173

**Section 18 - New York Addendum** — 174

**18-1. New York City Pregnancy Accommodations** — 174

**18-2. New York City Supplemental Gender Discrimination** — 175

**18-3. Non-Harassment** — 176

**18-4. Reproductive Health Decision Making Discrimination** — 185

**18-5. Pregnancy Accommodations** — 185

**18-6. New York City Temporary Schedule Change** — 186

**18-7. Sick Leave** — 188

**18-8. New York City Safe and Sick Leave (Includes The New York Paid Sick Leave Law)** — 190

**18-9. Lactation Accommodation** — 192

**18-10. Jury Duty Leave** — 193

## Table of Contents

**18-11. Witness Leave** 193

**18-12. Voting Leave** 194

**18-13. Statutory Short-Term Disability Benefits** 194

**18-14. Family Military Leave** 194

**18-15. State Paid Family Leave** 194

**18-16. New York- Volunteer Emergency Responders Leave** 197

**18-17. Time Off for Crime Victims** 197

**18-18. Receipt of Non-Harassment Policy** 198

**Section 19 - North Carolina Addendum** 208

**19-1. School Attendance Leave** 208

**19-2. Volunteer Emergency Responders Leave** 208

**19-3. Victims of Domestic Abuse, Sexual Assault, and Related Crimes Leave** 208

**Section 20 - Oregon Addendum** 209

**20-1. Workplace Accommodations** 209

**20-2. Non-Harassment and Discrimination** 209

**20-3. Sick Time** 212

**20-4. Lactation Breaks** 215

**20-5. Bone Marrow Donation Leave** 215

**20-6. Domestic Violence, Sexual Assault or Stalking Leave** 215

**20-7. Victims of Crime** 216

**20-8. Volunteer Emergency Responders Leave** 216

**20-9. Paid Family and Medical Leave** 216

**20-10. Receipt of Non-Harassment Policy** 218

**Section 21 - Pennsylvania Addendum** 222

**21-1. Volunteer Emergency Responders Leave** 222

**21-2. Time Off for Crime Victims** 222

**Section 22 - Tennessee Addendum** 224

**22-1. Pregnancy Accommodations** 224

**22-2. Abusive Conduct Prevention** 225

**22-3. Voting Leave** 226

**22-4. Volunteer Emergency Responders Leave** 226

**Section 23 - Texas Addendum** 227

**23-1. Voting Leave** 227

**Section 24 - Virginia Addendum** 228

## Table of Contents

**24-1. Pregnancy Accommodations** 228

**24-2. Reasonable Accommodation for Persons with Disabilities** 229

**24-3. Time Off for Crime Victims** 229

**24-4. Organ Donation Leave** 230

**Section 25 - Wisconsin Addendum** 231

**25-1. Leave for Emergency Responders** 231

**25-2. Volunteer Emergency Responders Leave** 231

**General Handbook Acknowledgment** 232

**Receipt of Non-Harassment Policy** 233

## Section 1 - Governing Principles of Employment

### 1-1. Introduction

For employees who are commencing employment with Checkmate.com, Inc. ("Checkmate.com, Inc." or "the Company"), on behalf of Checkmate.com, Inc., let me extend a warm and sincere welcome.

For employees who have been with us, thanks for your past and continued service.

I extend my personal best wishes for success and happiness here at Checkmate.com, Inc. We understand that it is our employees who provide the services that our customers rely upon, and who will enable us to create new opportunities in the years to come.

Vishal Agarwal, CEO

### 1-2. Equal Employment Opportunity

Checkmate.com, Inc. is an Equal Opportunity Employer that does not discriminate on the basis of actual or perceived race, color, creed, religion, national origin, ancestry, citizenship status, age, sex or gender (including pregnancy, childbirth, pregnancy-related conditions, and lactation), gender identity or expression (including transgender status), sexual orientation, marital status, military service and veteran status, physical or mental disability, genetic information, or any other characteristic protected by applicable federal, state, or local laws and ordinances. Checkmate.com, Inc.'s management team is dedicated to this policy with respect to recruitment, hiring, placement, promotion, transfer, training, compensation, benefits, employee activities, access to facilities and programs, and general treatment during employment.

Any employees with questions or concerns about equal employment opportunities in the workplace are encouraged to bring these issues to the attention of the CEO. Checkmate.com, Inc. will not allow any form of retaliation against employees who raise issues of equal employment opportunity. If employees feel they have been subjected to any such retaliation, they should contact the CEO. To ensure the workplace is free of artificial barriers, violation of this policy including any improper retaliatory conduct will lead to discipline, up to and including discharge. All employees must cooperate with all investigations conducted pursuant to this policy.

### 1-3. Diversity, Equality & Inclusion Policy

**Purpose:**

ItsaCheckmate strives to create an inclusive environment that embraces differences and fosters inclusion. We believe that valuing diversity, equality, and inclusiveness is a competitive differentiator enabling us to achieve our vision to create unmatched value for our clients, colleagues, and business partners.

**Scope:**

This Diversity, Equality & Inclusion Policy applies to all ItsaCheckmate employees, consultants, representatives, and contract workers when they act on behalf of ItsaCheckmate.

**Definitions:**

11

Diversity is the collective mixture of differences and similarities that includes individual and organizational characteristics, values, beliefs, experiences, backgrounds, preferences, and behaviors.

Equality is treating everyone the same and giving everyone access to the same opportunities.

Inclusion is the achievement of a work environment in which all individuals are treated fairly and respectfully, have equal access to opportunities and resources, and can contribute fully to the organization's success.

**Policy Statement and Requirements:**

ItsaCheckmate embraces and supports our employees' differences in age, ethnicity, gender, language differences, nationality or national origin, family or marital status, physical, mental, and development abilities, race, religion or belief, skin color, social or economic class, education, work and behavioral styles, political affiliation, military service, caste and other characteristics that make our employees unique.

**Commitment:**

Our commitment to diversity, equality, and inclusion aligns with our Core Values. Diversity, equality, and inclusion are sponsored at the highest levels in the Company such as our practices and policies, recruitment, and selection; compensation and benefits; professional development and training; promotions; transfers; layoffs; terminations; and the ongoing development of a work environment built on the premise of equity that ensures:

- Diversity is recognized as a business interest, with every level of the organization holding responsibility.
- Communication is respectful between all employees regardless of title or level.
- Insights of diverse groups are sought and welcomed; employees are not alienated or excluded because they do not fit into a set of cultural norms.
- The diversity of our workforce is visible at every level of the company.
- Employees are aware of their own unconscious and conscious bias and know how to ensure this does not manifest itself at work.

In respecting and valuing the diversity among our employees, and all those with whom we do business, managers, and employees are expected to ensure that there is a work environment free of all forms of discrimination and harassment.

**Procedure:**

**Managers Responsibilities:**

Implementing this Policy as part of their day-to-day management of employees and in applying policies and practices in a fair and equitable way.

Recognizing unacceptable behavior and taking immediate appropriate action.

**Employee Responsibilities:**

Implementing this Policy in their day-to-day work and their dealings with colleagues and clients.

Notifying their manager or senior management of any concerns regarding the conduct of other employees.

We all share the responsibility to ensure diversity and inclusion throughout ItsaCheckmate. We encourage all employees to actively embrace these principles in all that we do to deliver ItsaCheckmate's mission and to

make ItsaCheckmate the best place to work based on principles of diversity.

## 1-4. Reasonable Accommodations & Interactive Dialogue

Checkmate.com, Inc. is committed to complying with applicable federal, state, and local laws governing reasonable accommodations of individuals, including, but not limited to, the Americans with Disabilities Act (ADA). To that end, we will endeavor to make a reasonable accommodation to applicants and employees who have requested an accommodation or for whom Checkmate.com, Inc. has notice may require such an accommodation, without regard to any protected classifications, related to an individual's:

- Disability, meaning any physical, medical, mental, or psychological impairment, or a history or record of such impairment;
- Sincerely held religious beliefs and practices;
- Needs as a victim of domestic violence, sex offenses, or stalking;
- Needs related to pregnancy, childbirth, or related medical conditions; and/or
- Any other reason required by applicable law, unless the accommodation would impose an undue hardship on the operation of our business.

Any individual who would like to request an accommodation based on any of the reasons set forth above should contact the CEO. Accommodation requests can be made in writing using a form which can be obtained from the CEO. If an individual who has requested an accommodation has not received an initial response within five (5) business days, the employee should contact the CEO.

After receiving a request for an accommodation or learning indirectly that the employee may require such an accommodation, Checkmate.com, Inc. will engage in an interactive dialogue with the employee.

Even if employee has not formally requested an accommodation, Checkmate.com, Inc. may initiate an interactive dialogue under certain circumstances, such as when Checkmate.com, Inc. has knowledge that employee's performance at work has been negatively affected and a reasonable basis to believe that the issue is related to any of the protected classifications set forth above, in compliance with applicable law. In the event Checkmate.com, Inc. initiates an interactive dialogue with an employee, it should not be construed as Checkmate.com, Inc.'s belief an individual requires an accommodation, but will serve as an invitation for the employee to share with Checkmate.com, Inc. any information the employee desires to share, or to request an accommodation.

The interactive dialogue may take place in person, by telephone, or by electronic means. As part of the interactive dialogue, Checkmate.com, Inc. will communicate openly and in good faith with the employee in a timely manner in order to determine whether and how Checkmate.com, Inc. may be able to provide a reasonable accommodation. To the extent necessary and appropriate based on the request, Checkmate.com, Inc. will attempt to explore the existence and feasibility of alternative accommodations as well as alternative positions for the employee. Checkmate.com, Inc. is not required to provide the specific accommodation sought by the employee, provided the alternatives are reasonable and either meet the specific needs of the employee or specifically address the employee's limitations.

As part of the interactive dialogue, Checkmate.com, Inc. reserves the right to request supporting documentation, to the maximum extent permitted by applicable law.

Checkmate.com, Inc. will endeavor to keep confidential all communications regarding requests for reasonable accommodations and all circumstances surrounding the employee's underlying reason for needing an

accommodation.

Checkmate.com, Inc. will not allow any form of retaliation against employees who have requested an accommodation, for whom Checkmate.com, Inc. has notice may require such an accommodation, or who otherwise engage in the interactive dialogue process.

Employees with questions regarding this policy should contact the CEO.

## 1-5. Non-Harassment

It is Checkmate.com, Inc.'s policy to prohibit intentional and unintentional harassment of or against job applicants, contractors, interns, volunteers or employees by another employee, supervisor, vendor, customer or any third party on the basis of actual or perceived race, color, creed, religion, national origin, ancestry, citizenship status, age, sex or gender (including pregnancy, childbirth and pregnancy-related conditions), gender identity or expression (including transgender status), sexual orientation, marital status, military service and veteran status, physical or mental disability, genetic information or any other characteristic protected by applicable federal, state or local laws (referred to as "protected characteristics"). Such conduct will not be tolerated by Checkmate.com, Inc.

The purpose of this policy is not to regulate our employees' personal morality, but to ensure that no one harasses another individual in the workplace, including while on Company premises, while on Company business (whether or not on Company premises) or while representing the Company. In addition to being a violation of this policy, harassment or retaliation based on any protected characteristic as defined by applicable federal, state, or local laws also is unlawful. For example, sexual harassment and retaliation against an individual because the individual filed a complaint of sexual harassment or because an individual aided, assisted or testified in an investigation or proceeding involving a complaint of sexual harassment as defined by applicable federal, state, or local laws are unlawful.

**Harassment Defined**

Harassment generally is defined in this policy as unwelcome verbal, visual or physical conduct that denigrates or shows hostility or aversion towards an individual because of any actual or perceived protected characteristic or has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Harassment can be verbal (including slurs, jokes, insults, epithets, gestures or teasing), visual (including offensive posters, symbols, cartoons, drawings, computer displays, text messages, social media posts or e-mails) or physical conduct (including physically threatening another, blocking someone's way, etc.). Such conduct violates this policy, even if it does not rise to the level of a violation of applicable federal, state or local laws. Because it is difficult to define unlawful harassment, employees are expected to behave at all times in a manner consistent with the intended purpose of this policy.

**Sexual Harassment Defined**

Sexual harassment can include all of the above actions, as well as other unwelcome conduct, such as unwelcome or unsolicited sexual advances, requests for sexual favors, conversations regarding sexual activities and other verbal, visual or physical conduct of a sexual nature when:

- submission to that conduct or those advances or requests is made either explicitly or implicitly a term or condition of an individual's employment; or
- submission to or rejection of the conduct or advances or requests by an individual is used as the basis

14

for employment decisions affecting the individual; or

- the conduct or advances or requests have the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Examples of conduct that violate this policy include:

1. unwelcome flirtations, leering, whistling, touching, pinching, assault, blocking normal movement;
2. requests for sexual favors or demands for sexual favors in exchange for favorable treatment;
3. obscene or vulgar gestures, posters or comments;
4. sexual jokes or comments about a person's body, sexual prowess or sexual deficiencies;
5. propositions or suggestive or insulting comments of a sexual nature;
6. derogatory cartoons, posters and drawings;
7. sexually-explicit e-mails, text messages or voicemails;
8. uninvited touching of a sexual nature;
9. unwelcome sexually-related comments;
10. conversation about one's own or someone else's sex life;
11. conduct or comments consistently targeted at only one gender, even if the content is not sexual; and
12. teasing or other conduct directed toward a person because of the person's gender.

**Reporting Procedures**

If the employee has been subjected to or witnessed conduct which violates this policy, the employee should immediately report the matter to the Manager. If the employee is unable for any reason to contact this person, or if the employee has not received an initial response within five (5) business days after reporting any incident of what the employee perceives to be harassment, the employee should contact the Head of Human Resources. If the person toward whom the complaint is directed is one of the individuals indicated above, the employee should contact any higher-level manager in the reporting hierarchy.

**Investigation Procedures**

Every report of perceived harassment will be fully investigated, and corrective action will be taken where appropriate. All complaints will be kept confidential to the extent possible, but confidentiality cannot be guaranteed. All employees must cooperate with all investigations conducted pursuant to this policy.

**Retaliation Prohibited**

In addition, the Company will not allow any form of retaliation against individuals who report unwelcome conduct to management or who cooperate in the investigations of such reports in accordance with this policy. If the employee has been subjected to any such retaliation, the employee should report it in the same manner in which the employee would report a claim of perceived harassment under this policy.

Violation of this policy including any improper retaliatory conduct will result in disciplinary action, up to and including termination.

## 1-6. Drug-Free and Alcohol-Free Workplace

To help ensure a safe, healthy and productive work environment for our employees and others, to protect Company property, and to ensure efficient operations, Checkmate.com, Inc. has adopted a policy of maintaining a workplace free of drugs and alcohol. This policy applies to all employees and other individuals who perform work for the Company.

The unlawful or unauthorized use, abuse, solicitation, theft, possession, transfer, purchase, sale or distribution of controlled substances (including medical marijuana), drug paraphernalia or alcohol by an individual anywhere on Company premises, while on Company business (whether or not on Company premises) or while representing the Company, is strictly prohibited. Employees and other individuals who work for the Company also are prohibited from reporting to work or working while they are using or under the influence of alcohol or any controlled substances, which may impact the employee's ability to perform their job or otherwise pose safety concerns, except when the use is pursuant to a licensed medical practitioner's instructions and the licensed medical practitioner authorized the employee or individual to report to work. However, this exception does not extend any right to report to work under the influence of medical marijuana or to use medical marijuana as a defense to a positive drug test, to the extent the employee is subject to any drug testing requirement, except as permitted by and in accordance with applicable law. This restriction does not apply to responsible drinking of alcohol at business meetings and related social outings.

Employees must notify the Company within five (5) calendar days if they are convicted of a criminal drug violation in the workplace. Within ten (10) days of such notification or other actual notice, the Company will advise the contracting agency of such conviction.

All employees are hereby advised that full compliance with the foregoing policy shall be a condition of employment at the Company.

Any employee who violates the foregoing drug-free workplace policy described above shall be subject to discipline up to and including immediate discharge.

In the discretion of the Company, any employee who violates the drug-free workplace policy may be required, in connection with or in lieu of disciplinary sanctions, to participate to the Company's satisfaction in an approved drug assistance or rehabilitation program.

In order to maintain a drug-free workplace, the Company has established a drug-free awareness program to educate employees on the dangers of drug abuse in the workplace, our drug-free workplace policy, the availability of any drug-free counseling, rehabilitation and employee assistance programs and the penalties that may be imposed for violations of our drug-free workplace policy. (Such education may include: (1) distribution of our drug-free workplace policy at the employment interview; (2) a discussion of our policy at the new employee orientation session; (3) distribution of a list of approved drug assistance agencies, organizations, and clinics; (4) distribution of published educational materials regarding the dangers of drug abuse; (5) reorientation of all involved employees in cases in which a drug-related accident or incident occurs; (6) inclusion of the policy in employee handbooks and any other personnel policy publications; (7) lectures or training by local drug abuse assistance experts; (8) discussion by the Company's safety experts on the hazards associated with drug abuse; and (9) video tape presentations on the hazards of drug abuse.)

## 1-7. Workplace Violence

Checkmate.com, Inc. is strongly committed to providing a safe workplace. The purpose of this policy is to minimize the risk of personal injury to employees and damage to Company and personal property.

Checkmate.com, Inc. does not expect employees to become experts in psychology or to physically subdue a threatening or violent individual. Indeed, Checkmate.com, Inc. specifically discourages employees from engaging in any physical confrontation with a violent or potentially violent individual. However, Checkmate.com, Inc. does expect and encourage employees to exercise reasonable judgment in identifying potentially dangerous situations.

Experts in the mental health profession state that prior to engaging in acts of violence, troubled individuals often exhibit one or more of the following behaviors or signs: over-resentment, anger and hostility; extreme agitation; making ominous threats such as bad things will happen to a particular person, or a catastrophic event will occur; sudden and significant decline in work performance; irresponsible, irrational, intimidating, aggressive or otherwise inappropriate behavior; reacting to questions with an antagonistic or overtly negative attitude; discussing weapons and their use, and/or brandishing weapons in the workplace; overreacting or reacting harshly to changes in Company policies and procedures; personality conflicts with co-workers; obsession or preoccupation with a co-worker or supervisor; attempts to sabotage the work or equipment of a co-worker; blaming others for mistakes and circumstances; or demonstrating a propensity to behave and react irrationally.

**Prohibited Conduct**

Threats, threatening language or any other acts of aggression or violence made toward or by any Company employee WILL NOT BE TOLERATED. For purposes of this policy, a threat includes any verbal or physical harassment or abuse, any attempt at intimidating or instilling fear in others, menacing gestures, flashing of weapons, stalking or any other hostile, aggressive, injurious or destructive action undertaken for the purpose of domination or intimidation. To the extent permitted by law, employees and visitors are prohibited from carrying weapons onto Company premises.

**Procedures for Reporting a Threat**

All potentially dangerous situations, including threats by co-workers, should be reported immediately to any member of management with whom the employee feels comfortable. Reports of threats may be maintained confidential to the extent maintaining confidentiality does not impede Checkmate.com, Inc.'s ability to investigate and respond to the complaints. All threats will be promptly investigated. All employees must cooperate with all investigations. No employee will be subjected to retaliation, intimidation or disciplinary action as a result of reporting a threat in good faith under this policy.

If the Company determines, after an appropriate good faith investigation, that someone has violated this policy, the Company will take swift and appropriate corrective action.

If the employee is the recipient of a threat made by an outside party, that employee should follow the steps detailed in this section. It is important for the Company to be aware of any potential danger in its offices. Indeed, the Company wants to take effective measures to protect everyone from the threat of a violent act by employees or by anyone else.

## Section 2 - Operational Policies

### 2-1. Remote Work/Telecommuting

Checkmate.com, Inc. may allow employees to work remotely if their job duties and work performance are determined to be eligible for remote work. Eligibility will be decided on a case-by-case basis by the Company. Employees also may be required to work remotely during periods of public health emergencies if government orders and mandates recommend such work.

This policy provides general information regarding remote work/telecommuting. Employees who are approved to work remotely should consult their individual agreement for specific details of their remote work/telecommuting arrangement, such as expected work hours, equipment provided, and other important information.

Any remote work/telecommuting arrangement may be discontinued by the Company at any time and at the discretion of the Company. Employees also may discontinue the arrangement but may not be guaranteed office space at the Company's location.

**At-Will Employment**

This policy and any individual agreement addressing this work arrangement do not create a contract of employment and are not intended to be considered or construed as a promise of continued employment. Employment is at will and may be discontinued at any time by the Company or employee without notice, cause, or liability.

**Hours of Work**

Employees will work full time from home. Scheduled hours of work will be set by the employees' manager or supervisor. Employees should maintain regular contact with their supervisors and managers.

Nonexempt employees must accurately record all hours worked pursuant to the Company's timekeeping system and take rest and meal breaks as if in the Company's workplace and as required by law. Nonexempt employees may not work beyond scheduled working hours (including working more than 40 hours in a workweek) without prior, written authorization from their manager or supervisor.

**Location**

Employees will provide, at their expense, a secure, dedicated work area. Employees are responsible for maintaining the work area in a safe, secure, and nonhazardous condition at all times. Employees will maintain security devices and procedures necessary to prevent use by unauthorized persons, including by preventing the connection of any Company-furnished computer system, network, or database to any computer, network, or database other than a computer, network, or database to which connections are provided or authorized by the Company.

**Duties**

Employees are expected to follow all existing Company policies and procedures. The duties, obligations, responsibilities, and conditions of employment with the Company remain unchanged. Employees must stay engaged with work throughout the workday and be fully available during normal business hours. If employees do not successfully perform their job duties remotely, this arrangement will be revoked. Employees are

expected to follow existing Company policies with respect to scheduled and unscheduled time off, including the obligation to speak with their manager or supervisor before the scheduled start time in the event of an unscheduled absence, tardy, or early departure.

## Accidents and Injuries

Employees agree to maintain safe conditions in the remote work space and to practice the same safety habits and rules applied on Company premises. If employees incur an injury arising out of the course and scope of the assigned job duties while working in the remote work space, the workers' compensation provisions in place for the state in which the employees are working will apply. Employees must notify their supervisor or manager immediately and complete all necessary and/or requested documents regarding the reported injury. The Company assumes no responsibility for injuries occurring in the remote work space outside normal working hours or for injuries that occur as a result of a reasonably recognizable unsafe remote work space.

## Equipment

Employees agree to use electronic equipment that has been encrypted and meets all of the Company's security requirements. If the Company provides equipment for home use, employees agree to provide a secure location for Company-owned equipment and will not use, or allow others to use, such equipment for purposes other than Company business. Employees have no expectation of ownership in such equipment, linkages, property, or other items installed or provided by the Company. The Company will bear the expense of removal of any such equipment, linkages, and installations provided by the Company upon the termination of the remote work/telecommuting arrangement but not modification of or repairs to the work location. Employees hereby release the Company from any damage or liability incurred in the installing or removal of the equipment provided by the Company.

## Return of Company Property

All equipment, records, and materials provided by the Company will remain Company property. Employees agree to return Company equipment, records, and materials upon request. All Company equipment will be returned by employees for inspection, repair, or replacement as needed or requested or immediately upon termination of the remote work/telecommuting arrangement. All equipment must be returned within five (5) business days of written notice to the employees.

## Expenses

Upon presentment of receipts and in accordance with the Business Expense Reimbursement policy, the Company will reimburse employees for certain preapproved expenses.

Regular household utility charges, such as electricity, water, phone, Internet service, auto, homeowners' insurance, etc., are not reimbursable unless state law requires reimbursement.

## Confidentiality

Employees agree that they are subject to the Company's policies prohibiting the nonbusiness use or dissemination of the Company's confidential business information. Employees will take all appropriate steps to safeguard the Company's confidential business information, including segregating it from personal papers and documents, not allowing nonemployees to access such information, and keeping such information in locked drawers or file cabinets when not in use. Employees will maintain confidential information, including, but not limited to, information regarding the Company's products or services, processing, marketing and sales, client lists, client e-mail addresses and mailing addresses, client data, orders, memoranda, notes, records, technical data, sketches, designs, plans, drawings, trade secrets, research and development data, experimental work, proposals, new product and/or service developments, project reports, sources of supply and material, operating

19

and cost data, and corporate financial information.

**Contact**

If employees have any questions concerning this policy or would like to apply to work remotely, they should contact the CEO.

## 2-2. Bring Your Own Device (BYOD) Policy

**Purpose:**
This policy outlines requirements for BYOD usage and establishes the steps that both users and the IT department should follow to initialize, support, and remove personal devices from company access. These requirements must be followed as documented to protect company systems and data from unauthorized access or misuse.

**Scope:**
This policy covers all full-time and part-time employees, contract workers, consultants, temporary workers, and other personnel granted access to organizational systems, networks, software, and/or data.

Personal electronic devices include personally owned cell phones, smartphones, tablets, laptops and computers.

**Procedure:**
Device protocols

- To ensure the security of ItsaCheckmate information, all employees are required to have security software installed on their personal devices that the company monitors.
- ItsaCheckmate utilizes a company-controlled antivirus and mobile device management (MDM) software called Comodo to facilitate this requirement. The Security Team will provide the registration instructions for Comodo software, which will allow limited 24/7 monitoring against security threats. The Comodo software will help contain and secure applications, data, information, and software. The Security Team will deploy the mandatory software to all employees.
- Employees may store company-related information within our Google Cloud environment (Google Drive). Usage of Box.com, OneDrive, Dropbox, or SharePoint for company files is not allowed. Employees may not use cloud-based apps or backup that allows company-related data to be transferred to unsecured parties.
- Employees may not use unsecure Internet sites while on devices which are also used for ItsaCheckmate related work.

**Restrictions on authorized use:**
While at work, employees are expected to exercise the same discretion in using their personal devices as is expected for the use of company devices. ItsaCheckmate policies pertaining to harassment, discrimination, retaliation, trade secrets, confidential information and ethics apply to employee use of personal devices for work-related
activities.

Excessive personal calls, e-mails or text messaging during the workday, regardless of the device used, can interfere with employee productivity and be distracting to others.

- Employees must balance work and personal matters so they remain productive.

20

- An employee may not store information from or related to former employment on the company's application or within the company's Google environment.
- Family and friends should not use personal devices that are used for company purposes.

**Privacy/company access:**

Management reserves the right to request company-related data on personal devices.

Management may use our cloud-based applications such as Google, Asana, Slack, or Zoom to analyze usage patterns by employees.

**Safety:**

Employees are expected to follow applicable local, state and federal laws and regulations regarding the use of electronic devices at all times.

Employees whose job responsibilities include regular or occasional driving are expected to refrain from using their personal devices (laptops, tablets, and cellular phone) while driving. Regardless of the circumstances, including slow or stopped traffic, employees are required to pull off to the side of the road and safely stop the vehicle before placing or accepting a call or texting unless the hands free option is available and used in the vehicle. Special care should be taken in situations involving traffic, inclement weather or unfamiliar areas.

Employees who are charged with traffic violations resulting from the use of their personal devices (laptops, tablets, and cellular phones) while driving will be solely responsible for all liabilities that result from such actions.

**Lost, stolen, hacked or damaged equipment:**

Employees are expected to protect personal devices used for work-related purposes from loss, damage or theft. Employees must immediately notify management by email, HR, and the Security Team in the event their personal device is lost, stolen or damaged.

**Separation of employment:**

Upon resignation or termination of employment, the employee will be asked to remove all company files, data, and clear browser passwords stored locally on their device. The Security Team will facilitate the secure transfer of data and files to Google Drive.

**Violations of policy:**

Failure to follow ItsaCheckmate policies and procedures may result in disciplinary action, up to and including separation of employment.

## 2-3. Personal and Company-Provided Portable Communication Devices

Checkmate.com, Inc.-provided portable communication devices (PCDs), including cell phones and personal digital assistants, should be used primarily for business purposes. Employees have no reasonable expectation of privacy in regard to the use of such devices, and all use is subject to monitoring, to the maximum extent permitted by applicable law. This includes, as permitted, the right to monitor personal communications as necessary.

Some employees may be authorized to use their own PCD for business purposes. These employees should work with the IT department to configure their PCD for business use. Communications sent via a personal PCD also may subject to monitoring if sent through the Company's networks and the PCD must be provided for inspection and review upon request.

21

All conversations, text messages and e-mails must be professional. When sending a text message or using a PCD for business purposes, whether it is a Company-provided or personal device, employees must comply with applicable Company guidelines, including policies on sexual harassment, discrimination, conduct, confidentiality, equipment use and operation of vehicles. Using a Company-issued PCD to send or receive personal text messages is prohibited at all times and personal use during working hours should be limited to emergency situations.

If employees who use a personal PCD for business resign or are discharged, they will be required to submit the device to the IT department for resetting on or before their last day of work. At that time, the IT department will reset and remove all information from the device, including but not limited to, Company information and personal data (such as contacts, e-mails and photographs). The IT department will make efforts to provide employees with the personal data in another form (e.g., on a disk) to the extent practicable; however, the employee may lose some or all personal data saved on the device.

Employees may not use their personal PCD for business unless they agree to submit the device to the IT department on or before their last day of work for resetting and removal of Company information. This is the only way currently possible to ensure that all Company information is removed from the device at the time of termination. The removal of Company information is crucial to ensure compliance with the Company's confidentiality and proprietary information policies and objectives.

Please note that whether employees use their personal PCD or a Company-issued device, the Company's electronic communications policies, including but not limited to, proper use of communications and computer systems, remain in effect.

**Portable Communication Device Use While Driving**

Employees who drive on Company business must abide by all state or local laws prohibiting or limiting PCD (cell phone or personal digital assistant) use while driving. Further, even if usage is permitted, employees may choose to refrain from using any PCD while driving. "Use" includes, but is not limited to, talking or listening to another person or sending an electronic or text message via the PCD.

Regardless of the circumstances, including slow or stopped traffic, if any use is permitted while driving, employees should proceed to a safe location off the road and safely stop the vehicle before placing or accepting a call. If acceptance of a call is absolutely necessary while driving, and permitted by law, employees must use a hands-free option and advise the caller that they are unable to speak at that time and will return the call shortly.

Under no circumstances should employees feel that they need to place themselves at risk to fulfill business needs.

Since this policy does not require any employee to use a cell phone while driving, employees who are charged with traffic violations resulting from the use of their PCDs while driving will be solely responsible for all liabilities that result from such actions.

Texting and e-mailing while driving is prohibited in all circumstances.

## 2-4. Employee Classifications

For purposes of this handbook, all Checkmate.com, Inc. employees fall within one of the classifications below.

**Full-Time Employees** - Employees who regularly work at least 40 hours per week who were not hired on a short-term basis.

**Part-Time Employees** - Employees who regularly work fewer than 40 hours per week who were not hired on a short-term basis.

**Short-Term Employees** - Employees who were hired for a specific short-term project, or on a short-term freelance, per diem or temporary basis. Short-Term employees generally are not eligible for Company benefits, but are eligible to receive statutory benefits.

In addition to the above classifications, employees are categorized as either "**exempt**" or "**non-exempt**" for purposes of federal and state wage and hour laws. Employees classified as exempt do not receive overtime pay; they generally receive the same weekly salary regardless of hours worked. Such salary may be paid less frequently than weekly. The employee will be informed of these classifications upon hire and informed of any subsequent changes to the classifications.

## 2-5. Hiring Policy

ItsaCheckmate seeks to recruit and hire the best-qualified applicants and complies with all applicable federal, state, and local laws in its recruiting and hiring practices.

**Scope**:

This policy applies to all applicants.

**Procedure:**

The company carries out its recruiting and hiring processes in accordance with applicable federal, state, and local laws and provides equal employment opportunities to all applicants without regard to any protected status, as detailed in the company's discrimination and harassment prevention policy found in the Employee Handbook. Similarly, the company is committed to complying with all laws protecting qualified individuals with disabilities and employees' religious beliefs and observances in its recruiting and hiring processes. ItsaCheckmate will provide a reasonable accommodation for any known physical or mental disability of a qualified applicant or an applicant's known religious beliefs and observances, provided the requested accommodation does not create an undue hardship for the company and does not pose a direct threat to the health or safety of others in the workplace or the individual. The hiring process generally includes a review of applications, resumes, and other written documentation provided by applicants and candidates and interviews of qualified applicants to identify the most qualified applicants for a position. Interviews may include a Video interview.

A requirement for all applicants, in consideration, must be told the company requires them to "bring your own device" (BYOD). The device must be a working device and can install company-owned or Company approved antivirus software and is expected to be used on any devices used for company work. The hiring process generally includes a review of applications, resumes, and other written documentation provided by applicants and candidates and interviews of qualified applicants to identify the most qualified applicants for a position.

23

The company conducts background checks in conformance with all applicable federal and state laws, including providing applicants with required notices and information regarding such background and reference checks.

Upon hire, the company provides employees access to information, including all required federal and state forms as well as company forms and policies.

Employees who have any questions regarding this policy should contact Human Resources.

## 2-6. Hiring Relatives/Employee Relationships

A familial relationship among employees can create an actual or at least a potential conflict of interest in the employment setting, especially where one relative supervises another relative. To avoid this problem, Checkmate.com, Inc. may refuse to hire or place a relative in a position where the potential for favoritism or conflict exists.

In other cases, such as personal relationships where a conflict or the potential for conflict arises, even if there is no supervisory relationship involved, the parties may be separated by reassignment or discharged from employment, at the discretion of the Company. Accordingly, all parties to any type of intimate personal relationship must inform management.

If two employees marry, become related, or enter into an intimate relationship, they may not remain in a reporting relationship or in positions where one individual may affect the compensation or other terms or conditions of employment of the other individual. The Company generally will attempt to identify other available positions, but if no alternate position is available, the Company retains the right to decide which employee will remain with the Company.

For the purposes of this policy, a relative is any person who is related by blood or marriage, or whose relationship with the employee is similar to that of persons who are related by blood or marriage.

## 2-7. References

Checkmate.com, Inc. will respond to reference requests through the Human Resources and/or the CEO Department. The Company will provide general information concerning the employee such as date of hire, date of discharge, and positions held. Requests for reference information must be in writing, and responses will be in writing. Please refer all requests for references to the Human Resources and/or the CEO Department.

**Only the Human Resources and/or the CEO Department may provide references.**

## 2-8. Job Postings

Checkmate.com, Inc. is dedicated to assisting employees in managing their careers and reaching their professional goals through promotion and transfer opportunities. This policy outlines the on-line job posting program which is in place for all employees. To be eligible to apply for an open position, employees must meet the following requirements:

- be a current, regular, full-time or part-time employee;
- have been in current position for at least six (6) months;
- maintain a performance rating of satisfactory or above;
- not be on conduct/performance-related probation or warning;

- meet the job qualifications listed on the job posting; and
- provide their current manager with notice prior to applying for the position.

If employees find a position of interest on the job posting website and they meet the eligibility requirements, an on-line job posting application must be completed in order to be considered for the position. Not all positions are guaranteed to be posted. The Company reserves the right to seek applicants solely from outside sources or to post positions internally and externally simultaneously.

For more specific information about the program, please contact the Human Resources Department.

## 2-9. Internal Job Posting Policy (US)

**Definition**
A process where internal jobs / roles are posted to assist employees who wish to move into a different role.

**Objective**
Providing and promoting equal growth opportunities (through cross functional / lateral / vertical movement) to all employees to apply for an available role within ItsaCheckmate.

**Scope**

- All employees employed at ItsaCheckmate
- All freelancers/contractors of ItsaCheckmate

**Effective Date**
May 10, 2023

**Glossary of Terms**

- Applicant - Any employee who applies for a position posted under this policy.
- Candidate - An applicant who is shortlisted for an interview for the open position.
- Current Manager - The individual to whom the applicant presently reports to.
- Hiring Manager - The individual to whom the successful candidate will report to.
- Lateral Move - The applicant applies for a role of the same level (in a different vertical or department).
- Promotion - The applicant applies for a role of a higher level (any vertical or department).

**Criteria**

An employee interested in applying for a position through the IJP can apply only if the following criteria are met:

1. **Tenure (Promotion)**

25

| Tenure in Current Position | Condition for Promotion |
|---|---|
| 18 - less than 24 months | Only based on the approval of the current Department Head, Head of HR of the geography, and CEO |
| 24 - less than 30 months | Consecutive ratings of no less than 4 |
| 30 - less than 36 months | Combination ratings of 3, 4, and 5 (the latest rating being a 4 or 5) |
| 36 or more months | Minimum rating of 3 |

2. **Tenure (Lateral Move)** -  minimum 18 months in the current position, not on PIP or has ever been on a PIP during the tenure.

3. The position applied for should be at the same level **(Lateral Move)** or one level higher **(Promotion) than** the current level of the applicant.

4. Qualifications, skill set, and behavioral competencies are as per the requisites listed for the position posted.

5. A legal right to work in the country where the position is posted.

### Guidelines

- No employee who is on a PIP (Performance Improvement Plan) or undergoing disciplinary action would be eligible to apply for a position posted.
- It is expected that no internal transfer of a candidate will be discouraged except in the case of a risk of business disruption.
- In case of a dispute, the Head of the Current Department and the Head of HR would discuss the reasons and the final decision would be communicated to the applicant by the Head of the Current Department.
- The performance evaluation for the year of the transfer will be prorated based on the tenure served in each of the postings. The Current Manager would be expected to set the goals and close the set goals prior to the transfer of the candidate.
- Any time off to be taken by the transferring employee during the transition would be at the discretion of the Current Manager.
- In case of any escalations, the final decision is the CEO's.
- The positions will be open to internal candidates initially, however the IJP does not guarantee closure of the position through internal candidates only.
- There will not be any salary increase for transfers into the same level in the same / alternate department. Corrections / associated increase (if any) would be effective in the immediate appraisal / mid-year cycle.

### Process

**Step 1 - Position (Hiring Manager and Talent Acquisition)**

- All jobs that need to be posted must have a Job Description created and sent to the Talent Acquisition team.
- Talent Acquisition will post these jobs on the relevant careers pages (currently, Workable).

**Step 2 - Internal Job Posting Communication (Talent Acquisition)**

- Vacancies within the organization will be announced when the need arises via email which will include

26

a link to the Careers page.
- The link will lead to the job description for that role.

### Step 3 - Role Discussion (Applicant)(Optional)

- For a better understanding of the role, applicants can speak / discuss with the Hiring Manager / current employee in the role.

### Step 4 - Submission of Application (Applicant)

- Interested applicants must apply within 3 to 7 working days from the date of the posting.
- Applications will not be accepted past the job posting end date.
- Applicants must submit the following:
  - Completed application
  - Updated resume

### Step 5 - Vetting (Hiring Manager)

- Post the closing date for applications, the Talent Acquisition team will forward all applications to the Hiring Manager who will vet potential candidates.

### Step 6 - Follow-up (Talent Acquisition)

- Applicants would be informed of the status of their applications.
  - ? Successful applicants would be given the interview schedule.
  - Applicants not selected would be given feedback writing by the Hiring Manager

### Step 7 - Discussion with Current Manager (Applicant)

- Applicants vetted through the process should discuss with their Current Manager the application and interview schedule.  In his / her absence, the Skip Level Manager can be contacted.

### Step 8 - Interviews (Applicant, Talent Acquisition, Hiring Department)

- The interview panel will be determined by the Head of the Department.
- The interview schedules will be set up by the Talent Acquisition department, in discussion with the Hiring Manager.
- The schedule and invites will be sent to the applicant.
- The interview will take place per the schedule.

### Step 9 - Results (Head of Hiring Department, Human Resources)

- The top 2 candidates will be finalized, and the results will be announced to the candidates.

- Unsuccessful candidates will be given detailed written feedback as sent to the Talent Acquisition team.
- Talent Acquisition will also inform the Current Managers of the successful applicants. The Current Managers will keep the Heads of the Departments informed.
- The Head of the Hiring Department will decide on the final candidate.

## Step 10 - Transition (Current & Hiring Department)

- The Hiring Manager and the Current Manager will discuss the transfer date.
- The maximum time for transferring is 60 days from the day of the selection of a candidate.
- The Current Manager must find a potential replacement for the transferring employee.
- In case of exceptions, approval from the Head of the current and new Departments is required for the final start date.

## Step 11 - Closure (Human Resources)

- A transfer letter will be issued to the transferring employee.
- If there is a revision in salary, the same will be done during the Appraisal process / mid-year process.
- An announcement will be made to the organization after the transferred employee joins the new department.

## 2-10. Employee Referral Policy

ItsaCheckmate is always looking for good people, and you can help. Research has shown, and our own experience supports it, that new hires who come into a company through employee referrals are excellent contributors, stay with the company longer, and are more cost-effective recruits.

That's where you come in! If you know someone who would be a good addition to ItsaCheckmate, you may be awarded a referral bonus if you refer a candidate and he or she is hired.

### Program Rules

All ItsaCheckmate employees are eligible for the referral bonus.

The referral policy will be in effect beginning July 3, 2021.

The referral date cannot be earlier than the date the job opening is posted. The hiring of a referred employee must occur within 180 days (six months) of the initial referral date.

The referral must represent the candidate's first contact with ItsaCheckmate. Temporary, summer, contract and former employees of ItsaCheckmate are not eligible candidates for referral awards.

To be eligible for an award, an employee must submit a referral to the hiring manager with candidate's resume or employment application. The referring employee must agree to have his or her name used when the company contacts the candidate. The first employee to refer a candidate will be the only referring employee eligible for payment. Only candidates who meet the essential qualifications for the position will be considered. All candidates will be evaluated for employment consistent with company policies and procedures.

All information regarding the hiring decision will remain strictly confidential. The referring employee must be employed by ItsaCheckmate during the hired candidate's first six months of employment to receive payment of

the referral bonus.

Referral bonus varies based on location (Ex. $1,000 US; Rs 30,000 India). The bonus may be subject to governmental payroll tax withholdings depending on your location. Referral bonus payment: 25% at the time of hiring. 75% after the referred employee's six months of employment at ItsaCheckmate.

## 2-11. Background Check Policy

The purpose of this policy is to establish guidance around the practice of Background Checks for potential employees as well as offer, logging in, and password procedures.  This policy is applicable to all employees of ItsaCheckmate and any "freelancer or contractor" who is providing or completing services for the organization.

The background check is conducted through CHECKR and includes a criminal background check.

**Employee Background Checks:**

The procedures to undergo a background check are as follows:

1. Employee signs offer letter contingent upon successful completion of a background check.
2. Employees are "invited" via email to complete their background check.
3. Employee completes the background questionnaire and submits it to the vendor.

If the background check comes back without a decisive adherent to senior management values, the CEO will be consulted to make a final determination on proceeding with hiring.   The hiring manager is not to make the final decision, as that represents a conflict of interest.

**Checkr's background check process:**

Conducting background checks is a complex process.  Using the Checkr Hosted Apply Flow helps simplify the process for the manager and the employees, by automatically gathering the candidate PII required to process the requested screenings. Using the Checkr Hosted Apply Flow to order backgrounds is as follows:

- HR will request a background check.
- The employee receives an email with a link that opens a window requesting that they authorize the background check and provide their information.
- The employee enters their Personal Identifying Information (PII) and signs a disclosure, consenting, and authorization form electronically.  This information is securely transferred to Checkr and allows the background check to proceed.
- Checkr processes the information and conducts all required screenings.  These usually take around 3 - 5 business days to process.
- When the report is complete, Checkr posts the report to the Checkr Dashboard.  If the employee has requested the report, a copy is also sent to them.
- HR will review the report and determine the candidate's  eligibility based on the company's  criteria. Based on that information, HR decides whether to engage the employee or initiate an Adverse Action.

## 2-12. Probation Period

A newly hired employee's  first few months on the job are critical. This is a time of learning about the Company, expectations, and about the duties of your new position. Training and feedback on progress and performance are crucial to your success.

The first 90 calendar days of employment are considered the Probation Period. This is intended to provide a new employee with the opportunity to determine whether the position meets their expectations and to demonstrate their ability to achieve a satisfactory level of performance. Either the employee or employer may end the employment relationship at any time during the Probation Period, with or without advance notice.

Your Probation Period may be extended if the Company decides that such an extension is appropriate.

## 2-13. Performance Review

Depending on the employee's position and classification, Checkmate.com, Inc. endeavors to review performance annually. However, a positive performance evaluation does not guarantee an increase in salary, a promotion or continued employment. Compensation increases and the terms and conditions of employment, including job assignments, transfers, promotions, and demotions, are determined by and at the discretion of management.

In addition to these formal performance evaluations, the Company encourages employees and supervisors to discuss job performance on a frequent and ongoing basis.

## 2-14. Progressive Discipline Policy

ItsaCheckmate (IACM) expects employees to comply with the Company's  standards of behavior and performance and to correct any noncompliance with these standards.

Under normal circumstances, IACM endorses a policy of progressive discipline in which it attempts to provide employees with notice of deficiencies and an opportunity to improve.  IACM does, however, retain the right to administer discipline in any manner it sees fit. This policy does not modify the status of employees as employees-at-will or in any way restrict the Company's right to bypass the disciplinary procedures suggested.

**Procedure**

The following steps are suggested in the discipline procedure. All steps should be documented in the employee's personnel file.

**Step 1: Informal Discussion**

When a performance problem is first identified, the nature of the problem and the action necessary to correct it should be thoroughly discussed with the employee. Send the employee a follow-up email with an overview of the conversation and agreed-upon expectations.

**Step 2: Counseling and Verbal Warning**

If a private informal discussion with the employee has not resulted in corrective action, following a thorough

investigation, the manager should meet with the employee and document the verbal conversation on the disciplinary action form. The following topics will need to be discussed during the verbal; (a) review the problem, (b) permit the employee to present his or her views on the problem, (c) advise the employee that the problem must be corrected, (d) inform the employee that failure to correct the problem will result in further disciplinary action which may include discharge. The Manager will issue the Disciplinary Action Form to the employee via DocuSign.

**Step 3: Written Warning**

If satisfactory performance and corrective action are not achieved under Steps 1 and 2, the manager and his or her superior should meet with the employee and issue a written warning to the employee. Written warnings will need to be reviewed and approved by Human Resources prior to presenting to ensure consistency in the Disciplinary Action process. The Manager will issue the Disciplinary Action Form to the employee via DocuSign.

The written warning must include a statement indicating that the employee may be subject to additional discipline, up to and including termination, if immediate and sustained corrective action is not taken in the consequences section of the Disciplinary Action Form. A formal performance improvement plan (PIP) requiring the employee's  immediate and sustained corrective action will be issued within five (5) business days of the Step 3 meeting. Managers are to work with HR when creating the PIP to ensure it is detailed, measurable, and include time frames for expectations to be met. The Manager will issue the Disciplinary Action Form to the employee via DocuSign.

**Step 4: Final Written Warning and Possible Suspension**

If satisfactory performance and corrective action is not achieved under Steps 1,2 and 3, the manager and his or her manager should meet with the employee and issue a final written warning. Written final warnings will need to be reviewed and approved by Human Resources prior to presenting to ensure consistency in the Disciplinary Action process. The Manager will issue the Disciplinary Action Form to the employee via DocuSign.

Some performance, conduct, or safety incidents are so problematic that the most effective action may be the temporary removal of the employee from the workplace. Managers have the authority to temporarily remove employees from the workplace, with or without pay, if approved in advance by the Head of the Department and the Human Resources Director. An exempt employee generally may not be suspended without pay for less than a full day, and the suspension must be related to written workplace conduct rules applicable to all employees, e.g., such as a written policy prohibiting sexual harassment or workplace violence.

In compliance with the Fair Labor Standards Act (FLSA), unpaid suspension of salaried/exempt employees is reserved for serious workplace safety or conduct issues. HR will provide guidance to ensure discipline is administered without jeopardizing the FLSA exemption status.

Pay may be restored to the employee if an investigation of the incident or infraction absolves the employee of wrongdoing.

**Step 5: Termination due to failure to improve**

Failure to improve performance or behavior after the written warning or suspension can result in termination. This is the final and most serious step in the progressive discipline process. Generally, IACM will try to exercise the progressive nature of this policy by first providing warnings, and possible PIP, then issuing a final written warning or suspending the employee from the workplace before proceeding to a recommendation to terminate employment. However, IACM reserves the right to combine and skip steps depending on the circumstances of each situation and the nature of the offense. Furthermore, employees may be terminated

without prior notice or disciplinary action.

Management's recommendation to terminate employment must be approved by human resources (HR) and the division director or designate. Final approval may be required from the CEO or designate.

The progressive disciplinary procedures described above may also be applied to an employee who is experiencing a series of unrelated problems involving job performance or behavior.

**Appeals Process**

Employees will have the opportunity to present information to dispute information management has used to issue disciplinary action. The purpose of this process is to provide insight into extenuating circumstances that may have contributed to the employee's performance or conduct issues while allowing for an equitable solution.

If the employee does not present this information during any of the step meetings, he or she will have five business days after each of those meetings to present such information.

**Performance and Conduct Issues Not Subject to Progressive Discipline**

Behavior that is illegal is not subject to progressive discipline and may result in immediate termination. Such behavior may be reported to local law enforcement authorities.

Similarly, theft, substance abuse, intoxication, fighting, and other acts of violence at work are also not subject to progressive discipline and may be grounds for immediate termination.

**Documentation**

The employee will be provided copies of all progressive discipline documentation, including all PIPs. The employee will be asked to sign copies of this documentation via DocuSign attesting to his or her receipt and understanding of the corrective action outlined in these documents.

Copies of these documents will be placed in the employee's official personnel file.

## 2-15. Open Door Policy

All employees have the opportunity to express ideas and opinions to management. The Company believes that open communication is essential to a successful work environment, as well as to the Company's success. All employees may express ideas and opinions directly to Company management. Employees who would like to bring an idea or suggestion to the Company's attention, or just simply wishes to discuss an issue not covered by a separate reporting procedures, are always welcome to send an email or make a call to Human Resources.

## 2-16. Working Hours and Schedule

Checkmate.com, Inc. normally is open for business from 8:00 am to 5:00 pm, Monday through Friday.

Employees will be assigned a work schedule and will be expected to begin and end work according to the schedule. To accommodate the needs of the business, at some point Checkmate.com, Inc. may need to change individual work schedules on either a short-term or long-term basis.

Employees will be provided meal and rest periods as required by law. A supervisor will provide further details.

## 2-17. Timekeeping Procedures

Employees must record their actual time worked for payroll and benefit purposes. Non-exempt employees must record the time work begins and ends, as well as the beginning and ending time of any departure from work for any non-work-related reason, on forms as prescribed by management.

Altering, falsifying or tampering with time records is prohibited and subjects the employee to discipline, up to and including discharge.

Exempt employees are required to record their daily work attendance and report full days of absence from work for reasons such as leaves of absence, sick leave or personal business.

Non-exempt employees may not start work until their scheduled starting time.

It is the employee's responsibility to sign time records to certify the accuracy of all time recorded. Any errors in the time record should be reported immediately to a supervisor, who will attempt to correct legitimate errors.

## 2-18. Overtime

When Checkmate.com, Inc. experiences periods of extremely high activity, additional work may be required. Supervisors are responsible for monitoring business activity and requesting overtime work if it is necessary. Effort will be made to provide employees with adequate advance notice in such situations. Employees may work overtime only with prior management authorization. Any non-exempt employee who works overtime without authorization may be subject to disciplinary action, up to and including termination.

Any non-exempt employee who works overtime will be compensated at the rate of one and one-half times (1.5) their regular hourly wage for all time worked in excess of 40 hours each workweek, unless otherwise required by applicable law. Overtime pay is calculated based on actual hours worked. Paid time off, holidays, or any leave of absence will not be considered hours worked for purposes of performing overtime calculations. For purposes of calculating overtime for non-exempt employees, the workweek begins at 12 a.m. on Monday and ends 168 hours later at 12 a.m. on the following Monday.

## 2-19. Your Paycheck

Employees will be paid bi-weekly for all the time worked during the past pay period.

Payroll stubs itemize deductions made from gross earnings. By law, Checkmate.com, Inc. is required to make deductions for Social Security, federal income tax and any other appropriate taxes. These required deductions also may include any court-ordered garnishments. Payroll stubs also will differentiate between regular pay received and overtime pay received.

If there is an error in any employee's pay, the employee should bring the matter to the attention of the Head of Human Resources immediately so the Company can resolve the matter quickly and amicably.

Paychecks will be given only to the employee, unless the employee requests that they be mailed or authorizes in writing that another person may accept the check.

## 2-20. Direct Deposit

Checkmate.com, Inc. strongly encourages employees to use direct deposit. Authorization forms are available from the Head of Human Resources.

## 2-21. Salary Advances

Checkmate.com, Inc. does not permit advances on paychecks or against accrued paid time off. Advance pay for vacation must be requested in writing at least two weeks prior to the vacation period.

## 2-22. Your Employment Records

In order to obtain their position, employees have provided personal information, such as address and telephone number. This information is contained in their personnel file.

Employees should keep their personnel file up to date by informing their Human Resources Representative of any changes. Employees also should inform their Human Resources Representative of any specialized training or skills they acquire, as well as any changes to any required visas. Unreported changes of address, marital status, etc. can affect withholding tax and benefit coverage. Further, an "out of date" emergency contact or an inability to reach employees in a crisis could cause a severe health or safety risk or other significant problem.

## 2-23. Record Retention

Checkmate.com, Inc. acknowledges its responsibility to preserve information relating to litigation, audits and investigations. Failure on the part of employees to follow this policy can result in possible civil and criminal sanctions against the Company and its employees and possible disciplinary action against responsible individuals (up to and including discharge of the employee). Each employee has an obligation to contact the CEO to inform them of potential or actual litigation, external audit, investigation or similar proceeding involving the Company that may have an impact on record retention protocols.

## 2-24. Data Retention and Archiving

The purpose of this policy is to provide an organization-wide policy framework to govern management decisions on whether a particular document (or sets of documents, including electronic versions) should either be:

1. *Retained* - and if so the format of retention; or
2. *Disposed of* - and if so the time and method

Note: this policy is not concerned with the disposal or retention of unused materials (e.g., stocks of paper, unused forms, and duplicated documents)

**Overview:**

In the course of carrying out its various functions and activities, ItsaCheckmate collects information from

34

individuals and external organizations and generates a wide range of data/information which is stored throughout various systems and applications (Email, Slack, Asana, Confluence, Tovuti, Onehub, etc.).

a) These records include (but are not limited to):

- Data received from financial institutions
- Communications which have been sent out or received
- Financial records
- Contact lists
- Contracts
- Email communications and attachments
- Photos and/or graphic representations

Many of the above documents can be retained either as physical paper records or in electronic form.

b) Retention of specific documents may be necessary to:

- Fulfill statutory or other regulatory requirements
- Evidence events/agreements in the case of disputes
- Meet operational needs
- Ensure the preservation of documents of historic or other value

c) The untimely destruction of documents could cause ItsaCheckmate:

- Operational problems
- Difficulty in defending litigious claims
- Reputational damage
- Failure to adhere to best practices and policy on data/document retention

Conversely, the permanent retention of all documents is undesirable, and appropriate disposal is to be encouraged for the following reasons:

- To avoid unnecessary/excessive use of storage space (electronic or physical)
- Indefinite retention of personal data may be unlawful
- Reduction of fire risk (in the case of paper records)
- To keep records and office accommodation uncluttered

Best practices in records management emphasizes the importance of organizations having in place systems for the timely and secure disposal of documents and/or records that are no longer required for business purposes.

**Retention/Disposal Procedures:**

All decisions to retain or dispose of documents should act in accordance with the data retention/disposal procedures. The following are parameters of the retention/disposal procedure:

35

- No document should be disposed of unless its purpose and relevance has been considered in relation to its original objective.
- *Table 1* (shown below) will be referenced prior to making retention or disposal decisions. Table 1 provides guidance on recommended and mandatory minimum retention periods for specific classes of documents/records. If there is any uncertainty, the document/process owner will be consulted prior to carrying out disposal activities.
- When retention periods for documents expire, reviews shall always be completed prior to making disposal decisions. Disposal reviews do not need to be detailed or time-consuming but will always result in a retention decision.
- When a decision is made to dispose of documents, consideration should be given to the method of disposal (see *Section 4* below).

**Disposal of Documents/Records:**

ItsaCheckmate Data and Ach Policy describes the Company's policy regarding the secure disposal of confidential information.

EMPLOYEES SHALL ACCOUNT FOR THE FOLLOWING CONSIDERATIONS WHEN SELECTING ANY METHOD OF DISPOSAL:???

- Paper documents or removable media (CDs, DVDs, discs, etc.) containing personal data or confidential information *shall not* be binned or deposited in personal or public disposal bins.
  - Doing so could result in the unauthorized disclosure of such information to third parties and render ItsaCheckmate liable to action under law.
  - Sensitive documents should be destroyed on-site or placed into authorized disposal locations; if there are questions, please contact the CITO or Security Officer.

- Deletion - if steps are taken to make data virtually impossible to retrieve, then this will be regarded as equivalent to deletion.
  - If there are questions for procedures to make data unretrievable, please contact the CITO or Security Officer.
- Recycling - wherever practicable, disposal should promote recycling, in-line with ItsaCheckmate's overall commitment to the environment.

**Document Retention:**

ItsaCheckmate staff should be aware that data processed for any purpose must not be kept for longer than is necessary for that purpose. Retaining documents or records that contain personal or proprietary information beyond the length of time necessary for the purpose for which that data was obtained is not permitted.

The law contains no interpretive position on this provision. It is a matter for reasonable judgment and common sense as to how long personal data shall be retained and is governed by [Policy or SLA].

In many instances, the retention of personal data will be necessary, and thus justified for a significant period.

36

This is to the discretion of the owner of the document and senior management stakeholder.

**E-Mail Retention:**

Not only does the storage of large numbers of emails consume valuable server resources, but if the saved messages refer to individuals, then they may also fall under various governmental regulations. This means that the subject of the message may have the right to request access to his or her email. Increasingly, courts are also asking organizations to compile data held in the form of emails as evidence in court cases. Emails should therefore not be retained for longer than is required.

Please see ItsaCheckmate's Email Retention Policy for specific details on the retention of email. It is imperative that emails are regularly purged unless it is required to retain them.

Further guidance on the retention of documents is available from the Information Security Department. They can also advise you on good housekeeping practices regarding the storing and deleting of emails.

**Key Disposal/Retention Considerations Criteria Checklist:**

DETERMINATION OF WHETHER THE DOCUMENT/RECORD SET HAS BEEN CLASSIFIED

As a first step, the nature/contents of any documents or records being considered for disposal should be evaluated. No document(s) should be earmarked or designated for disposal unless this has been done. As far as existing documents or records are concerned, it follows that the above can only be achieved by inspection. The process may only take a few moments.

Nonetheless it is a skilled task depending on the complexity of the document(s) concerned and should only be undertaken by ItsaCheckmate's personnel that possess sufficient operational knowledge to enable them to identify the document concerned and its function within Company Any decision to the effect that future documents of a specified description be disposed of on the expiration of a specified retention period should be an informed one, i.e. taken with a full appreciation and understanding of the nature and function of the document/records.

If document appraisal is inadvertently overlooked or carried out negligently, or by an employee who lacks the necessary background operational knowledge, ItsaCheckmate runs the risk of important documents being destroyed in error.

RETENTION REQUIREMENTS TO FULFILL STATUTORY OR OTHER REGULATORY REQUIREMENTS

There is very little specific legislation that stipulates mandatory retention periods for documents held by ItsaCheckmate. However, staff should seek advice if they believe that there may be legislation which, either directly or indirectly, imposes minimum retention periods on the documents they are handling. For instance, minimum retention periods for certain financial records may be applicable.

RETENTION REQUIRED TO EVIDENCE EVENTS IN THE CASE OF DISPUTE?

On rare occasions, ItsaCheckmate may become involved in disputes with third parties. Such disputes, if not satisfactorily resolved, can result in reputational damage, and the dissatisfied party potentially bringing legal proceedings against ItsaCheckmate. Conversely, ItsaCheckmate may wish to file legal proceedings against an individual or organization, e.g., to recover an unpaid debt, or because of faulty

workmanship.

Where a dispute arises, or litigation has begun, it is important that ItsaCheckmate has access to all correspondence and other documentation that is relevant to the matter.

The starting point, therefore, is that the retention period is the length of time that must elapse before a claim is barred. Most potential legal claims are statute barred on the typical expiration of 7 years. For this reason, many organizations consider it prudent to retain files/records for a period of 7 years from the date when the subject matter was completed.

It is important, though, to keep in mind that during ItsaCheckmate's everyday business, large masses of document actions are generated that serve no purpose after relatively short periods of time. Many documents will relate to completed projects where, realistically, the risk of subsequent litigation or other dispute is minimal, if not non-existent. Long-term retention of such documents is counterproductive. ItsaCheckmate staff should be prepared to carry out a risk analysis, with a view to disposal of such documents within a shorter period of than the 7-year time frame.

## RETENTION REQUIREMENTS TO MEET OPERATIONAL ACTIVITIES

In some cases, retention may be desirable (whether permanent or otherwise), even though no minimum retention period applies or has expired. Staff should be aware of the risk of discarding documents or records that might be useful for future reference purposes (e.g., training), as precedents, or for performance management (performance indicators, benchmarking, and comparison exercises). A professional judgment needs to be made as to the usefulness of documents prior to making retention decisions by both process owner and retention custodian/Security Officer].

## RETENTION REQUIREMENTS OF INFORMATION WITH HISTORIC INTEREST OR INTRINSIC VALUE?

It is possible that some documents/records may be of historic interest. Though the possibility exists that a document falls within this description, appropriate inquiries should always be made before taking any further action. The process owner should be contacted for advice and guidance in this instance. Even if the document is of historical or monetary value, disposal rather than retention by ItsaCheckmate may well be the appropriate option (e.g., by way of transfer to a third party).

## SUGGESTED RETENTION PERIODS

| Type of Record | Suggested Retention Period |
|---|---|
| Accident Record | 3 years after end of investigation |
| Any information private to any individual | Destroy when no longer required |
| Bank records | 7 years |
| Company records | Permanent |
| CVs and job applications not hired | 6 months after notification |
| Disciplinary records | 5 years following end of employment |
| Employer's liability insurance certificate | 40 years |
| General email correspondence | 6 months unless likely it will be needed to retain for longer |
| Historical records of intrinsic value | Permanent |
| Medical and safety records | 7 years |
| Personnel files | 5 years following end of employment |
| Property records, trust deeds | Permanent |
| Redundancy records | 6 years after redundancy |
| Sickness/sick pay records | 3 years |
| Slack messages | 5 years |
| Software and hardware inventory details | 7 years |
| Tax records - self-employed or partnership | 5 years from last tax date |
| Tax records-companies | 6 years from last accounting period |

## 2-25. Safe Harbor Policy for Exempt Employees

It is Checkmate.com, Inc.'s  policy and practice to accurately compensate employees and to do so in compliance with all applicable state and federal laws. To ensure proper payment and that no improper deductions are made, employees must review pay stubs promptly to identify and report all errors.

Those classified as exempt salaried employees will receive a salary which is intended to compensate them for all hours they may work for Checkmate.com, Inc. This salary will be established at the time of hire or classification as an exempt employee. While it may be subject to review and modification from time to time, such as during salary review times, the salary will be a predetermined amount that will not be subject to deductions for variations in the quantity or quality of the work performed.

Under federal and state law, salary is subject to certain deductions. For example, unless state law requires otherwise, salary can be reduced for the following reasons:

- full-day absences for personal reasons;
- full-day absences for sickness or disability if the deduction is made in accordance with a bona fide plan, policy or practice of providing wage replacement benefits for such absences (deductions also may be made for the exempt employee's full-day absences due to sickness or disability before the employee has qualified for the plan, policy or practice or after the employee has exhausted the leave allowance under the plan);
- full-day disciplinary suspensions for infractions of our written policies and procedures;
- Family and Medical Leave Act absences (either full- or partial-day absences);
- to offset amounts received as payment from the court for jury and witness fees or from the military as military pay;
- the first or last week of employment in the event the employee works less than a full week; and
- any full work week in which the employee does not perform any work.

Salary may also be reduced for certain types of deductions such as a portion of health, dental or life insurance premiums; state, federal or local taxes; social security; or voluntary contributions to a 401(k) or pension plan.

In any work week in which the employee performed any work, salary will <u>not</u> be reduced for any of the following reasons:

- partial day absences for personal reasons, sickness or disability;
- an absence because the Company has decided to close a facility on a scheduled work day;
- absences for jury duty, attendance as a witness, or military leave in any week in which the employee performed any work (subject to any offsets as set forth above); and
- any other deductions prohibited by state or federal law.

However, unless state law provides otherwise, deductions may be made to accrued leave for full- or partial-day absences for personal reasons, sickness or disability.

If employees believe they have been subject to any improper deductions, they should immediately report the matter to a supervisor. If the supervisor is unavailable or if the employee believes it would be inappropriate to contact that person (or if the employee has not received a prompt and fully acceptable reply), they should immediately contact  the Head of Human Resources or any other supervisor in Checkmate.com, Inc. with whom the employee feels comfortable.

## 2-26. Training and Development Policy

The purpose of this policy is to outline the guidelines and procedures for continuous professional development (CPD) at ItsaCheckmate. All employees receive general orientation training when beginning their tenure. This policy aims to ensure that employees have access to relevant, high-quality training opportunities that contribute to their professional growth, enhance their skills, and align with the company's goals.

**Scope**
This policy applies to all employees of ItsaCheckmate, regardless of their position or department.

- *Note: This does not apply to employees who have given their notice of resignation.*

**Training Classifications**

**1. Mandatory Compliance Training:**

All employees are required to complete mandatory compliance training as designated by relevant laws, regulations, and company policies. This training ensures that employees are well-informed about legal and ethical obligations, workplace safety, and other critical compliance matters. The Training Department or Human Resources Department will oversee the scheduling and completion tracking of these trainings.

**2. Internal Training and Workshops:**

The Training Department and Human Resources Department will collaborate to organize internal training sessions and workshops. These sessions will focus on company-specific processes, tools, and skills that are vital for an employee's growth within the organization.

**3. Elective Professional Development Training (WorkRamp):**

ItsaCheckmate provides access to the WorkRamp platform, where employees can access a range of professional development courses. Employees are encouraged to take advantage of these resources to enhance their skills, stay updated with industry trends, and improve their overall performance.

**4. Online Training:**

In addition to WorkRamp, employees are encouraged to explore online training resources from reputable platforms that align with their professional goals and career path. Costs incurred for these courses will be evaluated based on cost-effectiveness and relevance.

**5. External Courses and Certifications:**

For more advanced and specialized training needs, employees may propose external courses, workshops, or certification programs. The approval of external training requests will be based on factors such as cost-effectiveness, alignment
with current or future roles, and potential benefits to the company.

**Training Approval Process:**

1. Employees request training needs and aspirations from their immediate supervisors. Based on the employee's current role, performance, and career path, supervisors will evaluate the relevance of the training to the company's objectives.
2. The Supervisor will discuss the employee's request and supporting information with the Department Head. They will determine if the training is beneficial to the employees' needs and growth within the company.

- If it is determined the training is not beneficial to the employee or company, the supervisor will inform the employee.
- If it is determined the training is beneficial to the employee and company, the Department Head will discuss the request and cost associated with the training program with the CEO.
- If the CEO approves the request and cost associated with the training program, their Supervisor will notify the employee and make arrangements for the training and time away from work.

41

*Note: If the Supervisor is requesting the employee's training, they will receive approval from their Department Head and the CEO if a cost is involved.*

**Cost Coverage**

A. ItsaCheckmate will cover the costs of mandatory compliance training, WorkRamp courses, and internal training sessions.

B. For external courses, workshops, and certifications, the company will evaluate the cost-effectiveness and alignment with the employee's current or future role. Partial or full reimbursement may be provided based on these criteria.

**Record Keeping and Reporting**

The Human Resources Department will maintain records of all completed Mandatory Federal and State compliance along with all external training and certifications. The Training Department will maintain records within WorkRamp for all other training.

It is requested that when certifications are completed, the employee reports the relevant information to Human Resources to update the certification tracking sheet.

**Policy Review:**

This policy will be reviewed annually to ensure its effectiveness and alignment with the company's evolving goals and industry trends.

**Conclusion:**

ItsaCheckmate is dedicated to investing in the growth and development of its employees. This Training and Development Policy aims to facilitate the acquisition of new skills, knowledge, and competencies while fostering a culture of learning and professional advancement. Through a combination of mandatory compliance training, elective courses, professional development opportunities, and certifications, we believe that our employees will contribute more effectively to the company's success while achieving their individual career goals.

## Section 3 - Benefits

## 3-1. Benefits Overview

In addition to good working conditions and competitive pay, it is Checkmate.com, Inc.'s policy to provide a combination of supplemental benefits to all eligible employees. In keeping with this goal, each benefit program has been carefully devised. These benefits include time-off benefits, such as vacations and holidays, and insurance and other plan benefits. We are constantly studying and evaluating our benefits programs and policies to better meet present and future requirements. These policies have been developed over the years and continue to be refined to keep up with changing times and needs.

The next few pages contain a brief outline of the benefits programs Checkmate.com, Inc. provides employees and their families. Of course, the information presented here is intended to serve only as guidelines.

The descriptions of the insurance and other plan benefits merely highlight certain aspects of the applicable plans for general information only. The details of those plans are spelled out in the official plan documents, which are available for review upon request from the CEO. Additionally, the provisions of the plans, including eligibility and benefits provisions, are summarized in the summary plan descriptions ("SPDs") for the plans (which may be revised from time to time). In the determination of benefits and all other matters under each plan, the terms of the official plan documents shall govern over the language of any descriptions of the plans, including the SPDs and this handbook.

Further, Checkmate.com, Inc. (including the officers and administrators who are responsible for administering the plans) retains full discretionary authority to interpret the terms of the plans, as well as full discretionary authority with regard to administrative matters arising in connection with the plans and all issues concerning benefit terms, eligibility and entitlement.

While the Company intends to maintain these employee benefits, it reserves the absolute right to modify, amend or terminate these benefits at any time and for any reason.

If employees have any questions regarding benefits, they should contact the CEO.

## 3-2. Paid Holidays

Full-time employees will be paid for the following holidays:

New Year's Day

Memorial Day

Independence Day

Labor Day

Thanksgiving Day

Day after Thanksgiving

Christmas Eve

43

Christmas Day

When holidays fall or are celebrated on a regular work day, hourly employees will receive one (1) day's pay at their regular straight-time rate, and an additional payment of straight-time for the actual time they work that day. Salaried employees who are called in or scheduled to work on a holiday will receive a floating holiday to be used at a later date.

If a holiday falls within an eligible employee's approved FTO period, the eligible employee will be paid for the holiday instead of the approved FTO day.

If a holiday falls within a jury duty or bereavement leave, the eligible employee will be paid for the holiday instead of jury duty or bereavement leave.

FTO or Unpaid Time Off may be granted to employees who desire to observe a religious holiday that is not recognized by the Company, provided undue hardship is not introduced to the company.

## 3-3. Flex Time Off

Checkmate.com, Inc. appreciates how hard employees work and recognizes the importance of providing time for rest and relaxation.

US employees enjoy an unlimited Flexible Time Off or FTO policy. This means employees do not accrue nor are they allotted an amount of FTO time based upon hours worked or tenure with the organization. Employees who have been employed for at least three (3) consecutive months may be eligible for FTO.

We recognize that our employees deserve and need their time off for renewal and rejuvenation. That said below are the conditions for utilizing IACM's Unlimited FTO policy.

- To be eligible for this benefit you must be employed by IACM for a minimum of 30 days.
- All FTO must be scheduled and approved by your manager in advance of taking the time off, whenever possible.
- Employees should understand that due to staffing needs, sometimes, not all leave requests can be honored. Advance requests are still subject to the appropriate approval.
- Employees are required to meet all established performance goals despite the absences.
- Except for those on protected leave (such as state or federal family and medical leave), if an eligible employee is unable to meet the expectations outlined above, IACM reserves the right to temporarily revoke unlimited leave.
- Continued abuse of this leave could result in disciplinary action, which may include separation of employment.

## 3-4. Lactation Accommodations

Checkmate.com, Inc. will provide a reasonable amount of break time to accommodate employees desiring to express breast milk for their child, in accordance with and to the extent required by applicable law. The break time, if possible and permitted by applicable law, must run concurrently with rest and meal periods already provided. If the break time cannot run concurrently with rest and meal periods already provided, the break time will be unpaid, subject to applicable law.

The Company may not be able to provide additional break time if doing so would seriously disrupt the

Company's operations, subject to applicable law.

The Company will make reasonable efforts to provide employees with the use of a room or location in close proximity to the employee's work area, other than a bathroom, to express milk in private. This location may be the employee's private office, if applicable. Please consult the CEO with questions regarding this policy.

Employees should advise management if they need break time and an area for this purpose. Employees will not be discriminated against or retaliated against for exercising their rights under this policy.

## 3-5. Workers' Compensation

On-the-job injuries are covered by Checkmate.com, Inc.'s Workers' Compensation Insurance Policy, which is provided at no cost. If employees are injured on the job, no matter how slightly, they should report the incident immediately to their supervisor. Failure to follow Company procedures may affect the ability of employees to receive Workers Compensation benefits.

This is solely a monetary benefit and not a leave of absence entitlement. Employees who need to miss work due to a workplace injury must also request a formal leave of absence. See the Leave of Absence sections of this handbook for more information.

## 3-6. Jury Duty

Checkmate.com, Inc. realizes that it is the obligation of all U.S. citizens to serve on a jury when summoned to do so. All employees will be allowed time off to perform such civic service as required by law. Employees are expected, however, to provide proper notice of a request to perform jury duty and verification of their service.

Employees also are expected to keep management informed of the expected length of jury duty service and to report to work for the major portion of the day if excused by the court. If the required absence presents a serious conflict for management, employees may be asked to try to postpone jury duty.

Employees on jury duty leave will be paid for their jury duty service in accordance with state law; employees will be paid their full salary unless they are on leave for an entire workweek during which no work is performed. If so, they may use FTO paid time off for leave taken under this policy.

## 3-7. Bereavement Leave

The death of a family member is a time when employees wish to be with their families. If the employee is full-time and loses a close relative, the employee will be allowed paid time off of up to four (4) workdays to assist in attending to obligations and commitments. For the purposes of this policy, a close relative includes a spouse, domestic/civil union partner, child, parent, sibling, aunt, uncle, cousin, in-laws or any other relation required by applicable law. Paid leave days only may be taken on regularly scheduled, consecutive workdays following the day of death. Employees must inform their supervisor prior to commencing bereavement leave. In administering this policy, Checkmate.com, Inc. may require verification of death.

Employees should follow individual applicable state laws.

## 3-8. Voting Leave

In the event employees do not have sufficient time outside of working hours to vote in a statewide election, if required by state law, the employee may take off enough working time to vote. Such time will be paid if required by state law. This time should be taken at the beginning or end of the regular work schedule. Where possible, supervisors should be notified at least two (2) days prior to the voting day.

## 3-9. Insurance Programs

Full-time employees may participate in Checkmate.com, Inc.'s insurance programs. Under these plans, eligible employees will receive comprehensive health and other insurance coverage for themselves and their families, as well as other benefits.

Upon becoming eligible to participate in these plans, employees will receive summary plan descriptions (SPDs) describing the benefits in greater detail. Please refer to the SPDs for detailed plan information. Of course, feel free to contact the CEO with any further questions.

## 3-10. Long-Term Disability Benefits

Full-time employees are eligible to participate in the Long-Term Disability plan, subject to all terms and conditions of the agreement between Checkmate.com, Inc. and the insurance carrier.

This is solely a monetary benefit and not a leave of absence. Employees who will be out of work must also request a formal leave of absence. See the Leave of Absence sections of this handbook for more information.

## 3-11. Salary Continuation

Checkmate.com, Inc. provides enhanced monetary short-term disability benefits to full-time employees. These enhanced monetary benefits are inclusive of any monetary workers' compensation or statutory short-term disability benefits.

This is not a leave of absence provision. Employees who will be out of work must request a leave of absence. See the Leave of Absence sections of this handbook for more information. Employees will be required to submit medical certification as requested by Checkmate.com, Inc. Required medical certification under this policy may differ from the medical certification required for any leave of absence requested.

## 3-12. Employee Assistance Program

Checkmate.com, Inc. provides the Employee Assistance Program, which offers qualified counselors to help employees cope with personal problems they may be facing. Further details can be obtained through Human Resources.

## 3-13. Retirement Plan

Eligible employees are able to participate in Checkmate.com, Inc.'s retirement plan. Plan participants may make pre-tax contributions to a retirement account.

Upon becoming eligible to participate in this plan, employees will receive an SPD describing the plan in greater detail. Please refer to the SPD for detailed plan information. Of course, feel free to speak to the CEO if there are any further questions.

## 3-14. Service/Work Anniversary Awards

### Service/Work Anniversary Awards-US

Purpose:

The purpose of this policy is to recognize the achievement of certain milestone tenures.

Eligibility:

All active US employees and freelancers who have accrued 3, 5, 7, 10, 12 years of service are considered eligible under this policy unless otherwise stated.

1. All Team Members are eligible, based on the completion of the required tenure.
2. The policy is effective starting January 1, 2023. All Team Members who complete the milestones in 2023 moving forward will be eligible under this policy. January achievers will receive the payout in February.
3. The tenure to be considered has to be uninterrupted service (i.e. any Team Member who has resigned/left the organization and is later rehired, only the latter / latest tenure would be counted).
4. Payouts are issued at the completion of the milestone.
5. In any year, the awards can be suspended by the CEO but with prior notice being given to the Management team. The suspension would be for the entire year.
6. The amount of the payout would count as income and, therefore, is taxable.
7. Team Members who terminate employment prior to their anniversary date are not eligible for service acknowledgement.